UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X **Docket#**
UNITED STATES OF AMERICA,     : 22-mj-01005(RLM)
                              :
                              :
    - versus -                : U.S. Courthouse
                              : Brooklyn, New York
KARA STERNQUIST,              :
                              : September 29, 2022
              Defendant       : 11:17 a.m.
------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR A BAIL APPLICATION
BEFORE THE HONORABLE RAMON E. REYES
UNITED STATES MAGISTRATE JUDGE

**A  P  P  E  A  R  A  N  C  E  S:**


**For the Government**:        **Breon S. Peace, Esq.**
                              United States Attorney


                              BY:  **Frank Turner Buford, Esq.**
                              Assistant U.S. Attorney
                              271 Cadman Plaza East
                              Brooklyn, New York 11201


**For the Defendant**:         **Allegra W. Glashausser, Esq.**
                              **Michael Padden, Esq.**
                              Federal Defenders of New York
                              One Pierrepont Plaza, 16th Fl.
                              Brooklyn, NY 11201




**Transcription Service**:     **Transcriptions Plus II, Inc.**
                              61 Beatrice Avenue
                              West Islip, New York 11795
                              RL.Transcriptions2@gmail.com



Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1          THE CLERK:  This is a Criminal Cause for a Bail

2   Application, *USA v. Kara Sternquist*.  The case number is

3   22-1005-M.

4          May I have the parties state their name for the

5   record?  Appearing for the government?

6          MR. BUFORD:  Good morning, your Honor.  Turner

7   Buford and Andy Palacio for the United States.

8          MR. PALACIO:  Good morning.

9          THE CLERK:  Thank you.  Appearing for Ms.

10  Sternquist?

11         MR. KELLEHER:  Good morning, your Honor.

12  Allegra Glashausser representing Ms. Sternquist.  Ms.

13  Sternquist is on the line from the hospital.

14         THE CLERK:  Thank you.

15         THE COURT:  Good morning.

16         THE CLERK:  And I'm sorry, lastly, may I have

17  the defendant state her name for the record?  Kara, can

18  you --

19         THE DEFENDANT:  Kara Sternquist.

20         THE CLERK:  -- state your name for the record?

21  Unmute your devices.

22         THE COURT:  She did.  She just did.

23         THE CLERK:  Oh, she did.  All right.  Okay.

24  Thank you.  Okay, Judge.

25         THE COURT:  This is your application, Ms.

3

Proceedings

1    Glashausser, so go ahead.

2            MS. GLASHAUSSER:  Thank you, your Honor.  As

3    your Honor knows, Kara Sternquist is currently in the

4    hospital.  She's been there for -- this is her third day

5    after seemingly receiving woefully inadequate medical

6    care while incarcerated at MDC.

7            I would be making this bail application in any

8    event but what has happened over the last week while Ms.

9    Stern is incarcerated at MDC I think make it more urgent

10   that your Honor grant this bail application.  Ms.

11   Sternquist needs ongoing medical care that she cannot

12   receive at MDC and that she should receive in the

13   community.

14           We have a strong bond package that I think

15   addresses the issue that the government raises in their

16   letter.  We have two suretors who have known Ms.

17   Sternquist for a long time.  Also present in the audience

18   is Moira Meltzer-Cohen, a lawyer who is a member of our

19   bar in the Eastern District of New York and we're

20   proposing that Ms. Sternquist live with her, with Moira

21   Meltzer-Cohen and her partner at their apartment.

22           Ms. Sternquist is not a risk of flight or a

23   risk of danger.  She is a long-term resident of New York

24   City.  She was working the same job for approximately

25   seven years before her arrest.  And there's no history of

4

Proceedings

1   her fleeing or invading law enforcement.  Particularly

2   given her medical condition right now, there's also not a

3   practical reality that Ms. Sternquist would even have the

4   ability to flee if she had the desire to, which she

5   doesn't.

6          Your Honor, I hesitate to go into her medical

7   condition on the record unless your Honor would like to

8   hear about it.  But she has limited mobility in addition

9   to her emergency situation right now.

10          THE COURT:  I would like to hear about the

11   limited mobility because that does impact in my mind any

12   potential risk of flight --

13          MS. GLASHAUSSER:  Okay, your Honor.  Yes, of

14   course.

15          THE COURT:  -- because you've got to be able to

16   move to flee.

17          MS. GLASHAUSSER:  Correct.  So currently Ms.

18   Sternquist, my understanding is she cannot get out of her

19   bed.  The records show that she is bedridden.  I have

20   visited her.  She is in an extreme amount of pain.  I

21   don't believe she can even sit up.  Before the current

22   emergency situation, she had partial paralysis in the

23   bottom half of her body after a spinal surgery in spring

24   of this year.  She had a rare syndrome, the name is in my

25   letter, where for whatever reason the spinal nerve is

5

Proceedings

1  compressed and can cause partial paralysis.  She's unable

2  to do any of her toileting on her own.  She wears diapers

3  and has a catheter.  The catheter situation is what led

4  to her being in the emergency room currently.  But even

5  when she is doing well, even aside of her current

6  emergency medical situation, it causes her extreme pain

7  and limited mobility.  She believes she needs a

8  wheelchair really to get around.  MDC assessed her as

9  needing a four wheeled walker to get around.  Either way,

10  everyone agrees that her mobility is limited and it was

11  extremely -- she was very slow in moving and with pain.

12  We obviously don't know what will happen after her

13  hospital stay right now.

14           (High pitched sound in background)

15        THE COURT:  I don't know what that is.  I'm

16  sorry, I don't know what that is.

17        MS. GLASHAUSSER:  Okay.

18        THE COURT:  Never heard that before.  Do we

19  still have everyone on the phone?

20        THE DEFENDANT:  (Indiscernible) is here.

21        THE COURT:  Okay.  Thank you.  I'm sorry.

22        MS. GLASHAUSSER:  So she certainly isn't going

23  to be better after her current ER stay.  What they're

24  dealing with now is whether there's permanent damage to

25  her genital area because of how the catheter was

6

Proceedings

1   misplaced when MDC changed the catheter right before she

2   went to the emergency room.  She's been having numerous

3   tests, more than one CT scan.  I believe the sonogram is

4   the other type of test that they've been doing.  And

5   they've been looking into this incredibly horrifying

6   sounding syndrome for gangrene which is a life-

7   threatening infection.  So she is in a tremendously bad

8   medical situation right now.  We don't know how long

9   she'll be at the hospital, how long the recovery will be,

10  but her mobility certainly won't be better than the

11  limited mobility she had before.

12          Additionally, shall be living with Moira

13  Meltzer-Cohen and her partner who is a nurse who

14  hopefully would be able to provide assistance at the home

15  as necessary.  We are also in contact with the VA as Ms.

16  Sternquist is a veteran in the hope that they will also

17  be able to provide medical assistance going forward after

18  she is released from the hospital.

19          But especially given her current medical

20  condition, there really can be no risk of flight.  She's

21  not going anywhere.

22          THE COURT:  And there is no -- she's at

23  Brooklyn Hospital, correct?

24          MS. GLASHAUSSER:  Right.  Yes.

25          THE COURT:  And they don't know how long she's

7

Proceedings

1   going to be there?

2           MS. GLASHAUSSER:  They don't know how long

3   she's going to be there.  When she went first arrived,

4   they said she was admitted for a minimum of two nights.

5   We're now past that time and they haven't started

6   discussing discharge.  She was moved out of the ER to a

7   room sometime yesterday.  By yesterday evening she was in

8   a room.  She's still in a room now.  We have her hospital

9   records up till yesterday afternoon.  Some of them were

10  submitted with a letter.  They are still -- she is on a

11  huge number of medications that I just Googled to see

12  what they are, all to treat infections.  The type of

13  words used in those records are things like massive

14  enlargement, rare -- excuse me, that's not from the

15  medical record.  But what's happening is something they

16  are treating extremely seriously and they do not know

17  when she'll be released yet.  The infection hasn't

18  stopped so right now it's still an emergency situation

19  and they don't know when she'll be released.

20          But what I think that the Court should be

21  thinking about is that it's important that she not be

22  released back to MDC which is how she got into the

23  hospital in the first place.  And they are just not set

24  up to provide ongoing medical care.

25          Even before the emergency currently happening,

Transcriptions Plus II, Inc.

8

Proceedings

1  she had a different type of catheter that needed to be

2  replaced regularly and because she wasn't seen by a

3  doctor for the first ten days of her stay, despite, I now

4  learned from the Court's deputy, despite two different

5  judges doing medical orders first at the initial

6  arraignment when I was not yet counsel and then again

7  when I became counsel.  She didn't see a medical doctor

8  for ten days and that lapse of time is why the removal of

9  the first catheter caused the abrasion which then led to

10  the attempt to implant a different type of catheter that

11  was, as the records say, the balloon was expanded at the

12  wrong spot.  It's extremely painful for Ms. Sternquist,

13  as I'm sure we all can imagine.  Or really I want to say

14  I really can't imagine.  She's in a tremendous amount of

15  pain.

16          THE COURT:  Mr. Buford, do you want to respond?

17          MR. BUFORD:  Yes, your Honor.  To be clear, our

18  concern is not that the defendant is a risk of flight or

19  a danger while she's hospitalized.  Obviously those

20  concerns are mitigated given her present situation.

21  However, we do think when the defendant does recover

22  there is significant risk of flight and danger to the

23  community.

24          As we pointed out in our papers, the defendant

25  has shown, not just in this case but throughout her

9

Proceedings

1  criminal history, that she has an ability to generate

2  false identification documents.  In this case,

3  identification documents to perform fraudulent law

4  enforcement credentials and not just a limited number,

5  dozens of fraudulent law enforcement credentials across a

6  variety of federal agencies that were stockpiled in her

7  apartment.

8          It's my understanding from the agent is that

9  when Ms. Sternquist was arrested she had in her

10  possession a New York State driver's license for which

11  there is no corresponding legitimate client ID, meaning

12  in all likelihood she had a fake ID on her person at the

13  time that she was arrested.

14          She's also shown a propensity to use aliases

15  not just in this case, buying firearms related equipment

16  online using another name, but also creating at least one

17  fraudulent law enforcement credential that had her

18  picture but another name on it.  Again, this is

19  consistent with her prior history where she has two

20  previous convictions for making fraudulent identification

21  documents.

22          The concern is given her ability to acquire

23  these types of implements that she could change her

24  identity on relatively short notice and flee.  There

25  s also concern, judge, and this is sort of the more acute

10

Proceedings

1  one from our standpoint, relating to the firearms.  When

2  the agents went into her apartment, they found over ten

3  guns in the process of being constructed and what

4  appeared to be a sort of workspace where those guns were

5  being assembled.  At least four of those guns appeared to

6  be fully created, two pistols and two rifles that from

7  the agents' evaluation are fully automatic.  Those are

8  about as dangerous a gun as you can have.  And with

9  fraudulent law enforcement credentials and a weapon like

10  that, you'd have the ability to get into very sensitive

11  places and hurt a lot of people very quickly.  That gives

12  us a great deal of concern.

13        Even if the defendant were not herself

14  intending to use those weapons, if she were just making

15  them for other people or transferring them, that alone

16  would be a significant danger to the community.

17        It's our understanding from the agents in its

18  early days that they had begun a search of the

19  defendant's cell phone, the one she had on her person,

20  and they observed pictures of firearms that they do not

21  believe they have recovered from the apartment which

22  raises the question of where are those guns?

23        And again, given the defendant's ability to use

24  other identities and her ability to make identification

25  documents, we're not sure what other property or stashes

                          Proceedings

1    the defendant may have.

2            With respect to the mobility, your Honor, our

3    understanding is the underlying conditions arise from the

4    surgery in March of 2022.  Since that time, the

5    defendant, as we say in the complaint, has continued to

6    acquire these identifications and these guns.  So the

7    mobility does not prohibit her from engaging in this kind

8    of conduct.  We also understand that she lived in a two-

9    story apartment at a building that has at least three or

10   four stairs you have to go up to get into and was

11   commuting regularly to her job some distance away from

12   where she resided.

13           So again, we're concerned that when she returns

14   to her previous state of health that she would be in a

15   position -- and again, our view is you don't need a lot

16   of time given the weapons that are involved here, to

17   cause a great deal of damage in a short amount of time.

18           The other thing we'll say, Judge, is we have

19   spoken to the suretors.  We don't have any concerns about

20   them being financially responsible or having moral

21   suasion over the defendant.  The one thing we would raise

22   is when we asked them whether they had visited the

23   defendant at the apartment where she was residing at the

24   invitation of defense counsel they declined to answer the

25   question.  That raises a little bit of a concern for us

Proceedings

1    in the sense that it's our understanding that going

2    forward it's likely to be a contested issue in this case

3    whether the defendant actually resides at the apartment.

4    Even that fact may be in dispute by counsel in which case

5    these two suretors may have information that would make

6    them potential witnesses down the road as to what

7    occurred.  Again, it's not necessarily disqualifying.

8    It's just we're in the early days and we don't know what

9    information they might have that could be relevant to the

10   case.  And it's the only concern we have about the

11   suretors, your Honor.

12          But taking a giant step back, we don't come to

13   the position we're taking here lightly.  We just think

14   given the weapons, given the fraudulent identification,

15   the risk is too great and that's why we're recommending

16   detention.

17          THE COURT:  All of those fraudulent

18   identifications, weapons, et cetera were seized, correct?

19          MR. BUFORD:  The ones we know about, your

20   Honor.

21          THE COURT:  What about computers and electronic

22   devices?

23          MR. BUFORD:  There were multiple computers that

24   were seized inside the apartment including multiple cell

25   phones including the one that was seized from the

13

Proceedings

1  defendant's person.  As I say, your Honor, those are
2  being processed and the review has begun but it's early
3  days for that.  I don't have sort of concrete specifics
4  to put before the Court on that.

5          THE COURT:  Okay.  And the only concern about
6  the proposed sureties is them being potential witnesses?

7          MR. BUFORD:  Yes, your Honor.

8          THE COURT:  Ms. Meltzer-Cohen lives --
9  physically tell me where it is and --

10         MS. GLASHAUSSER:  Brooklyn.

11         THE COURT:  Walk up?  Elevator building?

12         MS. GLASHAUSSER:  I believe there is one set of
13  stairs to get to the apartment so Moira Meltzer-Cohen and
14  her partner would help Ms. Sternquist get up the stairs
15  and she would then remain in the apartment.

16         THE COURT:  No objection to electronic
17  monitoring, home detention, home incarceration, whatever
18  you want to call it?

19         MS. GLASHAUSSER:  No, your Honor, so long as
20  she can get to particularly her medical appointments.  I
21  believe those are carved out from any sort of home
22  detention provision but I'm not sure.  I believe she
23  would have extensive medical needs obviously.

24         THE COURT:  No objection to one cell phone with
25  monitoring by Pretrial Services?

14

Proceedings

1          MS. GLASHAUSSER:  No, your Honor.

2          THE COURT:  What about Ms. Meltzer-Cohen being

3   a third-party custodian?

4          MS. GLASHAUSSER:  I have not discussed that

5   with Moira Meltzer-Cohen.  I could take a pause and do

6   so.  However, Moira Meltzer-Cohen is an officer of the

7   Court so in some sense -- I've never actually proposed a

8   lawyer as a suretor.  I think that --

9          THE COURT:  I don't know that -- there's no

10  obligation as an officer of the Court -- is there an

11  obligation on attorneys to report to a court when they

12  see someone violating the terms of their bond?

13         MS. GLASHAUSSER:  No, your Honor, but there

14  would be I believe an ethical obligation not to in any

15  way assist with any sort of ongoing criminal activity

16  which I think would cover what we're talking about.

17  Obviously none of us are concerned that that will happen,

18  but attorneys do have -- I can't cite the ethical rules

19  right now but there is that sort of obligation that we

20  all have as lawyers.

21         THE COURT:  Yes, there's an obligation

22  certainly not to engage in criminal activity or assist

23  someone to do that but --

24         MS. GLASHAUSSER:  Or facilitate it.

25         THE COURT:  Or facilitate it.  But observing

Proceedings

1    criminal activity or a violation of a bond, I don't know

2    that there is an obligation of an attorney to report

3    that.  So that's the obligation of a third-party

4    custodian.  If you see someone who you are a custodian of

5    violating the terms of their release which includes

6    engaging in further criminal activity, you have an

7    obligation to report that to the Court and if you don't,

8    you can be held in contempt.  So it goes beyond I believe

9    ordinary obligations, ethical obligations, of an

10   attorney.

11         Here's where I'm headed, Mr. Buford.  I don't

12   discount at all the seriousness of the charges that Ms.

13   Sternquist faces.  And I don't discount the strength of

14   the government's case at this point.  Given her current

15   medical condition and with appropriate conditions

16   including the two proposed sureties, Ms. Meltzer-Cohen as

17   a third-party custodian, residents with Ms. Meltzer-Cohen

18   and her partner, and no access to anything other than one

19   cell phone that is monitored by Pretrial along with the

20   other home incarceration and the other normal conditions

21   that we put on bonds, I think that guards against any

22   risk of flight and any danger to the community.

23         My only hesitance is I don't know enough about

24   the current medical condition and when that will be

25   resolved, if ever.  And I'm a little hesitant because

16

Proceedings

1  there is some dispute as to the extent of the lack of

2  mobility.  That's my only hesitance.

3          MR. BUFORD:  Your Honor, we can only speak to

4  what we observed and can deduce prior to the arrest.  My

5  understanding from the agents is that they did not

6  recover a wheelchair from the apartment.  And again, our

7  understanding is that while the apartment is on the first

8  floor, to enter the building you have to go up three or

9  four stairs and that once you're inside the apartment,

10  there's another staircase that goes to a downstairs

11  section of the apartment all of which we have every

12  reason to believe the defendant was able to navigate

13  prior to her current medical situation.

14          In addition, it's our understanding from

15  speaking with the defendants employer that she was

16  working full time at their location which I think is on

17  118th Street.  The apartment is in Hell's Kitchen,

18  meaning that the defendant was commuting there regularly

19  again prior to the arrest.

20          Our view is that with that mobility and this

21  kind of fire power, the defendant could be a danger to

22  the community.  Whether that mobility will return, we

23  can't say.

24          THE COURT:  Is there anything, and I apologize

25  if I missed it, but is there anything in the medical

17

Proceedings

1  records from Brooklyn Hospital that substantiates the

2  mobility or lack thereof?

3          MS. GLASHAUSSER:  I am not sure exactly.  I

4  know that there was a notation about that she was

5  confined to her bed currently.  I personally saw here

6  there and --

7          THE COURT:  With leg irons or whatever to the

8  bed?  Or was it handcuffed?

9          MS. GLASHAUSSER:  Sure, with leg irons but she

10  really couldn't move.  I mean she was speaking clearly

11  with pain.  She wasn't really moving at all.  But I'm not

12  sure, when your Honor says the current medical condition,

13  there's the medical condition that began in March of

14  2022.  That is documented in both the BOP records and the

15  current hospitalization records.  And that's what causes

16  the partial paralysis in her lower half.  There's no

17  indication that that will improve.  So that was her

18  status before she was currently hospitalized where she

19  had been given the four wheeled walker or had been -- I

20  don't think she got it yet but was assessed to get a four

21  wheeled walker by MDC, that's in the BOP records I

22  submitted, to assist her in moving.

23          THE COURT:  Those were submitted to Judge

24  Bulsara?

25          MS. GLASHAUSSER:  No, to you, your Honor.  That

18

Proceedings

1  was on -- so in my letter that was submitted last --

2               (High pitched sound in background)

3            THE CLERK:  I don't know why that happened,

4  Judge.

5            THE COURT:  It happened, that's the second

6  time.

7            MS. GLASHAUSSER:  In the letter I submitted

8  last night, there's the excerpt from the BOP records is

9  immediately following the letter.

10            THE COURT:  Yes, I see that.  But show me

11  specifically.

12            MS. GLASHAUSSER:  Yes, page 3 at the top it

13  says new non-medication order, walker, four wheeled.

14            THE COURT:  I see.  Okay.

15            MS. GLASHAUSSER:  So it's correct that they

16  didn't believe she needed a wheelchair.  I don't think

17  that point is significant.  Everyone agrees that she has

18  limited mobility whether it's with a walker or -- you

19  know, frankly I think a wheelchair versus a walker for

20  people with limited mobility is just something of a

21  personal preference for how you feel comfortable moving

22  around.  She's not completely unable to walk.  That's not

23  what I am representing.  She walks with difficulty and

24  slowly.

25            And the conditions that your Honor is proposing

Proceedings

1    address any risk of flight whether she can walk very

2    slowly or not.  I do believe also that Moira

3    Meltzer-Cohen is willing to be a third-party custodian

4    having heard your Honor explain it in the context of your

5    Honor's explanation just now.

6              I also just would note that the government is

7    agreeing that she's not currently a risk of flight or a

8    risk of danger which I think means that she has to be

9    released.  The question of risk of flight or risk of

10   danger isn't whether at some future point the government

11   might be able to come back with a different presentation

12   showing circumstances have changed.  She's not currently

13   such a risk.  There's no indication that even under the

14   government's view she would become a risk at any point in

15   the near future, so she should be released.

16             MR. BUFORD:  Your Honor, to be clear, we think

17   it's unlikely she's going to escape from the hospital or

18   in her current condition walk out of the hospital anytime

19   soon.  But once she's discharged and presumably back at

20   whatever level of mobility she had before she got there,

21   we do think that's a concern.

22             THE COURT:  And you think it's a concern that

23   no conditions or combinations of conditions can

24   alleviate?

25             MR. BUFORD:  Your Honor, given the severity of

20

Proceedings

1   the risk, even if there is a low chance of something bad
2   happening, with these kinds of guns, we're reluctant to
3   consent to release under any conditions, your Honor.
4                    (Pause in proceedings)
5              THE COURT:  Okay.  Here's what we're going to
6   do.  Ms. Sternquist's medical condition in my mind
7   impacts the decision on whether to release her on a bond.
8   The more precarious that medical condition and how it
9   affects her mobility whether because of the disc problem
10  or other things, and we don't know how that medical
11  condition is going to improve over time and she is
12  currently not in MDC, and she's being cared for by the
13  good people at Brooklyn Hospital -- if it does not
14  improve mobility wise, I think at the point of when she's
15  going to be discharged from Brooklyn Hospital she would
16  be a good candidate for release under stringent terms
17  including home incarceration with Ms. Meltzer-Cohen at
18  her apartment as a third-party custodian, a substantial
19  bond amount and other conditions that Pretrial would
20  recommend.
21             So I'm going to currently deny the request.
22  You may consider this punting if you will, but I think we
23  need to see how Ms. Sternquist's condition improves if at
24  all.  If it improves to the point where she is walking
25  without the need for assistance of a rollator or a

21

Proceedings

1   wheelchair or whatever, that may change the calculation.

2            MS. GLASHAUSSER:  Your Honor, respectfully, may

3   I speak for a moment?

4            THE COURT:  Sure.

5            MS. GLASHAUSSER:  I think that the medical

6   condition may have gotten confused between the one that

7   is ongoing and nobody expects to improve which is what

8   she got the four wheeled walker for.  That predated the

9   issue with respect to the catheter being misplaced.  And

10  she is currently shackled to a bed.  So I just don't

11  think it's right to discount that she is currently

12  incarcerated, she is shackled to a bed, she is being

13  guarded at all times.  We are unable to speak on the

14  phone and she is unable to access her doctors who she has

15  been working with since the spring of this year with

16  respect to her underlying spinal cord injury.  So she is

17  greatly impacted by being incarcerated right now.

18            And the government agree is that right now

19  there is no risk of flight or risk of danger.  So under

20  the Bail Reform Act, especially as it is the government's

21  burden here to show that she needs to be detained, when

22  they are agreeing that she is not a risk right now and

23  your Honor believes that even if she is released from the

24  hospital so long as her underlying medical condition

25  hasn't improved, which nobody expects it to, that she

22

Proceedings

1    could be released under these stringent conditions.  I
2    would urge your Honor to release her now because the
3    government has not met their burden and because just as a
4    practical matter, I don't know how much advance notice I
5    will receive when she is to be released and going back to
6    MDC.  Because she is incarcerated, I do not have -- she
7    can't pick up the phone and call me.  For the past three
8    days we have been able to have somebody go to the
9    hospital and visit with her.  That's not something
10   obviously we can keep up for the long term as her
11   suretors cannot visit her.  It's just me and our
12   paralegal.  I am happy too that she is at the hospital
13   and not at MDC, but that is not the same as being
14   released.
15            I think that the conditions your Honor outlined
16   address all of the government's concerns which are mostly
17   speculative.  They said something about a low chance of
18   something happening.  They are talking about they don't
19   know if there are other things at other places.  Those
20   are not things that incarcerate people.  We incarcerate
21   people based on history and facts.  Ms. Sternquist has
22   absolutely no history of violence.  There's nothing in
23   her record or background indicating that she has any
24   violent history.  So in that context, the government just
25   hasn't met their burden here.

23

Proceedings

1        MR. BUFORD:  Your Honor, the defendant was
2   essentially Court at her apartment manufacturing ghost
3   guns.  And not just pistols, fully automatic rifles and
4   more than one.  Again, even if the defendant with no
5   prior history of violence wasn't herself planning to use
6   these weapons, having them in circulation, creating them
7   is a risk to the community.  This isn't a situation in
8   which the defendant was found to have a pistol or
9   something like that on her person which even under the
10  circumstances would still be a crime.  These are multiple
11  very dangerous weapons that were found in her possession
12  along with the fraudulent law enforcement conditions that
13  bear her picture.  To say that those facts create a
14  speculative risk of danger to the community is not right,
15  Judge.  There is a risk of danger to the community based
16  on those facts alone.
17        And when you consider the fact that the
18  defendant does have a history of using aliases and other
19  identities, it's reasonable to wonder whether there are
20  other places we don't know about especially when the
21  agents have looked at her phone and seen guns that were
22  not recovered inside the apartment.
23        MS. GLASHAUSSER:  If I may just respond to this
24  concept that -- so these guns were not recovered from Ms.
25  Sternquist.  I just want that fact to be clear.  And the

24

Proceedings

1   government is asserting that it is her apartment, but

2   that is a fact that we do not know whether or not it is

3   true.

4            MR. BUFORD:  Your Honor --

5            MS. GLASHAUSSER:  The conditions that your

6   Honor is imposing address the very thing that the

7   government is talking about, things at a prior or a

8   different apartment in Manhattan with Ms. Sternquist

9   living with Moira Meltzer-Cohen in a totally separate

10  apartment and with --

11            (High pitched sound in background)

12           THE COURT:  What is that?  What is that?

13           THE CLERK:  I'll call the computer people

14  later.  I don't know.  But it's still recording, Judge.

15           THE COURT:  Okay.  Good.

16           THE CLERK:  And I need the people on the phone

17  to mute your devices.  There is an ongoing proceeding

18  right now, so mute your devices.  Thank you.

19           MS. GLASHAUSSER:  With the third-party

20  custodian, with the monitoring of the one cell phone,

21  there is no realistic risk of any of the conduct that the

22  government is alleging happened in the past continuing if

23  Ms. Sternquist is released.  And that's what we're

24  looking at as far as bond, a reasonable risk.

25           MR. BUFORD:  Your Honor, I would just note that

25

Proceedings

1    the Pretrial report indicates Ms. Sternquist says she

2    lived at that apartment by herself for seven years.  And

3    it's her picture on the PIV cards which we included in

4    our memo, your Honor.  The idea that this was happening

5    at someone else's doing and she just didn't know about it

6    is not backed up by the evidence.

7              THE COURT:  Okay.

8              MS. GLASHAUSSER:  Your Honor, I also note we

9    have the suretors present on the phone and Moira

10   Meltzer-Cohen present here.  I don't think this is the

11   correct outcome, but I do think your Honor could also

12   order that she be released while she is in the hospital,

13   have the suretors -- have your Honor do the colloquy with

14   the suretors, have that all set up, and ask for a further

15   report on her medical condition when her discharge is

16   occurring.

17             THE COURT:  Can you give me a bond please,

18   Sui-May?

19             THE CLERK:  Sure, Judge.  Here you go.

20                  (Pause in proceedings)

21             MR. BUFORD:  Your Honor, I'm sorry to

22   interrupt.  If the Court would permit, I was due before

23   Judge Donnelly at 11:30.  She knew that I was in an

24   ongoing proceeding, but I might ask Mr. Palacio to cover

25   for me at that proceeding if that's okay?

26

Proceedings

1          THE COURT:  Okay.  All right.  I have changed
2     my mind.  I'm prepared to release Ms. Sternquist on a
3     $500,000 bond with two sureties and a third-party
4     custodian, travel restrictions to New York City, Pretrial
5     Services supervision, random home visits, reporting to
6     Pretrial as directed either in person or by telephone,
7     home incarceration with electronic monitoring, residence
8     with third-party custodian Moira Meltzer-Cohen, and
9     possession of only one cell phone with monitoring by
10    Pretrial Services.
11         PRETRIAL OFFICER:  Your Honor, Pretrial asks
12    that with the technology restriction, you give Pretrial
13    permission to inspect any computer router and devices
14    with internet access belonging to the defendant or in the
15    defendant's home.
16         THE COURT:  That would be in the home of the
17    third-party custodian.
18         MS. GLASHAUSSER:  Your Honor, I would ask -- in
19    other cases that I have, the other residents of the home
20    have in the past made sure all of their devices are
21    password protected and do not provide access to the
22    client so that -- particularly in the case of a lawyer I
23    think it would be problematic to have Pretrial have
24    access to the devices themselves.
25         PRETRIAL OFFICER:  But that's what Pretrial

27

                         Proceedings

1   needs, just inspecting to make sure that there are pass

2   codes on the devices.

3            MS. GLASHAUSSER:  Okay.  Understood.  I

4   misunderstood.

5            THE COURT:  No place to put this.  I'm just

6   going to put, it's on the record, but I'm going to put on

7   the bond Pretrial Services to inspect routers, et cetera,

8   to ensure that there are pass codes.

9            Now I have a question.  Ms. Glashausser, did

10  you intend for Ms. Meltzer-Cohen to be a surety as well

11  as a -- well, I threw third-party custodian out there

12  but --

13           MS. GLASHAUSSER:  I did not, your Honor.  And I

14  believe the third party custodian document is separate

15  than --

16           THE COURT:  Yes.

17           MS. GLASHAUSSER:  -- the surety document.

18           THE COURT:  Is Ms. Pace on the line?

19           MS. PACE:  I am, your Honor.

20           THE COURT:  I need to ask you some questions

21  and your answers must be made under oath.

22  M S.   P A C E,

23       called as a witness, having been first duly sworn,

24       was examined and testified as follows:

25           THE COURT:  It's been indicated to me that you

Proceedings

1    are Ms. Sternquist's ex-wife and close friend, correct?

2            MS. PACE:  That is correct, your Honor.

3            THE COURT:  And you are currently employed and

4    make about 150,000 a year?

5            MS. PACE:  Yes.  Sometimes more than that

6    because sometimes I do part-time jobs, but at least that,

7    yes.

8            THE COURT:  Okay.  And you have known Ms.

9    Sternquist for eight years?

10           MS. PACE:  Yes.  Since March 17, 2014.

11           THE COURT:  Okay.  And Ms. Glashausser

12   explained to you what it means to sign a bond?

13           MS. PACE:  Yes, she did.

14           THE COURT:  And do you want to sign this bond?

15           MS. PACE:  Yes, I do, your Honor.

16           THE COURT:  Do you give me authority to sign it

17   on your behalf?

18           MS. PACE:  I do give you authority to sign it

19   on my behalf, your Honor.

20           THE COURT:  Okay.  Ms. Simpson, are you on the

21   line?

22           MS. SIMPSON:  Yes.  I just unmuted, your Honor.

23           THE COURT:  Okay.

24   M S.  S I M P S O N,

25       called as a witness, having been first duly sworn,

29

Proceedings

1       was examined and testified as follows:

2              THE COURT:  You are a close friend of Ms.

3    Sternquist?

4              MS. SIMPSON:  Yes, your Honor.

5              THE COURT:  You've known her for about six

6    years.  Is that correct?

7              MS. SIMPSON:  Yes.

8              THE COURT:  And you are a patient care

9    technician at Holy Name in Teaneck, New Jersey and you

10   you also side jobs?

11             MS. SIMPSON:  Yes.

12             THE COURT:  You make about $1,200 a month in

13   that patient care job?

14             MS. SIMPSON:  Yes.  Also with the other side

15   things as well, yes, your Honor.

16             THE COURT:  Okay.  Ms. Glashausser explained

17   what it means to sign a bond to you?

18             MS. SIMPSON:  Yes, she did, your Honor.

19             THE COURT:  And do you want to sign this bond?

20             MS. SIMPSON:  Yes, I do.

21             THE COURT:  And do you give me the authority to

22   sign the bond on your behalf?

23             MS. SIMPSON:  I give you and Ms. Glashausser

24   the authority.

25             THE COURT:  Ms. Sternquist, are you there?

30

Proceedings

1          THE DEFENDANT:  Yes, I am, your Honor.

2          THE COURT:  Okay.  Ms. Sternquist, I am

3     prepared to release you on a $500,000 bond signed by Ms.

4     Pace and Ms. Simpson.  Your travel will be restricted to

5     New York City.  You are going to be placed under Pretrial

6     Services supervision with reporting as directed by

7     Pretrial and subject to random visits at the residence.

8     You will be under home incarceration residing with Ms.

9     Meltzer-Cohen.  You cannot leave the home at any time

10    except for attorneys visits, court appearances, and

11    necessary medical appointments.  You will only be

12    permitted to possess one cell phone that will be

13    monitored by Pretrial Services and Pretrial will inspect

14    the other electronic devices in the residence to make

15    sure that they are protected by passwords.  And you

16    cannot use those other electronic devices.  Do you

17    understand that?

18          THE DEFENDANT:  Yes, your Honor.

19          THE COURT:  Okay.  I'm going to give you three

20    additional warnings that you need to know about.  If you

21    violate any federal, state, or local law when you're

22    released, that's a violation of your bond.  So you could

23    be detained on these charges until your trial plus face

24    charges for any crimes you may commit.

25          If you fail to come to Court when you're

31

Proceedings

1   supposed to, that is a violation of the bond so you can

2   be detained plus face a charge of bail jumping.  And if

3   you are convicted of the underlying charges and bail

4   jumping, your sentences could be served consecutively one

5   after the other.  So you must come to court when you're

6   supposed to.

7           And if you attempt to influence the testimony

8   of any witness that may appear against you in your case,

9   that's a violation of the bond.  So you can be detained

10   plus face charges of witness tampering.  And if you're

11   convicted of the underlying charges and witness

12   tampering, your sentences could be served consecutively.

13   Do you understand?

14           THE DEFENDANT:  Yes, your Honor.

15           THE COURT:  Ms. Sternquist do you give me the

16   authority to sign the bond for you?

17           THE DEFENDANT:  I do, your Honor.

18           THE COURT:  Okay.

19           MR. BUFORD:  Your Honor, if we could make one

20   additional -- ask the Court to inquire of the suretors

21   one additional thing for Ms. Pace?

22           THE COURT:  Yes.

23           MR. BUFORD:  There's an NYPD record that Ms.

24   Sternquist made a complaint to NYPD I think in October of

25   2019 regarding Ms. Pace.  Again, there's no I think

32

Proceedings

1    arrest or anything like that. I just want to make sure

2    everyone's comfortable with that additional information.

3            THE COURT: Ms. Pace, are you aware that Ms.

4    Sternquist made a complaint against you with the New York

5    City Police Department in October of 2019 was it?

6            MR. BUFORD: Yes, your Honor.

7            THE COURT: Are you aware of that?

8            MS. PACE: I don't remember, I don't remember.

9    I can't say. I honestly don't remember.

10           THE COURT: You don't remember?

11           MS. PACE: I don't. I don't remember anything.

12   I can't say honestly one way or the other.

13           THE COURT: Mr. Buford, what was that complaint

14   about?

15           MR. BUFORD: Harassment, your Honor.

16           THE COURT: Would the fact that Ms. Sternquist

17   made a complaint against you to the New York City Police

18   Department about harassment cause you to reconsider

19   whether you want to be a surety?

20           MS. PACE: No, not at all. You know, we had

21   some crisis, you know, when we were married I guess just

22   like any other couple does, but I have no idea. No, it

23   doesn't impact anything.

24           THE COURT: Okay. Thank you. Is there

25   anything else?

33

Proceedings

1           MR. BUFORD:  No, your Honor.  If the Court

2   would consider a very brief stay of two hours so we may

3   consult with the office about the possibility of an

4   appeal, we'd appreciate it.

5           THE COURT:  That's fine.  The order setting

6   conditions of release and appearance on bond will be

7   stayed for two hours.  It is now 12:11 p.m. on September

8   29, 2022.  All right.

9           MR. BUFORD:  Thank you, Judge.

10          THE COURT:  Thank you, everyone.  We're

11  adjourned.

12          MS. GLASHAUSSER:  Thank you, your Honor.

13          THE COURT:  Oh, I need the third party's

14  custodian form.

15          THE CLERK:  I think that will be you guys.  I

16  don't think I have it.  Do I have it?  They don't usually

17  come to me.  We'll get one.  Do you have it?  I don't

18  have it here.  Third party custodian.

19          THE COURT:  Are we still on the record or no?

20          THE CLERK:  We are, Judge.

21          THE COURT:  Okay.  Ms. Meltzer-Cohen, can you

22  come up to the podium, please?

23          MS. MELTZER-COHEN:  Good afternoon, your Honor.

24          THE COURT:  Good afternoon.  I'm going to ask

25  you a couple of questions.

34

Proceedings

1          MS. MELTZER-COHEN:  Sure.

2    M O I R A    M E L T Z E R - C O H E N,

3       called as a witness, having been first duly sworn,

4       was examined and testified as follows:

5          THE COURT:  You heard the proceedings.  I saw

6    you in court, you were paying attention.  Yes?

7          MS. MELTZER-COHEN:  Yes.

8          THE COURT:  Okay.  We had a discussion on being

9    a third-party custodian which is someone who affirms to

10   the Court after signing a third-party custodian form that

11   they will report to the Court and Pretrial Services if

12   the defendant violates the terms and conditions of the

13   bond.

14         MS. MELTZER-COHEN:  That's right.

15         THE COURT:  And if you do not, you will be

16   subject to a contempt proceeding.  Do you understand

17   that?

18         MS. MELTZER-COHEN:  Oh, I do.

19         THE COURT:  And you are agreeing, based on what

20   Ms. Glashausser said, to have Ms. Sternquist live with

21   you and your partner, yes?

22         MS. MELTZER-COHEN:  I am.

23         THE COURT:  And are you willing to be --

24         MS. MELTZER-COHEN:  As is my partner.

25         THE COURT:  Are you willing to be a third-party

35

Proceedings

1    custodian?

2              MS. MELTZER-COHEN:  I am.  I can still go to

3    work though, right?

4              THE COURT:  Of course.

5              MS. MELTZER-COHEN:  Okay.

6              THE COURT:  Of course.  But as we indicated,

7    Pretrial Services is going to be able to inspect routers,

8    computers, and other things to make sure that they are

9    all password protected.  You are not permitted to give

10   Ms. Sternquist the passwords or use any of those devices.

11   She will have only one cell phone that is going to be

12   monitored by Pretrial.  And you have to make sure that

13   that all happens.

14             MS. MELTZER-COHEN:  That's fine.

15             THE COURT:  Okay.  Now what I'm going to ask

16   you to do is -- we don't have a third-party custodian

17   form.

18             THE CLERK:  I told Melanie to email me right

19   now.

20             THE COURT:  Oh, okay.

21             THE CLERK:  We haven't used this courtroom for

22   a while, so --

23             THE COURT:  That's okay.

24             THE CLERK:  I don't know where the forms are

25   anymore.

36

Proceedings

1          THE COURT:  That's all right.

2          THE CLERK:  But one's coming.

3          THE COURT:  Okay.  So we're going to give you

4   the third party custodian form.  Please read it, fill it

5   out and sign it.  I actually don't think there's anything

6   for you to fill out.  Sign it and then Pretrial will

7   countersign it.  And I don't know if you're going to give

8   Ms. Meltzer-Cohen any further instructions but that's

9   what we'll do.  Okay?

10          MS. MELTZER-COHEN:  That's fine.  Is Pretrial

11   going to come by today to my house?

12          MS. GLASHAUSSER:  I think we'll do it right now

13   right after the proceeding is done.  You'll meet with

14   Pretrial.

15          THE COURT:  Yes.  You'll meet with Pretrial

16   afterwards and they'll explain everything.

17          MS. MELTZER-COHEN:  Okay.

18          THE COURT:  All right?

19          THE CLERK:  Actually, she can probably go there

20   and fill one out because I don't need the form.  It's for

21   your record.

22          PRETRIAL OFFICER:  Yeah, just for us.

23          THE CLERK:  Right.  It's for them.

24          THE COURT:  Okay.  All right.  Great.  Thank

25   you.

37

Proceedings

1          THE CLERK:  Thank you.

2          MS. GLASHAUSSER:  Your Honor, can I just ask

3    logistically during this two-hour period whether the bond

4    could be sent to the marshals?  Because I know they have

5    a long process to review.  They do a whole check before

6    they actually release.  Could it be after the Court

7    grants it?  I'm just hoping that process could begin.

8    She's in the hospital, right?

9          THE COURT:  The practical effect is when are

10   the handcuffs going to come off, right?  And the guard go

11   home.

12         MS. GLASHAUSSER:  Right.  Right.

13         THE COURT:  And that could have been in a

14   matter of --

15         MS. GLASHAUSSER:  I just wanted to --

16         THE COURT:  My concern is that if we start the

17   process now and it gets done and they call the guard and

18   say leave and take the cuffs off and then Mr. Buford is

19   in front of the Part 1 judge appealing and they reverse

20   this and they're just going to have to send somebody

21   back.  So --

22         MS. GLASHAUSSER:  I guess maybe I'll check with

23   the deputy about the logistics of getting the bond to the

24   right folks at the right time so it can all --

25         MR. BUFORD:  I don't know how this plays out

38

                              Proceedings

1   but my understanding is that logistically at the hospital

2   right now it's actually BOP personnel that are guarding

3   her as opposed to the marshals.  So again, I don't know

4   how that affects the process.

5              MS. GLASHAUSSER:  Okay.  I guess I'll reach out

6   at 2:11.

7              THE CLERK:  2 o'clock, right?  Fine.  I have a

8   2 o'clock proceeding though.

9              THE COURT:  Okay.

10             THE CLERK:  Oh, email, right?

11             MR. BUFORD:  Yeah.  I think we would put a

12  letter on the record and appeal to the miscellaneous

13  district judge if we elect to do that.

14             THE CLERK:  Okay.  And I don't know who that

15  is.

16             MR. BUFORD:  Judge Komitee I believe.

17             THE CLERK:  You can inquire to the clerk's

18  office.  Okay?  Okey doke.  We're good.

19             MR. BUFORD:  Thank you, your Honor.

20             MS. GLASHAUSSER:  Thank you, your Honor.

21             THE CLERK:  Thank you.  All right.

22                       (Matter concluded)

23                            -oOo-

24

25

39

# C E R T I F I C A T E

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **29th** day of **September**, 2022.

*Mary Greco*

Transcriptions Plus II, Inc.