UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X **Docket#**
UNITED STATES OF AMERICA,      : 22-mj-01005(RLM)
                               :
                               :
     - versus -                : U.S. Courthouse
                               : Brooklyn, New York
KARA STERNQUIST,               :
                               : September 29, 2022
              Defendant        : 4:02 p.m.
------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR A BAIL APPEAL
BEFORE THE HONORABLE ERIC R. KOMITEE
UNITED STATES DISTRICT JUDGE

A    P    P    E    A    R    A    N    C    E    S:


For the Government:          Breon S. Peace, Esq.
                             United States Attorney


                    BY:      **Frank Turner Buford, Esq.**
                             **Andres Palacio, Esq.**
                             Assistant U.S. Attorney
                             271 Cadman Plaza East
                             Brooklyn, New York 11201


For the Defendant:           **Allegra W. Glashausser, Esq.**
                             Federal Defenders of New York
                             One Pierrepont Plaza, 16th Fl.
                             Brooklyn, NY 11201



Transcription Service:       **Transcriptions Plus II, Inc.**
                             61 Beatrice Avenue
                             West Islip, New York 11795
                             RL.Transcriptions2@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1          THE COURT:  Please be seated.

2          THE CLERK:  Criminal Cause for a Bail Appeal,

3  *The United States of America v. Kara Sternquist*, docket

4  number 22-mj-1005.

5          Would you all please state your appearances for

6  the record starting with the government?

7          MR. BUFORD:  Good afternoon, your Honor.  It's

8  Turner Buford and Andy Palacio for the United States.

9          THE COURT:  Good afternoon.

10          PRETRIAL OFFICER:  Good afternoon, your Honor.

11  (Indiscernible) with Pretrial Services.

12          THE COURT:  Good afternoon.

13          MS. GLASHAUSSER:  Good afternoon, your Honor.

14  Allegra Glashausser representing Ms. Sternquist who is on

15  the phone with us.

16          THE COURT:  Good afternoon, Ms. Glashausser and

17  Ms. Sternquist, good afternoon to you as well.  Can you

18  hear me?  Ms. Sternquist, are you with us?

19          THE CLERK:  You may have to un-mute your phone.

20          THE DEFENDANT:  Yes, I can hear.

21          THE COURT:  Okay.  All right.  Let me begin by

22  saying a couple of things that I say when we hold status

23  conferences by telephone which are, Ms. Sternquist for

24  your benefit, it's obviously very important that you hear

25  and understand everything that is happening here today.

3

Proceedings

1    And so if there's something that doesn't come through

2    clearly to you, if you get dropped from the call and you

3    dial back in, please speak up and let us know that and we

4    will make sure to repeat anything you may have missed.

5            And secondly, if you want to speak privately

6    with your attorney at any point, or Ms. Glashausser, if

7    you need to speak privately with your client, you should

8    both feel free to let us know that as well.  Ms.

9    Sternquist, do you understand everything I just said?

10           THE DEFENDANT:  Yes, I do, your Honor.

11           THE COURT:  Okay.  All right.  We're here

12   because the government has appealed Judge Reyes' order

13   releasing Ms. Sternquist on certain conditions.  Maybe

14   the government can just summarize for me what those

15   conditions are and why you believe they are inadequate.

16           MR. BUFORD:  Yes, your Honor.  So earlier this

17   morning, Judge Reyes issued a release order for the

18   defendant and as the Court I believe knows, the defendant

19   is currently at the Brooklyn Hospital receiving care in

20   connection with an urgent medical situation that

21   developed while at the MDC.  She has been there since

22   Monday evening.  The release order that Judge Reyes

23   entered called for the defendant's release on the

24   following conditions.

25           $500,000 unsecured bond signed by two

4

Proceedings

1   financially responsible suretors one of whom is the
2   defendant's ex-wife, the other of whom is a longtime
3   friend.  In addition, the defendant was to be released
4   into the custody of a custodian of the Court, or a third-
5   party custodian rather, who is an attorney and who I
6   believe is present in the courtroom here today who
7   volunteered to take on the defendant pursuant to the
8   terms that go with being a custodian which is to say
9   she's not a signatory to the bond, your Honor, but
10  undertakes to advise the Court if she observes any
11  violations of the terms or conditions of release.
12          THE COURT:  This is a minor point but is that a
13  conflict?  She's also representing I think.
14          MR. BUFORD:  So my understanding, your Honor,
15  is that the attorney does not presently have an attorney-
16  client relationship with the defendant.
17          THE COURT:  Okay.
18          MR. BUFORD:  And I don't know that it would
19  rise to the level of a conflict if it did exist.  But I
20  could be wrong about that.  In terms of the present
21  relationship, I don't believe there is one.
22          THE COURT:  Okay.  I thought the Pretrial
23  Services report said something about a representation but
24  it could be a past representation.
25          MR. BUFORD:  Yeah, I'm not aware there's a

5

                    Proceedings

1    present representation, your Honor.

2              THE COURT:  Okay.

3              MR. BUFORD:  In addition, the --

4              THE COURT:  But then you said the custodian

5    does not sign the bond but takes on certain

6    responsibilities to alert the Court if certain events

7    come to pass.  How does that work mechanically?

8              MR. BUFORD:  Your Honor, on this I might defer

9    to Pretrial.  I understand there's specific paperwork

10   that is signed by the custodian when such an arrangement

11   is undertaken.

12             THE COURT:  Okay.  We can table that question

13   for a moment but thank you.

14             MR. BUFORD:  In addition, the attorney resides

15   with a partner who I understand is a nurse who would not

16   sign on as a custodian but would also be present in the

17   apartment while the defendant resides there.

18             The reason we have concerns, your Honor, are we

19   don't think the package is sufficient to address the risk

20   of flight or the danger to the community that this

21   defendant poses.  As we said in the memo that we filed

22   earlier today, the defendant's apartment was searched

23   earlier this month and law enforcement covered dozens of

24   fake badges for various federal law enforcement agencies,

25   multiple fraudulent law enforcement credentials for a

6

Proceedings

1   variety of United States agencies including, among

2   others, the FBI, the EPA, the U.S. Attorney's Office,

3   fraudulent personal identity verification cards, or PIV

4   cards in the name again of various federal agencies

5   bearing the defendant's picture.

6            And in addition to those fraudulent law

7   enforcement credentials, they also found what purports to

8   be identification documents, driver's licenses, for

9   dozens of other individuals, not the defendant, and

10   hundreds of credit cards in the names of people, not the

11   defendant.  They also found --

12            THE COURT:  But not bearing the defendant's --

13            MR. BUFORD:  Not bearing the defendant's

14   picture, your Honor.

15            They also found multiple firearms that were in

16   the process of being completed or assembled inside the

17   apartment, four of which appeared to be fully assembled,

18   consist of two --

19            THE COURT:  I'm sorry, say that again?  Four?

20            MR. BUFORD:  Four of which appeared to be fully

21   assembled.  In other words, the construction process was

22   complete.

23            THE COURT:  Four of what?

24            MR. BUFORD:  Four guns, your Honor.

25            THE COURT:  Four guns?

7

Proceedings

1           MR. BUFORD:  Yes.  And there were multiple

2    other guns that were in various stages of being built.

3    These are so-called ghost guns, your Honor, un-serialized

4    weapons that are assembled from various parts.  And the

5    officers observed what appeared to be a workstation where

6    this process of assembling firearms was happening.

7           Of the four that appeared to be fully

8    assembled, two were pistols, two were rifles.  And the

9    agents' assessment is that these are fully automatic

10   rifles which are very dangerous guns.

11          THE COURT:  Fully automatic meaning one trigger

12   pull is capable of firing --

13          MR. BUFORD:  As I understand it, your Honor, if

14   you pull the trigger the gun will fire all the bullets

15   until you stop pulling the trigger or it runs out of

16   bullets.

17          THE COURT:  And what's the magazine capacity?

18          MR. BUFORD:  That I don't know, your Honor.

19   But they did find multiple high-capacity magazines inside

20   the apartment although there was no ammunition recovered

21   either from the guns or loose in the apartment.

22          In addition, as we sort of detail in the

23   complaint, there were purchase records suggesting that

24   various parts overuse to assemble these guns had been

25   shipped through the mail to the defendant's residence for

8

Proceedings

1  various firearm sales and multiple packages bearing

2  fraudulent law enforcement credentials were intercepted

3  at JFK Airport in route to the defendant's apartment.

4           So it's reasonable if the defendant possessed

5  fraudulent law enforcement credentials with her picture

6  on them to assume there was some sort of --

7           THE COURT:  Sorry, I heard you list the

8  fraudulent law enforcement credentials but I did not

9  catch that one or more of them bore the defendant's

10  photo.  Can you say more about that?

11           MR. BUFORD:  Yes, your Honor.  So there are

12  multiple law enforcement credentials including PIV cards

13  for the CIA and other agencies.  There's a photograph of

14  this included in our letter earlier this morning that

15  show the defendant's picture on the card.  In addition --

16           THE COURT:  A PIV card is what exactly?

17           MR. BUFORD:  So it's the card that all federal

18  employees have, every federal -- I shouldn't say all

19  federal employees.  We at the U.S. Attorney's Office have

20  them.

21           THE COURT:  It has the embedded --

22           MR. BUFORD:  Chip that you use to access your

23  computer, that you use to access the office.  It beeps

24  open the doors.  And there was at least one fraudulent

25  special agent badge that was intercepted in route to the

9

Proceedings

1 defendant's apartment by CBP at JFK that purported to

2 identify the defendant in the sense that it had her

3 picture on it with a different name as a special agent of

4 the Environmental Protection Agency.  So there are

5 fraudulent law enforcement credentials bearing the

6 defendant's pictures that were recovered within the

7 apartment.

8          THE COURT:  And what's the quality of these

9 fraudulent PIV cards?

10          MR. BUFORD:  Having seen PIV cards myself, your

11 Honor, they looked like reasonable facsimiles of them.

12 I've talked with the agents who say that without a sort

13 of really searching examination, the kind of thing like

14 the special agent badge for the EPA is something that

15 would pass muster on a quick look.

16          THE COURT:  Okay.

17          MR. BUFORD:  In other words, these aren't

18 cartoonish like Halloween costume type stuff.

19          THE COURT:  Right.  They're coming from China?

20          MR. BUFORD:  The packages that were intercepted

21 by CBP were coming from China, yes.

22          THE COURT:  And those included?

23          MR. BUFORD:  Those included a fake United

24 States Marshal's badge without a picture.  It included

25 fake badges for the Department of Defense, the Department

10

Proceedings

1    of State, as well as this fraudulent EPA special agent

2    credential with the defendant's picture on it and another

3    name.

4              THE COURT:  Okay.  Is this a presumption case?

5              MR. BUFORD:  It is not, your Honor.

6              THE COURT:  Okay.

7              MR. BUFORD:  And so the government's concern

8    about the proposed package is given that both of the

9    custodians have jobs, one is an attorney, the other a

10   nurse, there's likely to be significant amounts of time

11   while the defendant is at home in the apartment in

12   Brooklyn essentially unsupervised.  We know that the

13   defendant has the ability to receive packages.  It

14   appears that that was one method the defendant used to

15   supply herself with both the gun parts and the fraudulent

16   identifications.  So if she were to receive a package

17   during the day at this address, as I understand the

18   arrangement, there would be no one there to monitor it.

19   And that package could consist of fraudulent

20   identification or an electronic device that's not

21   disclosed to Pretrial Services.

22             The defendant can also have visitors during the

23   hours when the custodians are not at home.  The number of

24   identifications here, including identifications with the

25   pictures and names of other people and just the amount of

11

Proceedings

1   the guns that are here, strongly suggest there are other

2   people involved.  That would be consistent with the

3   defendant's conviction in New Jersey for transferring

4   templates, fraudulent identifications to other people and

5   using a Gmail address to facilitate those transactions.

6          And so if the defendant were to receive a

7   fraudulent identification and/or a phony credit card

8   which there's every reason to believe could be in

9   existence, there would be nothing to stop her from going

10  out the door and being gone in terms of a risk of flight.

11         The other thing that could happen if the

12  defendant were to leave the apartment, she could have

13  access to firearms.  On the phone that the agents

14  recovered from the defendant there were pictures of guns

15  that the agents do not believe were recovered from the

16  apartment.  The whereabouts of those guns are presently

17  unknown.  And given the type of weapon that's involved

18  here, one doesn't need a lot of time to hurt a lot of

19  people with one of these guns.  And if you have a

20  fraudulent law enforcement credential, you have the

21  potential to get into some very sensitive locations with

22  a very dangerous weapon.  That's the concern that the

23  government has.

24         And in our view, the existing package is not

25  sufficient to ensure the safety of the community given

12

Proceedings

1  what was found inside the apartment.

2           THE COURT:  Is there anything that you can add

3  based on the investigation about what the purpose is for

4  which Ms. Sternquist is accumulating these IDs, these

5  weapons?

6           MR. BUFORD:  Your Honor, it's still early days

7  and we're processing the equipment that was recovered

8  from the apartment which includes multiple laptops and

9  multiple phones.  I understand the agents are reviewing

10  them as we speak, but we're not sure what the specific

11  purpose was for these weapons.  But again, when you

12  couple the existence of fake law enforcement credentials

13  with high-powered automatic assault rifles, it's not a

14  fanciful leap of logic to assume that there's a real

15  danger involved in having those two things together.

16           THE COURT:  Okay.  So the defense is saying

17  that the defendant is not particularly mobile in her

18  current condition and that she may not be mobile even

19  after, as we hope, she gets through the current health

20  travails that she's facing.  Do you have any view on that

21  one way or the other?

22           MR. BUFORD:  The only comment we would make is

23  one we made to Judge Reyes this morning, your Honor,

24  which is we obviously can't speak to what the defendant's

25  condition will be after this hospitalization.  Prior to

Proceedings

1  the hospitalization, the defendant did have the same

2  underlying conditions which we understand arose from a

3  surgery in March of 2022 that went badly.

4  Notwithstanding the limited mobility the defendant had

5  after that surgery and prior to her arrest, the defendant

6  was able to live and work in the apartment which requires

7  walking up at least some stairs to get to the first

8  floor.  The apartment itself is two stories meaning we

9  assume the defendant was going up and down the stairs

10 inside the apartment.  She was also commuting from Hell's

11 Kitchen to Harlem on a regular basis, all of which is to

12 say --

13          THE COURT:  Is that something you acknowledge?

14 The Pretrial Services report said they couldn't verify

15 her employment.

16          MR. BUFORD:  Well, based on the representation

17 made by the defendant, if you take the employment history

18 at its face, she would have had to commute regularly.

19 And we've also spoken independently with the employer and

20 they have verified that she did in fact work there,

21 physically worked there.  In other words, she wasn't

22 working from home.

23          THE COURT:  And did they say how often she

24 physically worked there and for how long?

25          MR. BUFORD:  My understanding is that she's a

14

Proceedings

1  full-time employee, your Honor, but I can't speak to her

2  specific hours.  I think she was earning something like

3  60,000 a year from the work there.

4          THE COURT:  But reporting in person every day.

5          MR. BUFORD:  I think multiple days a week, your

6  Honor, is what I understand.

7          THE COURT:  Okay.  Let me state what may be the

8  obvious question here.  When you look at the Pretrial

9  Services report here, it's not a close call.  Right?

10 There's no basis that emerges from that report to think

11 anything other than that Pretrial is correct to conclude

12 that there is no set of conditions that would assure the

13 defendant's continued appearance and the safety of the

14 community.  I mean we're dealing with somebody who has a

15 very long criminal history including multiple federal

16 felonies who has a history of violations of supervised

17 release who was on pretrial release in another case when

18 the crime charged here occurred who has access obviously

19 to false identification documents, if we take the

20 government at its word, and who is facing an extremely

21 long potential exposure.  Obviously she hasn't been

22 charged yet with the weapons possession, but the

23 complaint and the Pretrial Services report suggests some

24 likelihood that she will be.  And so all of those factors

25 point in one single direction.

Proceedings

1    What I understand Judge Reyes to have likely

2 focused on, although I haven't listened to the audio of

3 that conference, is Ms. Sternquist's, as I said, severe

4 and right now acute health situation.  And what I'm

5 trying to get at first in respect of that is how it

6 becomes relevant under the statute if at all.  And the

7 problem with this situation is the Bureau of Prisons will

8 always take the position that they are eminently well

9 equipped to handle any health concern that may arise.

10 I'm not sure we would all agree with their assessment in

11 that regard, but I'm not sure that that's something that

12 we can view as dispositive perhaps.  But to the extent

13 that there is a partial paralysis here from a prior back

14 surgery, one's ability to flee depends on a lot of

15 factors but that might be one way in which this becomes

16 technically relevant under the statute and that's why I

17 ask.

18    What is the most the government can say about

19 how you could go about seeking her continued detention

20 given all the factors that I just listed in a way that

21 takes maximum account of her health needs and her ability

22 to get the best quality healthcare in an acute and severe

23 moment that she can?

24    MR. BUFORD:  Your Honor --

25    THE COURT:  She's in the hospital now.

16

Proceedings

1          MR. BUFORD:  She's in the hospital now.

2          THE COURT:  And nobody I take it is agitating

3    for her transfer from that facility to another facility.

4          MR. BUFORD:  Certainly not until discharged

5    from the hospital as medically indicated in the judgment

6    of the doctors that have been caring for her.  MDC I

7    think did provide medical care to the defendant and I

8    think appropriately recognized when there was an acute

9    situation that was beyond their capability to treat they

10   sent her to the hospital so she could get care from the

11   doctors that were there.  Going forward I think the MDC

12   medical staff will continue to treat the patient as best

13   as they can, your Honor.  I'm not sure I can say much

14   more than that.  She does present with unique medical

15   challenges.

16         THE COURT:  And there's no situation in which

17   you could arrange, or I could order, that certain ongoing

18   medical care be performed in a particular facility that

19   is not the MDC's medical offices?

20         MR. BUFORD:  That I don't know, your Honor.  I

21   know that she's technically for pretrial purposes in the

22   custody of the marshals and lodged at MDC for that

23   purpose.  The marshals do have contractual arrangements

24   with other prison facilities, but I understand it's not

25   clear --

17

Proceedings

1          THE COURT:  Tell me that technicality.  She's

2     not --

3          MR. BUFORD:  I believe, your Honor, that

4     Pretrial, until she's committed to the custody of MDC,

5     she's sort of formally in the custody of the marshals are

6     not under the -- you just said the Bureau of Prisons?

7          MR. BUFORD:  I think she's housed at the Bureau

8     of Prisons, but when she comes to court, she's released

9     into the marshal's custody and they bring her here.  But

10    I don't think she's a sentenced prisoner that's committed

11    to the custody of the Bureau of Prisons.  I may be wrong

12    about that.

13         THE COURT:  So she's not sentenced.  That we

14    all agree on.  But what is the significance of this?

15         MR. BUFORD:  The significance is, your Honor, I

16    think the marshals have, and perhaps the Bureau of

17    Prisons as well, contractual arrangements with other

18    facilities that are not sort of federal facilities.  They

19    are contract, places where they may or may not be able to

20    house certain people.  But my understanding from the

21    marshals is it's not clear under the terms of those

22    agreement any of those facilities would necessarily

23    accept the defendant.  And it's also not clear to me that

24    an order directing them to accept the defendant would be

25    appropriate.

18

Proceedings

1          It's also, finally, not clear to me that the

2     medical care there would be any better than at MDC.

3          THE COURT:  Okay.  18 U.S. Code Section 3142(d)

4     provides that if the person whose release is being sought

5     was at the time the offense was committed on release

6     pending trial in a state case, and there's an indication

7     that such person may flee, which is a very low standard,

8     or pose a danger, then the statute requires temporary

9     detention for period of not more than ten days for the

10    government to notify the appropriate court or state or

11    local law enforcement official.  Have you made that

12    notification?  Does that have any applicability to what

13    we're talking about here today?

14         MR. BUFORD:  Your Honor, I believe -- I cannot

15    independently confirm that the notification has been

16    made.  I know that NYPD officers were part of our arrest

17    and that her pending case is in the state.  I'm not aware

18    of any request on the part of the state that she be

19    brought before a state court to answer for a violation of

20    bond conditions before the state.

21         THE COURT:  Okay.  All right.  Let me turn to

22    Ms. Glashausser.  Right now we have a time constraint

23    here.  You've heard my take on this.  If you're just

24    looking at the statute in black and white it seems pretty

25    clear which way this case points to me.  Again, I don't

19

Proceedings

1   see a basis for release other than on the basis of the

2   health concerns that we're talking about.  But tell me --

3          MS. GLASHAUSSER:  Yes, your Honor.

4   Respectfully, I disagree but I also think that the health

5   concerns are specifically ones that your Honor is

6   supposed to consider when considering bail.  Under

7   Subsection (g)(3)(A) and the factors to be considered,

8   the person's physical condition is one of the listed

9   factors.  So this is an unusual case.  This is exactly

10  the type of factor your Honor is supposed to consider.

11         THE COURT:  Okay.

12         MS. GLASHAUSSER:  Ms. Sternquist is currently

13  in the hospital not because the MDC provided medical care

14  but because they caused a medical emergency through their

15  doctor, what their doctor did to Ms. Sternquist.  It is

16  completely inappropriate medically for her to be returned

17  to that facility right now.  She has been in the hospital

18  for three days with a very severe infection because the

19  MDC first violated Court orders to have her seen by a

20  doctor, violated two Court orders.  And then when finally

21  she was seen by a doctor, it led to this chain of events

22  with the catheter being put in incorrectly and the

23  balloon being opened before it had reached the correct

24  portion of the body.  Incredibly painful.  And that is

25  caused by the MDC.

Proceedings

1        Prior to this emergency, she already had, as

2   the government says, unique medical challenges.  I would

3   be here making the same bond application even if she

4   hadn't been brought to the hospital in part based on her

5   medical challenges which have caused partial paralysis.

6   Under the statute --

7        THE COURT:  Partial paralysis in a way that is

8   expected to be temporary or permanent, or do we not know?

9        MS. GLASHAUSSER:  No, your Honor.  And my

10  understanding of the surgery she had in March was that it

11  was meant to be corrective.  She had this spinal

12  compression that is apparently rare that caused -- it's

13  kind of like a sudden onset paralysis and the surgery is

14  meant to fix that.  Sometimes it does and sometimes it

15  doesn't.  Here it did not.  She is left without being

16  able to do any of her own toileting and very limited

17  sensation in the bottom half of her body.  That's well

18  documented in the records that we have submitted.

19       The BOP had assessed her as needing a four

20  wheeled walker to get around.  She had used a wheelchair

21  previously.

22            (High pitched sound in background)

23       MS. GLASHAUSSER:  And earlier today, the

24  government I think tellingly admitted that they did not

25  think there was any current risk of flight or danger

21

Proceedings

1  given her current health condition.  That to me really is

2  the game.  It's the government's burden here.  And under

3  the Bail Reform Act, they need to show that the person is

4  serious --

5           THE COURT:  What did the government say

6  exactly?

7           MS. GLASHAUSSER:  That she was not currently,

8  given her current medical condition, a risk of flight or

9  a risk of danger.  They were concerned about the future

10  risk if she were to --

11           THE COURT:  Right.  But she's not incarcerated

12  either.  So the question is --

13           MS. GLASHAUSSER:  She is incarcerated, your

14  Honor.  She's shackled to a bed.  There are guards

15  outside her room.  She has no phone access.  She's unable

16  to speak to family or friends.  The only people she has

17  had access to are me and a paralegal who, because of the

18  emergency nature of the situation, have been going to the

19  hospital each day for the past three days.

20           THE COURT:  Right.

21           MS. GLASHAUSSER:  She is incarcerated.

22           THE COURT:  Maybe I misspoke there and I

23  apologize if that was inaccurate.  But what I mean is

24  what we are disputing is whether she should be released

25  pending trial.

22

Proceedings

1           MS. GLASHAUSSER:  Correct, your Honor.

2           THE COURT:  Right.  And it is at least

3   conceivable that she's in the midst of some acute health

4   challenges that will we all hope resolve favorably and

5   that whatever led the government to say she does not

6   present a risk of flight in the current circumstances,

7   that that assessment will, and we actually hope it does,

8   change.

9           MS. GLASHAUSSER:  She already had this medical

10  condition that nobody thinks is going to improve.  There

11  is a more acute immediate condition, but already --

12          THE COURT:  Right.  But how much was the -- I

13  mean --

14          MS. GLASHAUSSER:  And if the government

15  believes at some future date that the circumstances have

16  changed so much that Ms. Sternquist now is a risk, they

17  can come into court and present that to the Court, say

18  conditions have changed and now we have a new application

19  to make.  But the Bail Reform Act doesn't allow somebody

20  to be detained when they are not currently a risk of

21  danger or flight on a speculative future risk.

22          Additionally, the government I believe left out

23  surely inadvertently some of the other conditions that

24  were imposed here to reduce any possible future risk.  In

25  addition to the suretors and the third-party custodian,

23

Proceedings

1   Judge Reyes also imposed home incarceration with GPS
2   monitoring and also said that Ms. Sternquist could only
3   have one cell phone and that that cell phone would be
4   monitored by Pretrial.  Those additional conditions
5   address some of the concerns the government was raising
6   in terms of using email to access somebody on the
7   internet to deliver parts.  Those address exactly that
8   situation.
9           THE COURT:  Do they really though?
10          MS. GLASHAUSSER:  Yes.
11          THE COURT:  How?
12          MS. GLASHAUSSER:  Because the Pretrial would
13   know if anything untoward was occurring on the one
14   device.
15          THE COURT:  So just walk through the
16   hypothetical that the government posed.  The custodian in
17   whose home Ms. Sternquist will be living goes to work.
18   Ms. Sternquist is home alone.  Nobody's monitoring
19   whether she has any visitors.  Right?
20          MS. GLASHAUSSER:  Not under the --
21          THE COURT:  Anybody could come and deliver a
22   second electronic device which has access to the internet
23   through email or otherwise.  I mean I don't agree that a
24   magistrate judge ordering that she can only have one cell
25   phone will suffice to prevent communications with

24

Proceedings

1  potential purchasers for the serious armaments that we're

2  talking about here.

3          MS. GLASHAUSSER:  That is the sort of condition

4  that judges in our district are imposing all the time to

5  address concerns about a whole variety of things that

6  people are alleged to have done on the internet.  I do

7  know that Pretrial comes to people's houses and searches

8  and that if anything like that does happen, that that is

9  part of their job in supervising somebody and I think

10  they're quite good at it.

11          So we do not have to eliminate every possible

12  risk.  It is in fact the government's burden to show that

13  there is a strong risk of flight or a clear and a

14  convincing risk of danger, and there just isn't here.

15          Your Honor called it a very long criminal

16  history.  Respectfully, the criminal history does not

17  show risk of flight or risk of danger.  There is no

18  history of violence, absolutely none.  And there is not a

19  history of fleeing.

20          THE COURT:  If I, just as a theoretical matter,

21  if I view the accusations against Ms. Sternquist as

22  suggesting a likelihood that she is in the business of

23  disseminating illegal and very dangerous firearms, is

24  that a danger to the community?

25          MS. GLASHAUSSER:  Your Honor, we're not talking

Proceedings

1   about whether the crime itself the government is alleging

2   is a danger to the community.  It's whether Ms.

3   Sternquist on her release conditions --

4           THE COURT:  Right.

5           MS. GLASHAUSSER:  -- with an extremely strong

6   bail package is a danger to the community.  And to

7   that --

8           THE COURT:  Right.  So I'm saying if I think

9   there is a substantial probability that she would be

10  inclined to distribute untraceable extremely dangerous

11  firearms, does that qualify under the statute the

12  dangerousness prong?

13          MS. GLASHAUSSER:  I don't believe so, your

14  Honor, especially if there is no evidence here of

15  distribution.  We are well beyond what the facts and Ms.

16  Sternquist's history and characteristics show which is

17  what your Honor is supposed to look at.

18          THE COURT:  Okay.  So I mean either the guns

19  are for personal use or they're for distribution.  I'm

20  not sure which is worse.  And how do you want me to think

21  about that I guess is the question?

22          MS. GLASHAUSSER:  I suppose I want your Honor

23  to think about that as allegations that any gun parts,

24  and I believe the government has not verified whether

25  these guns were operable.  I know they noted there was no

26

Proceedings

1    ammunition.  But all of these materials have been seized

2    by the government.  Ms. Sternquist is now in the hospital

3    with a life-threatening infection.  She is not mobile.

4    She will not have access to any of her electronic devices

5    which the government has also seized.  These are exactly

6    the sort of conditions that judges in our district are

7    putting in place everyday successfully for individuals to

8    be released pretrial.

9              Here it is especially important that Ms.

10   Sternquist be released because of her physical condition

11   because MDC is the one that cause the physical condition

12   because MDC ignored court orders already to provide

13   medical care, and because Ms. Sternquist vitally needs

14   that medical care.  I think that's exactly -- all of

15   those things were the things I believe that Judge

16   Reyes --

17             THE COURT:  Vitally needs that medical care

18   meaning not the medical care she's getting right now but

19   you're talking about the regular medical care?

20             MS. GLASHAUSSER:  Correct, your Honor.  So the

21   reason that she ended up in the hospital is that she uses

22   a catheter regularly that needs to be changed.  MDC

23   failed to change it for longer than the amount of time

24   that was supposed to take place.  Removing it caused an

25   abrasion in her genital area that meant they could not

27

Proceedings

1   replace that catheter and had to use this other one, and

2   that's the one that was placed and expanded before it had

3   reached the bladder.   MDC --

4                THE COURT:   Is there a specialist that she

5   needs to see who is a specialist of a type that MDC does

6   not have on staff?

7                MS. GLASHAUSSER:   I don't think MDC has any,

8   they don't have specialists on staff.   But Ms. Sternquist

9   has a, my understanding, is a host of doctors that she

10  had been seeing at Mount Sinai, all sorts of -- you know,

11  I don't pretend to have any medical background, your

12  Honor.

13               THE COURT:   Right.   No, I understand.

14               MS. GLASHAUSSER:   But the history here is clear

15  that MDC can't provide that care.   And when we add that

16  fact to the fact that her current medical condition --

17  the government believes even right now that there is no

18  risk of flight or no risk of danger and the medical

19  condition reduces vastly any future risks of those

20  things, that all points to Ms. Sternquist being released

21  and Judge Reyes's decision being the right one.   The Bail

22  Reform Act has a presumption in favor of the least --

23  there's only a limited class of people that are not to be

24  released.   In this case, Judge Reyes formed a package

25  that is quite strong to address exactly the concerns that

28

Proceedings

1  your Honor is talking about and that the government is

2  talking about and will allow Ms. Sternquist to receive

3  medical care that will not send her to the emergency

4  room.

5          THE COURT:  Is this as binary as we seem to be

6  proceeding under the assumption that it is or is there

7  any other option besides release on the conditions that

8  Judge Reyes ordered or confinement?

9          MS. GLASHAUSSER:  I mean there are other

10 conditions that your Honor could --

11         THE COURT:  Sorry, I don't other conditions

12 that would assure her appearance.  Like we could talk

13 about whether anybody else is willing to sign the bond

14 and whether there is any property that anybody has to

15 post.  But what I meant was do I have any option to order

16 some sort of periodic release for medical visits that MDC

17 is unable to provide effectively or any other condition

18 that would protect her health?  Not condition that would

19 assure her appearance.

20         MS. GLASHAUSSER:  I don't believe so, your

21 Honor.  MDC has proven in other cases but specifically in

22 this one that Court orders are not something that they

23 are following.  And I have not --

24         THE COURT:  I saw the reference in your letter

25 to Judge Bulsara's order that a medical visit happen by

Proceedings

1   September 23rd and that it wasn't until the 26th.  What

2   was the other instance of noncompliance here?

3          MS. GLASHAUSSER:  Judge Bulsara that same day

4   had ordered that Ms. Sternquist be moved to the women's

5   unit.  She had been housed in the men's unit.  And

6   ordered that it be done by a specific time.  I believe on

7   that same day, September 23rd.  And it might even have

8   been the day earlier and MDC did not do that.  You can

9   see Judge Bulsara's reaction --

10          THE COURT:  And still has not.

11          MS. GLASHAUSSER:  -- to that on the docket.

12   No, after Judge Bulsara issued an order to show cause

13   that MDC should not be held in contempt and then Ms.

14   Sternquist was moved to a unit by herself on the women's

15   side of the building.

16          As far as medical orders specifically, I also

17   learned this morning in speaking to the magistrate

18   judge's deputy that there had been a medical order issued

19   on September 15th as well to MDC before I got involved in

20   the case when the prior lawyers were representing her

21   which I didn't even realize.  That one seems to have just

22   been entirely ignored.

23          But more -- I don't know if I would say more

24   importantly, but we are here looking at the Bail Reform

25   Act and --

30

Proceedings

1        THE COURT:  I understand that.  But you know,

2   these are the factors that I think are relevant to

3   whether the current bail conditions are adequate.  We are

4   talking about -- so there's a fairly long break in the

5   criminal history here between age 32 and 37.  So five

6   years of no entries on the criminal history.

7        MS. GLASHAUSSER:  And I believe, your Honor,

8   that entry for page 32 is a dismissed case.

9        THE COURT:  Yes, the misdemeanor.  Was she in

10  the Navy during that period?  What's different about that

11  period versus the prior period?

12       MS. GLASHAUSSER:  No, your Honor.  She was in

13  the Navy I believe in the early 2000s.

14       THE COURT:  Okay.

15       MS. GLASHAUSSER:  Just out of high school.

16       THE COURT:  Oh, okay.

17       MR. BUFORD:  That's our understanding as well,

18  your Honor.

19       THE COURT:  All right.  But so since then,

20  arrested on a theft offense at age 19, sentenced to

21  probation, warrant issues for the probation violation.

22  Age 22, a federal conviction in the U.S. District Court

23  in the Southern District of Ohio for identity theft, a

24  felony.  Sentenced to one year in jail.  I don't what

25  this 2007 conviction is.  That looks like a fairly --

31

Proceedings

1   it's a Class A misdemeanor which when I read the

2   description of transportation without paying, I was

3   thinking of turnstile jumping or something extremely non-

4   serious, but that --

5           MS. GLASHAUSSER:  I think that's what that is,

6   your Honor.

7           THE COURT:  That would be a Class A

8   misdemeanor?

9           MS. GLASHAUSSER:  Well I don't believe that

10  they charge that anymore actually in New York City but I

11  don't know exactly what class of misdemeanor it is.  I'm

12  looking to one of the prosecutors who is in the state.

13          THE COURT:  But again, a bench warrant issued

14  and sentenced after the bench warrant issues to a term of

15  four months incarceration.  And I understand that's to

16  run concurrently but it seems like there was something

17  more meaningful than turnstile jumping going on there.

18          MS. GLASHAUSSER:  Your Honor, I just note as

19  far as the bench warrant, it's one week before it was

20  vacated.  That's extremely common in state court that

21  people miss a Court date and come slightly afterwards.

22  But I'd also just note that we're going very far back in

23  time as far as Ms. Sternquist's current --

24          THE COURT:  Yes, 2007.  Arrested again in 2007

25  for carrying a concealed weapon, a felony.  Pleads no

Proceedings

1   contest and is sentenced to 60 days imprisonment and two

2   years probation.  And it looks like while she's on

3   probation, arrested in Staten Island for grand larceny,

4   criminal possession of stolen property, both Class E

5   felonies.  Pleads guilty to a Class A misdemeanor and is

6   sentenced to an order of protection term, I'm not sure

7   what that means, of 90 days.  Does that mean that in

8   order of protection was issued --

9           PRETRIAL OFFICER:  Yes, your Honor.

10          THE COURT:  -- against her?  How does --

11          THE CLERK:  Stand by a microphone.  Thank you.

12          PRETRIAL OFFICER:  So in that case it just

13   means that an order of protection was placed in favor of

14   someone else against the defendant.

15          THE COURT:  Okay.  That's what I generally

16   understand an order of protection to be.  Okay.  And that

17   was for a term of 90.  So then there was an order of

18   protection entered against Ms. Sternquist and in addition

19   she was sentenced to 90 days of incarceration.

20          PRETRIAL OFFICER:  Correct, your Honor.

21          THE COURT:  Okay.  Not even a year later, call

22   it four months later, arrested for petty larceny and

23   criminal possession of stolen property, sentenced to ten

24   days.  Three months after that, arrested for criminal

25   possession of stolen property and criminal trespass.

Proceedings

1    Again convicted.  Again an order of protection issues.

2    Do we know what these orders of protection are about?  Or

3    we just know that they were orders of protection issued?

4                PRETRIAL OFFICER:  Yes, your Honor.  We just

5    know from our criminal history research that it was just

6    an order of protection ordered.

7                THE COURT:  Okay.  But in whose defense or for

8    whose benefit we don't know?

9                PRETRIAL OFFICER:  The names?  No, your Honor.

10               THE COURT:  Okay.  A full year later criminal

11   possession of marijuana which is irrelevant in my

12   opinion.  Seven months after that arrested by federal

13   officials in the District of New Jersey for possession of

14   tools for forgery and counterfeiting.

15               MS. GLASHAUSSER:  Your Honor, I apologize for

16   interrupting.  If I may, Ms. Sternquist is texting me or

17   the paralegal is texting me.  If I can give some context

18   to the orders of protection?

19               THE COURT:  If you can give it to me?

20               MS. GLASHAUSSER:  May I give you some context?

21               THE COURT:  Sure.  Yes, please.

22               MS. GLASHAUSSER:  And I am going to be

23   imprecise in the time period, but there was a time period

24   where Ms. Sternquist was homeless which I believe is when

25   there are some of these petty larceny convictions.  And

34

Proceedings

1    her understanding of the order of protection were that

2    she could not go back to the store where the petty

3    larceny had taken place.  I don't know if that's correct,

4    but that's what she understood those to be.

5            THE COURT:  Okay.  I mean that makes sense and

6    I appreciate you saying so.  So age 26, this is 2010, so

7    still 12 years ago, convicted in federal court in New

8    Jersey for possession of tools for forgery or

9    counterfeiting, sentenced to 27 months incarceration and

10   a three-year term of supervised release and two

11   violations charge of the supervised release.  Looks like

12   supervised release was eventually revoked and she was

13   sent back to custody in 2013.

14           In the meantime, while she's out on supervised

15   release, arrested for petty larceny and criminal

16   possession of stolen property again in Manhattan.  And

17   that's when we get to the five-year break.  But then

18   criminal mischief last year, our Class D felony in New

19   York State Supreme Court.  That case is still pending.

20   And it's while she's on pretrial release for that case

21   that this arrest happens.  So that's, I'll say it again,

22   that's an extremely long criminal history and fairly

23   unbroken with a number of indications of noncompliance

24   with the terms of either pretrial release or supervised

25   release after serving a sentence.  We've got the

35
Proceedings

1  extremely serious nature of the offense charged here.  A

2  history, such as it is, of not only failures to appear

3  but also additional criminal activity while under

4  supervision.

5      MS. GLASHAUSSER:  Your Honor, if I may, I don't

6  think there's -- I mean other than the petty larceny, a

7  history while under supervision.

8      THE COURT:  And the fact that we're here right

9  now.  I understand this case has not been proved but the

10  evidence looks fairly strong, right --

11      MS. GLASHAUSSER:  I just would urge --

12      THE COURT:  -- given the --

13      MS. GLASHAUSSER:  I apologize, your Honor.  I'd

14  urge the Court not to consider being released on bail in

15  state court the same as how being released on bail in

16  federal court is.

17      THE COURT:  Why?

18      MS. GLASHAUSSER:  Because there are very few

19  conditions imposed on people in state court and little

20  follow-up.  Here we not only have the Pretrial Services

21  office that does a lot of work with my clients and a lot

22  of work to ensure people are successful and the numbers

23  of people that are successful in returning to court and

24  being successful on bail are extremely high in our

25  district I think in part because there's a lot follow up.

36

Proceedings

1  There's strong bail packages.  It's not that somebody is

2  just released.  So I do think that that's quite

3  different.

4          And there is also one other --

5          THE COURT:  But the Pretrial Services office

6  here is taking the position that there is no condition or

7  combination of conditions that can assure the defendant's

8  release.

9          MS. GLASHAUSSER:  I understand.  I mean this

10 report was made on September 15th when Ms. Sternquist was

11 arrested.  Pretrial hadn't spoken to any of the suretors.

12 Neither had the government.  Ms. Sternquist's health

13 condition was unverified and we didn't have a lot of

14 information about it.  So it is quite different now.

15          And there's one other factual matter that I

16 just want to note to address one of your Honor's and the

17 government's earlier concerns about the home where she

18 would be released.  Under our proposal, because Moira

19 Meltzer-Cohen, the lawyer who is here, is a lawyer, she

20 usually works during the day while her partner is a nurse

21 who works at night.  There actually is someone home the

22 vast majority of the day.

23          THE COURT:  They're on reverse schedules?

24          MS. GLASHAUSSER:  Yeah, reverse schedules.  And

25 also to address your Honor's question about visitors, I

37

Proceedings

1   had started to say there were other conditions if your

2   Honor wished to impose them.  Courts have imposed

3   conditions about who can visit and have Pretrial approve

4   people who can visit the home.  That is another condition

5   that is available to your Honor if that's -- that seems

6   to have been one of the concerns of the government and

7   one the concerns of the Court.  So I just wanted to make

8   sure the Court was clear on those two additional factors

9   with the current proposal in the hope that that assuages

10  some of your Honor's concerns.

11         I do not believe there's any indication surely

12  in the state cases of home incarceration, which is what

13  Judge Reyes ordered here, with GPS monitoring, cell phone

14  monitoring, suretors, and a third-party custodian who is

15  a lawyer admitted in our district which I think those

16  things provide extremely strong both moral suasion to Ms.

17  Sternquist to follow the conditions --

18         THE COURT:  Is there any possibility, and I'm

19  not obviously suggesting anybody should or should not do

20  this, but any possibility that somebody who's being

21  offered up as a custodian now would also be willing to

22  serve as a suretor and do they have any real property to

23  post?  And I'm not even saying this is dispositive or

24  that this would be dispositive, but I'm just curious how

25  that's not part of the package.

Proceedings

1          MS. GLASHAUSSER:  It's not impossible but my

2    understanding of a third-party custodian is that is seen

3    as stronger than a suretor who just signs a piece of

4    paper.  The third-party custodian, any third-party

5    custodian is at risk of being held in contempt.  And

6    particularly when you have a third-party custodian who is

7    a lawyer, I think that risk of being held in contempt is

8    much more -- she understands --

9          THE COURT:  But they're not posting property

10   or --

11         MS. GLASHAUSSER:  No, your Honor.

12         THE COURT:  Okay.

13         MS. GLASHAUSSER:  But I will say that the bond

14   amount on this bond is the highest of any of my clients

15   that I've had.  I think with reason because the people

16   signing the bond, while they have jobs, they don't have a

17   great deal of money nor does Ms. Sternquist.  So it's an

18   extremely high amount for the people signing the bond.

19         THE COURT:  Right.  All right.  Let me sum up

20   here on where I come out on this.

21         I find it extremely concerning that the MDC

22   (A), seems to have failed to provide adequate medical

23   care to Ms. Sternquist, and (B), seems to have violated

24   one or maybe more than one order from judges in this

25   courthouse along the way.  And I will encourage the

39

Proceedings

1   defense in the event that Ms. Sternquist is not getting

2   the medical care that she needs at the MDC on the

3   schedule that she needs it to bring that early and often

4   to the attention of the district judge who ends up being

5   assigned this case.

6            I have to follow the terms of the Bail Reform

7   Act as we all agree here and I understand that in Section

8   (g) the factors to be considered, I am explicitly

9   instructed to consider the defendant's character as well

10  as physical and mental condition, family ties,

11  employment, resources, et cetera, and that that actually

12  picks up the questions of physical health.  At the same

13  time, the key issues here are the risk of flight and the

14  risk of danger to the community.  And I find, and I don't

15  think there's really much question about this, that Ms.

16  Sternquist presents very seriously on both of those

17  scores.

18           In terms of the risk of nonappearance, she is I

19  think facing the possibility of a very substantial jail

20  term here to the extent we're talking about automatic

21  weapons that are untraceable.  I understand she hasn't

22  been even charged with that conduct yet let alone

23  convicted.  But nobody's disputing, as we sit here now at

24  least, that the law enforcement officers who effectuated

25  her arrest did recover this cache of very serious

40

Proceedings

1   weapons.  And I think the ID technology is very serious

2   also.  We obviously don't know what it is as we sit here,

3   what use it is that Ms. Sternquist intended to make of

4   these documents or why she was going to so much effort to

5   procure them, not only the documents but the badges.  But

6   it's not hard to envision some very serious criminal

7   activity that could be facilitated through the use of

8   documents like that and badges.  We hear all the time

9   about push in robberies and not only do we hear about

10  them, we see them being prosecuted in this courthouse and

11  elsewhere.  I'm not at all suggesting that I know what

12  use Ms. Sternquist was proposing to make of these

13  documents.  I'm just saying there are uses of materials

14  like this that are exceedingly dangerous.

15          There's the long criminal history, the history

16  such as it is of failures to appear and of additional

17  criminal activity while under supervision.  There is most

18  recently the fact that Ms. Sternquist was out on pretrial

19  release in a state case when the incident arrest

20  transpired.

21          And so for all those reasons, it seems to me --

22  I don't want to say that I don't know of any condition or

23  combination of conditions that would assure Ms.

24  Sternquist's appearance in court throughout this case,

25  but I don't believe that the current set of conditions is

41

Proceedings

1  sufficient to do that or two assure the safety of the

2  community.  And the safety of the community really is my

3  bigger concern given both her criminal history and the

4  facts that are being presented to me about the offense of

5  arrest here.

6          And so I will order her detained over the

7  proposal that she be released on the instant set of

8  proposed conditions.

9          You can take it up with -- you'll have a

10  district judge assigned in this case in the next couple

11  of weeks.  And if the picture either changes in terms of

12  the risk of flight or what a bail package might look like

13  or if there's new information about the MDC and the

14  circumstances under which they are or are not responding

15  to the interactions they've had in this matter with this

16  Court, you know, obviously you'll take it up with the

17  district judge at that time.

18          So thank you.  We're adjourned.

19          MR. BUFORD:  Thank you, judge.

20               (Matter concluded)

21                  -oOo-

22

23

24

25

42

# C E R T I F I C A T E

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **2nd** day of **October**, 2022.

*Mary Greco*

Transcriptions Plus II, Inc.