UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
UNITED STATES OF AMERICA

     -against-

KARA STERNQUIST

                                            22-cr-473
--------------------------------------------------------X


**Reply in support of Kara Sternquist's Motion
to Dismiss**

Allegra Glashausser
Attorney for Ms. Kara Sternquist
Federal Defenders of New York
1 Pierrepont Plaza, 16th Floor
Brooklyn, N.Y. 11201
(212) 417-8734

# Table of Contents

<u>Argument</u>

Kara Sternquist, who has no violent felony convictions, is part of the "people," and has a constitutional right to "bear arms"……………………………………………1

A.    In *Range*, the *en banc* Third Circuit persuasively explains why those convicted of non-violent felonies are part of the "people" protected by the Second Amendment and that there is no historical tradition preventing them from having guns…………………………...……………………………………………3

    1.    Like Range, nothing in Ms. Sternquist's background indicates that she is dangerous, violent, or a threat…..…………...……………………………7

    2.    Like Range, there is no evidence that Ms. Sternquist possessed any guns other than for self-defense…………...……………………...………....10

B.    The government's reliance on pre-*Bruen* decisions is misplaced……………....15

C.    The government has failed to meet its *Bruen* burden…………………………...17

    1.    The government's claim that "felons" "do not fall within the definition of 'people'" is completely unsupported………………………………18

    2.    The government fails to show any historic tradition of permanently disarming people with non-violent felony convictions……………..20

Conclusion…………………………...……………………………………………..25

**Argument**

**Kara Sternquist, who has no violent felony convictions,
is part of the "people," and has the constitutional right
to "bear arms."**

In her opening motion, Kara Sternquist moved to dismiss her conviction under

18 U.S.C. § 922(g)(1) as unconstitutional both facially and as applied to her, under the

new *Bruen* historical inquiry framework. *New York State Rifle & Pistol Association v.*

*Bruen*, 142 S. Ct. 2111 (2022). *Bruen* "presumptively protects" the right to bear arms,

unless the government meets their burden of identifying a tradition of "distinctly

similar" regulations from the founding era. *Id.* at 2129-30, 2137-38. Since Ms.

Sternquist filed her opening motion, the Third Circuit, sitting *en banc*, applied *Bruen* to

hold that a person with a non-violent prior felony – just like Ms. Sternquist – retained

the protections of the Second Amendment. *Range v. Att'y Gen,* 69 F.4th 96 (3d Cir.

2023)(en banc). The full Third Circuit reversed Mr. Range's conviction under 18

U.S.C. § 922(g)(1), finding that the statute was unconstitutional as applied to Mr.

Range. *Id.* This Court should reach the same conclusion here. *Range* persuasively

rejects the arguments made by the government in response to Ms. Sternquist.

Rather than grapple with *Range*, conduct a thorough historical analysis, or

attempt to meet their burden under *Bruen*, the bulk of the government's response to

Ms. Sternquist's motion argues that *Bruen* did not "disturb[ ]" prior Second Circuit

case law. Gov. Res. at 5-12. In support, the government repeatedly cites one pre-*Bruen*

decision that is 8 sentences long and has no analysis, *United States v. Bogle*, 717 F.3d 281

(2d Cir. 2013) (per curiam). Gov. Res. at 4, 5-12. It cites just one post-*Bruen* circuit case, *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023), which relied on the now-defunct reasoning of the panel opinion in *Range*, overturned by the *en banc* court. This Court simply cannot ignore *Bruen* or the numerous circuit and district court cases recognizing that it dramatically changed the Second Amendment analysis. *See* Def. Mot. at 4.[1] *See also Atkinson v. Garland*, No. 22-1557, 2023 WL 4071542 (7th Cir. June 20, 2023) (remanding for reconsideration in light of *Bruen*, and noting, "Nothing allows us to sidestep *Bruen* in the way the government invites."); *United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309 (S.D. Miss. June 28, 2023) (holding that 922(g)(1) was unconstitutional as applied to a person convicted of aggravated assault and manslaughter, who served 15-16 years in prison).

When the government finally turns to *Bruen*, it asserts that there are a "plethora of examples" from the nation's historical tradition of firearm regulation to restrict "felons from possessing firearms," but points to none, instead asserting that there is a historical tradition of restricting religious groups from possessing guns and that,

---

[1] Citing *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023) (statute prohibiting possession of guns by someone subject to a domestic violence restraining order unconstitutional), *cert. granted* June 30, 2023; *United States v. Perez-Gallan*, 2022 WL 16858516 (W.D. Tex. Nov. 10, 2022) (same); *United States v. Connelly*, 2023 WL 2806324 (W.D. Tex. Apr. 6, 2023) (statute prohibiting possession of guns by an unlawful user of a controlled substance is unconstitutional); *United States v. Harrison*, 2023 WL 1771138 (W.D. Okla. Feb. 3, 2023) (same); *United States v. Hicks*, , 2023 WL 164170 (W.D. Tex. Jan. 9, 2023) (federal statute prohibiting receipt of firearm while under felony indictment violated Second Amendment); *Firearms Policy Coal. v. McCraw*, 2022 WL 3656996, at *5 (N.D. Tex. Aug. 25, 2022) (holding that statute limiting gun ownership to people over 21 was not "consistent" with the nation's "historical tradition).

historically, many felonies were punishable by death. Gov. Res. at 4, 14-19. This does not meet the government's burden. Instead, the indictment must be dismissed.

A.    <u>In *Range*, the *en banc* Third Circuit persuasively explains why those convicted of non-violent felonies are part of the "people" protected by the Second Amendment and that there is no historical tradition preventing them from having guns.</u>

As explained in Ms. Sternquist's opening motion, Def. Mot. at 7-12, Ms. Sternquist is part of the "people" protected by the Second Amendment and there is no historical tradition preventing someone with her background from having guns. *Range* persuasively applies *Bruen* to a situation similar to that of Ms. Sternquist.

In *Range,* the Third Circuit found that Range, despite his felony conviction, was part of the "people" who enjoyed Second Amendment rights. *Range*, 69 F.4th at 98. In reaching this conclusion, the court rejected the government's argument that the "people" protected by the Second Amendment only included "the political community of law-abiding, responsible citizens." *Id.* at 101. It noted that the references in *Heller, McDonald*, and *Bruen* to "'law-abiding, responsible citizens' were dicta" because "the criminal histories of the plaintiffs [ ] were not at issue in those cases." *Id.* It explained, as Ms. Sternquist did, Def. Mot. at 7, that "other Constitutional provisions reference 'the people,'" and are not limited based on a person's criminal history. *Id.* And, it found that the government's "claim that only 'law-abiding, responsible citizens' are protected by the Second Amendment [would] devolve authority to legislators to decide whom to exclude from 'the people'" because

3

the phrase "law-abiding, responsible citizens" is "expansive" and "vague." *Id.* at 102–03.

In the government's response motion in Ms. Sternquist's case, the government makes these exact same arguments that were rejected by the *Range* court, and fails to explain why it believes the Third Circuit interpreted *Bruen* incorrectly. Gov. Res. at 7-8 (arguing at length that the phrase "law-abiding, responsible citizens" was not dicta).

*Range* also held that there was no historical tradition preventing Range, a non-violent felon, from having guns. *Range*, 69 F.4th at 103-06. In doing so, it rejected the government's attempts to point to the historical tradition of race and religious-based restrictions on bearing arms as an analogue to restrictions on all people convicted of felonies from barring arms. As the court noted,

> Apart from the fact that those restrictions based on race and religion now would be unconstitutional under the First and Fourteenth Amendments, the Government does not successfully analogize those groups to Range and his individual circumstances. That Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that Range is part of a similar group today. And any such analogy would be "far too broad[ ]." *See* Bruen, 142 S. Ct. at 2134 (noting that historical restrictions on firearms in "sensitive places" do not empower legislatures to designate any place "sensitive" and then ban firearms there)."

> *Range*, 69 F.4th at 104–05.

The court also rejected the government's arguments based on the fact that "founding-era felons" were often punished by death, saying that

4

> That Founding-era governments punished some nonviolent crimes with death does not suggest that the particular (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition. The greater does not necessarily include the lesser: founding-era governments' execution of some individuals convicted of certain offenses does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed…a felon could "repurchase arms" after successfully completing his sentence and reintegrating into society.

> *Range*, 69 F.4th at 105.

It also rejected the government's argument based on criminal forfeiture laws of the founding era, saying that "Founding-era laws often prescribed the forfeiture of the weapon used to commit a firearms-related offense without affecting the perpetrator's right to keep and bear arms generally." *Range*, 69 F.4th 96, 105 (3d Cir. 2023).

As with the argument relating to Ms. Sternquist not being a part of the "people," the government's response motion in Ms. Sternquist's case also makes these exact same arguments about historical tradition that were rejected by the *Range* court. Gov. Res. at 16 (argument relating to forfeiture and death penalty); at 17 (argument related to religious and ethnic groups being disarmed). It does not explain why it believes the *Range* decision was wrong to reject these arguments.

The government's response motion simply does not engage with the *Range* majority opinion. Instead, the government calls it "unpersuasive" and briefly cites the dissenting and concurring opinions. Gov. Res. at 11-12. It also relies heavily on *Jackson*, 69 F.4th 495, a panel decision that itself relied heavily on the now-defunct

5

reasoning of the panel opinion in *Range*, to find that 922(g) was constitutional as applied to Jackson, who had two felony convictions for selling controlled substances. *Jackson* was decided just 4 days before the case it relied on was reversed by the Third Circuit *en banc* court.

*Range* was not a close case. Nine judges signed the majority opinion, three concurred, and four dissented. The dissenters recognized that the majority opinion is not narrow, but, instead, that the "analytical framework they have applied to reach their conclusion renders most, if not all, felon bans unconstitutional." *Range*, 69 F.4th at 113 (Shwartz, dissenting). While not binding on this Court, the reasoning of a sister circuit sitting *en banc* should be influential.

Moreover, in the few weeks since *Range* was decided, a panel of the Seventh Circuit reached similar conclusions as *Range* about the impact of *Bruen* on the constitutionality of 922(g)(1) as applied to people with non-violent prior convictions. In *Atkinson*, 2023 WL 4071542, the Seventh Circuit remanded for the district court to conduct the *Bruen* analysis as applied to Atkinson, who had been convicted of federal felony mail fraud. *Id.* at *3. The court noted that "the government would have us avoid a *Bruen* analysis altogether" and, instead, "[i]nvoking *Heller* and *McDonald*, it urges us to uphold § 922(g)(1) based on oft-quoted dicta describing felon-in-possession laws as 'presumptively lawful.'" *Id.* at *3. It concluded: "Nothing allows us to sidestep *Bruen* in the way the government invites." *Id.* The Seventh Circuit also rejected the government's attempt to point "to only a couple of isolated historical

6

facts and incidents, offering no detail about their application and import" as sufficient. *Id.*

      1.     Like Range, nothing in Ms. Sternquist's background indicates that she is dangerous, violent, or a threat.[2]

      Kara Sternquist, a transgender woman, was raised as a boy in Iowa, Missouri, and Texas. Growing up, it was normal for families to have guns and for children to learn to shoot them. When she was only 10 years old, Ms. Sternquist's parents sent her to an all-boys military school, where she learned gun safety. *See* Ex. A, excerpt school records. A message to a friend in 2021 indicated that she was "taught the mechanics and safety of and respect for guns and weapons of all sorts." Discovery, Cellebrite Report, Folder IS0001514657 (text attached, Ex. B).

      Military school, however, was unsurprisingly not a good fit, for reasons unrelated to gun culture. Her parents sent her to Casa by the Sea, a boarding school in Mexico, which was later shut down because the children were physically and emotionally abused. *See* Ex. A (noting transfer to Casa by the Sea); Tim Weiner, "2 Foreign Units of Troubled U.S. Academy are Closed," N.Y. TIMES, Sept. 13, 2004, available at https://tinyurl.com/4e54fcyd. She finally got out when she was about 17 years old. Her early adulthood was difficult. She worked as a magician, a stage light

---

[2] For purposes of this motion, the facts as stated in the indictment and complaint relating to gun possession are deemed to be true. Ms. Sternquist, however, does not waive the right to put the government to its proof on any of these facts in the event this motion is denied.

technician, and at a boat repair shop. *See* Ex. C, explanation of magic card tricks written and drawn by Ms. Sternquist. At times, she was homeless.

In 2007, she was convicted of creating fake identifications, under 18 U.S.C. § 1028 (a)(1). In 2010, she was convicted of possession of forgery or counterfeiting tools, under 18 U.S.C. § 1028 (a)(5). As the government notes, this crime involved having special paper, inks, and "lamination pouches" to make fake-IDs. Gov. Res. at 2. As in *Range*, Ms. Sternquist's crimes were committed "with a pen." *Range*, 69 F.4th at 112 (Ambro, J., concurring). Neither case involved victims or stealing money. She has never been convicted of a violent offense, or ever been alleged to have committed a violent offense. In the 10 years before her arrest in the current case, she had no convictions.

In those 10 years since her last conviction, she also became a dynamic member of her community. *See* Dkt. 51, at p. 6-7. She worked at the Manhattan Jewish Community Center, had a part-time job as an usher at the National Yiddish Theater Folksbiene, and was well-connected to LBBTQ pride groups. She volunteered for the Make-A-Wish foundation, by dressing as favorite children's characters, such as Ms. Frizzle from the Magic School Bus, a ghostbuster, and as Missy, a Dr. Who character. She is lifelong friends with people from her childhood, as well as her ex-wife, Giacinta Pace. Numerous friends have been available to support her after her arrest.

In the government's response motion, it does not assert anything to the contrary; it does not point to any violence Ms. Sternquist has ever committed or been

accused of committing; it does not point to anything in her background indicating that she is a threat of any kind, or a danger. Instead, it attempts to distinguish Ms. Sternquist's background from Range's by saying that Ms. Sternquist was convicted of "serious" felonies. Gov. Res. at 11, 20. But, it does not define "serious," and points to no case law suggesting a distinction in Second Amendment rights between serious or non-serious convictions. What is notable about Ms. Sternquist's record is that it is not dangerous, violent, or threatening. Like in *Range*, her prior felony convictions are paper-based crimes.

The government also asserts there is a history of "disarming certain individuals viewed as threats to the public order," Gov. Res. at 14. It does not provide a citation for this assertion. As with "serious" felonies, the phrase "threats to the public order" is not defined.  In any event, the government also does not point to anything in Ms. Sternquist's background suggesting she is a "threat[ ] to the public order." Instead, the government points to Ms. Sternquist's current charges, asserting that "the threat [Ms. Sternquist] poses to public safety is evident." Gov. Res. at 7, 20 (asserting she had a "small arsenal of dangerous weapons").[3] But, this argument is circular: The

---

[3] The government overstates her current charges, saying the indictment has "multiple felony counts." Gov. Res. at 3. The indictment has two felonies, and one misdemeanor, 18 U.S.C. § 701, which is punishable by a maximum of only 6 months of imprisonment.

It also asserts that one item "qualified" as a "machine gun," Gov. Res. at 3, but that is far from proven. Indeed one government agency found that none of the items were automatic, Sternquist 6271-73 (Forensic Laboratory Examination Report), before a second agency reached a different conclusion with respect to one item. Even so, the second agency could only get, at most,

government cannot argue that Ms. Sternquist does not have a Second Amendment right to possess guns by pointing to the fact that she is charged with possessing guns. The very question before the Court is whether Ms. Sternquist has a constitutional right to have guns. That the government alleges she had them cannot also be the evidence that her constitutional right was properly curtailed.

2. Like *Range*, there is no evidence that Ms. Sternquist possessed any guns other than for self-defense.

As in *Range*, here, there is also no evidence that Ms. Sternquist had any intent to do anything violent, or unlawful with any gun. On the contrary, the available evidence shows that Ms. Sternquist perceived a need to protect herself as the rights of transgendered people came under attack. Indeed, the government has already made this argument, stating that it spoke to a person who said that Ms. Sternquist was "building the firearms to defend herself." Gov. Ltr, Dkt. 55 at 5. The Second Amendment is designed to allow people to protect themselves, particularly inside a home.

---

two bullets to shoot from that item. Sternquist 6203 (ATF report). In five testing attempts, only twice did the tester report that the gun firing two bullets. *Id.*

As noted in Dkt 75, the ATF reports also indicate that – before experienced ATF agents fixed and replaced parts, one item became jammed immediately; and two did not work until ATF took them apart and reassembled them with replacement parts. Sternquist 06204 (noting that "after the first round was fired, the Exhibit was completely locked up and the spent cartridge casing could not be removed easily"); Sternquist 06200 (describing "perform[ing] a detailed disassembly"); Sternquist 06201 (item was "crudely made" and of "very low quality in both materials used and craftsmanship applied"). This is far from an "arsenal" the government describes. Gov. Res. at 7.

10

The discovery provided by the government also points to that purpose. It shows that Mr. Sternquist became painfully aware of the raise of right-wing anti-trans rhetoric. As Ms. Sternquist wrote to a friend in July 2021, she had driven across the country and heard "political ads on [the] radio [that] were basically 'I'd shoot one of them transgenders for even looking at the same bathroom' as my child.'" Ex. B; *see also* message from 9-15-20 (sharing a concerning video showing protesters chanting "kill transgenders."). In a message to a friend, it states that she "realized that [ ] a government [ ] already showed me they don't [care] about my rights/existence" and should "t[a]k[e] the necessary steps to ensure my own safety." *Id.* It added, "we have a constitutional amendment protecting [the right to gun] possession." *Id.* The browser history indicated that she had viewed numerous websites reporting on anti-trans laws and rhetoric. Ex. B, excerpt "Web History."

Then, Ms. Sternquist was threatened by two men in her hometown of New York City in the Fall of 2021. *See* Police Report, attached Ex. D. The men used a slur related to her being a transwoman, and one picked up a liquor bottle, threatening to hit her with it. Although, to her, it was clearly a hate crime, the police did not record that part of her complaint, and did not seem to take her report seriously. In a message to her mother, she explained that she had been a victim of a hate crime, but that the police "didn't even arrest both of the people who attacked" her. Ex. B. This taught her to be concerned whether police would protect her.

11

That same year, she became a target of hateful, vitriolic speech after her address was posted on Kiwi Farms, a website devoted to stalking and harassing people, including those in the LBGTQ community.[4] Afterward, she started receiving death threats on Facebook. Two are pictured below, and full size versions are attached in Ex. E, including ones saying that she would "get a bullet" and that "I'm gonna slaughter you and your family when I find you":





---

[4] *See e.g.,* Josh Taylor, "'It's not that hard': Does kicking Kiwi Farms off the internet prove tech firms can act against hate speech?", THE GUARDIAN, Sept. 19, 2022, available at https://tinyurl.com/546zcdbp (describing Kiwi Farms as "An internet forum known for its active targeting and harassment of trans people, Kiwi Farms has also been blamed for suicides after people were hounded offline – and sometimes out of their homes – by a firehose of vitriol coordinated and directed from the site"); Margaret Pless, "Kiwi Farms, the Web's Biggest Community of Stalkers," NEW YORK MAGAZINE, July 19, 2016, available at https://tinyurl.com/yc8mfaf3.

Ms. Sternquist's individual experience of hateful anti-trans speech and violence was not unique. This anti-trans rhetoric was widely documented in the press.[5] From 2017 to 2021, there was a 93% increase in transgender homicides. C. Mandler, "Murders of trans people nearly doubled over past 4 years, and Black trans women are most at risk, report finds," CBS NEWS, Oct. 14, 2022, available at https://tinyurl.com/bdcrb8sk (noting that, in 2019, the American Medical Association recognized "an epidemic of violence against the transgender community").[6]

In this culture of hate, portions of the LGBTQ community began rethinking their position on guns, with groups advocating for members of the LGBTQ community to learn how to use guns safely, for self-defense. *E.g.,* Shannon Heffernan, 'I feel better knowing I have the option of not being a victim,' WBEZChicago, NPR

---

[5] *E.g.,* Rebecca Boone, "Right-wing extremists amp up anti-LGBTQ rhetoric online," AP NEWS, June 13, 2022, available at https://tinyurl.com/mwh9d5w4 (reporting on the arrests of 31 people from 11 states were planning to riot at a pride event, and a pastor telling his congregation that transgender people "should be executed by the government."); Helen Santoro, "How Anti-LGBTQ+ Rhetoric Fuels Violence," SCIENTIFIC AMERICAN, Dec. 12, 2022, available at, scientificamerican.com/article/how-anti-lgbtq-rhetoric-fuels-violence/ (noting rise in violence against the LBGTQ community, explaining that "The false claims and rhetoric used by right-wing extremists dehumanize and vilify the LGBTQ+ community and provoke stochastic terrorism, a phenomenon in which hate speech increases the likelihood that people will attack the targets of vicious claims"); United States Department of Justice, 2021 Hate Crime Statistics, https://www.justice.gov/hatecrimes/hate-crime-statistics (finding that about 1/5 hate crimes were motivated by sexual orientation, gender, or gender identity); Matt Lavietes, NBC NEWS, May 17, 2022, "Biden warns of 'rising hate and violence' against LGBTQ people," available at https://tinyurl.com/yk48kk45 (noting "a recent uptick in charged rhetoric around LGBTQ issues across the country.")

[6] *See also,* Human Rights Campaign, "Fatal violence against the transgender and gender non-conforming community in 2020," available at https://tinyurl.com/2rtb6scs.

13

affiliate, Feb. 26, 2013 (reporting on the "Pink Pistols movement" which aims to "teach queers to shoot, then [ ] teach the rest of the world we've done it" so that others "may think twice about using (LGBT people) as a target"); Andy Craig, "Gun Rights are Gay Rights," Cato at Liberty Blog, June 16, 2022, available at https://www.cato.org/blog/gun-rights-are-gay-rights ("The reality is that gay and trans people still face violent assaults at a much higher rate than the general population. It is precisely for that reason that the rights of self-defense, including armed self-defense, can be especially important for them."). Indeed, Justice Alito noted the need for self-defense against anti-gay hate crimes in his *Bruen* concurrence. *Bruen,* 142 S. Ct. at 2159 (describing a story of a "a gay man from Arkansas" firing a shot overhead that caused "four gay bashers" to flee).

Ms. Sternquist herself was preparing to talk to InRange TV about gun safety and self-defense in the trans community. As described in a text message in discovery, InRange is an online forum that discusses the history of gun ownership, including by marginalized people. Ex. B (text from 3-21-22).

In this context, the government's evidence does not show that Ms. Sternquist any intent related to the alleged gun possession except for self-defense.[7] Notably, the

---

[7] The other purpose suggested from the discovery is even more benign and related to aesthetics and collecting interesting looking gun parts. There are texts about designing a gun-related item to go from "purple to pinkest pink" in a "hello kitty pattern." Discovery, Cellebrite Report, Folder IS0001514657, message from 7-17-21. The message references a color from "Anish Kapoor," a conceptual artist. *Id.* Elsewhere messages talk about getting a flare gun "regripped with mother of pearl," *id.*, message from 6-16-22, and adding other unusual color and design features.

government has never alleged that Ms. Sternquist had even one round of ammunition. The government's conclusory assertion that Ms. Sternquist is, nonetheless, a "threat" to "public safety" is completely unsupported by any citation or argument.

Instead, like *Range*, 922(g)(1) as applied to Ms. Sternquist is unconstitutional.

B.    The government's reliance on pre-*Bruen* decisions is misplaced.

In addition to failing to adequately distinguish *Range* in its response motion, the government also fails to engage with *Bruen*. Instead, the government acts as though the landmark Second Amendment Supreme Court decision was no big deal, asserting that the "constitutionality of [922(g)] is long settled," citing a "near unanimity among the lower courts" pre-*Bruen*. Gov. Res. at 6. This argument simply ignores that *Bruen* changed the analysis, as numerous courts have found. *See, e.g. Range*, 69 F.4th 96; *Rahimi*, 61 F.4th 443; *Bullock*, 2023 WL 4232309

In making this argument, it relies heavily on *Bogle*, a pre-*Bruen*, 8-sentence, per curiam Second Circuit decision. Gov. Res. at 4, 8, 9, 10, 13. The government claims that *Bogle* somehow "transform[ed]" a pre-*Bruen* understanding of the constitutionality of 922(g) "into binding circuit precedent." Gov. Res. at 9. This is wrong. *Bogle* merely said that 922(g) remained constitutional following *Heller* and *McDonald*. It did not conduct the historical analysis that the Supreme Court stated in *Bruen* was necessary. Under *Bruen*, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and

15

bear arms" 142 S. Ct. at 2127. A *Bruen* argument was not addressed and rejected by *Bogle*; the *Bruen* argument simply did not exist yet.

"It is a venerable principle that a court isn't bound by a prior decision that failed to consider an argument or issue the later court finds persuasive." *Miller for & on Behalf of N.L.R.B. v. California Pac. Med. Ctr.*, 991 F.2d 536, 541 (9th Cir. 1993). When a point is "not [ ] raised in briefs or argument nor discussed in the opinion of the Court," the "case is not a binding precedent on th[at] point." *United States v. L.A. Tucker Truck Lines*, 344 U.S. 33, 38 (1952). *See also, e.g., Bourdon v. United States Dep't of Homeland Sec.*, 940 F.3d 537, 548 (11th Cir. 2019) ("Nor is a case 'binding precedent' on points that were 'not there raised in briefs or argument nor discussed in the opinion.'") (quoting *L.A. Tucker Truck Lines*, 344 U.S. at 38); *United States v. Dunn*, 719 F. App'x 746, 749 (10th Cir. 2017) ("[A]n opinion does not constitute binding precedent on a point that is not raised or decided.") (citing *L.A. Tucker Truck Lines*). Put simply, prior "cases cannot be read as foreclosing an argument that they never dealt with." *Waters v. Churchill*, 511 U.S. 661, 678 (1994) (citing *L.A. Tucker Truck Lines*, 344 U.S. at 38). In *Bogle*, the Second Amendment was only challenged by a pro-se, incarcerated defendant, who did not comb through the historical record; the government made no argument that 922(g) is part of the historical tradition.

The government also attempts to elevate dicta in *Heller* and *McDonald* into precedent, repeating that those cases made a supposed "safe harbor for felon dispossession." Gov. Res. at 6-7. This argument was roundly rejected by *Range*:

because *Heller* and *McDonald* did not conduct the *Bruen* historical analysis of 922(g), dicta in them cannot substitute for conducting the *Bruen* analysis. *See also Bullock*, 2023 WL 4232309, at *18 (explaining that Justice Barrett, Justice Thomas, citing *Voisine v. United States*, 579 U.S. 686, 715 (2016) (Thomas, J., dissenting), the Fifth Circuit, and the Third Circuit have found all the "law-abiding" language to be dicta).

As the Seventh Circuit counseled: "Remember what the Court itself did in *Bruen* after rejecting a means-end approach and announcing the text-and-history standard—it rolled up its sleeves and examined a wealth of laws and commentary spanning several centuries, paying close attention to the enforcement and impact of various regulations." *Atkinson*, 2023 WL 4071542 at *3. That is what this Court must do too.

C.    <u>The government has failed to meet its *Bruen* burden.</u>

As the *Bullock* district court recently pointed out, "in cases litigated not that long ago, the U.S. Department of Justice formally advanced the position that early American history did <u>not</u> support felon disarmament," telling the Fourth Circuit that "[a]s for convicted criminals, Colonial societies do not appear to have categorically prohibited their ownership of firearms," and telling the First Circuit, that "18 U.S.C. § 922(g)(1) is firmly rooted in the twentieth century and likely bears little resemblance to laws in effect at the time the Second Amendment was ratified." *Bullock*, 2023 WL 4232309, at *28 (emphasis added), citing Brief of Appellee, *United States v. Staten*, No. 10-5318, 2011 WL 1542053, at *25 (4th Cir. Apr. 25, 2011) and Brief of Appellee,

17

*United States v. Pettengill*, No. 10-2024, 2011 WL 1977759, at **27-28 (1st Cir. May 13, 2011).

This concession is telling. In its response motion here, the government still has found no examples of a historic tradition of disarmament for people convicted of felonies. Thus, the government fails to meet its burden under *Bruen*.

1.    The government's claim that "felons" "do not fall within the definition of 'people'" is completely unsupported.

In Ms. Sternquist's brief, she explained at length why she is a member of the "people" protected by the Second Amendment. Def. Mot. at 7-13. As *Heller* made clear, "the people" covered by the Second Amendment "unambiguously refers to all members of the political community, not an unspecified subset." *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008) (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990). As *Heller* explained, "the people" is a "term of art employed in select parts of the Constitution." 554 U.S. at 579. In this context, "the people" has one unitary meaning: it "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Verdugo-Urquidez*, 494 U.S. at 265.

In response, the government does not engage with this argument, and simply ignores that "the people" appears elsewhere in the Bill of Rights. *See* Def. Mot. at 7-8. Instead, the government just asserts that "felons do not fall with the definition of 'people,'" citing *United States v. Jimenez*, 895 F.3d 228 (2d Cir. 2018), a pre-*Bruen* case,

applying the now-defunct two-step framework. Gov. Res. at 14.  In addition to applying the wrong framework, *Jimenez* also did not limit what "people" are covered by the Second Amendment. In *Jimenez*, the court assumed without deciding, that "at least members of the 'national community' or those with a 'sufficient connection' with that community are part of the 'people' covered by the Second Amendment." *Jimenez*, 895 F.3d at 233 n.1; *see id.* at 233 ("we have never determined which particular conduct or characteristics can disqualify some individuals from the right that *Heller* recognized").

The only other argument the government makes on this point is that "felons lose their right to serve on a jury, receive government benefits, hold public office, travel freely, or even the right to vote" and that the "prohibition on felony possession fits squarely within this vein of acceptable collateral consequence for convicted felons." Gov. Res. at 14. In support it cites, *Richardson v. Ramirez*, 418 U.S. 24 (1974), which upheld a state disenfranchisement law for people convicted of felonies, noting that the 14th amendment has an explicit exception for those excluded due to a "participation in rebellion, or other crime." *Id.* at 43, citing, U.S. Cons. Amend. XIV, § 2 ("the right to vote…[shall not be] in any way abridged, except for participation in rebellion, or other crime."). The Second Amendment has no similar exception. The government does not explain how *Ramirez* supports its argument; it does not.

2.    The government fails to show any historic tradition of permanently disarming people with non-violent felony convictions.

In her opening motion, Ms. Sternquist analyzed the historical tradition at length, noting that there were no historical laws disenfranchising felons. Def. Mot. 13-20. In response, the government "assum[es] the accuracy" of the fact that there are no historical laws disenfranchising felons. Gov. Res. at 15.[8] However, the government states there are a "plethora of examples" from the nation's historical tradition of firearm regulation to support restricting "felons from possessing firearms," Gov. Res. at 4, that there is "ample historical evidence" of a "long tradition" of disarming "individuals viewed as threats to public order and stability," Gov. Res. at 14, a "significant number of close historical analogues for prohibiting felons from owning weapons," Gov. Res. at 14, and a "broad history of disarmament of individuals who were viewed as general threats to the public order." Gov. Res. at 17. [9] Despite this sweeping language, the government does not show a "plethora" or "significant number" of examples or any "ample" or "broad" historical tradition.

---

[8] Although the government calls Ms. Sternquist's "claims…conjectural" with respect to the historical analysis, Gov. Res. at 4, it does not point to any particular claim, or explain how citations to the historical record are "conjectural."

[9] The defense could find no cases using the phrase "threats to the public order" and the Second Amendment. A *Range* concurrence uses a somewhat similar phrase "threaten the orderly functioning of society," 69 F.4th at 110 (Ambro, Senior Judge, concurring). This phrase is also undefined, uncited in *Range* and does not appear elsewhere in the caselaw.

Instead, the government points to five things: a dictionary definition of "felony" from 1854, an English law that had a religion-based right to bear arms, a "minority report" from the founding era that was not incorporated into the Second Amendment, a law review article discussing a recommendation that states disarm people with "questionable loyalty to the United States" during the revolution, and a North Carolina state law that required people to forfeit their gun for "hunting illegally." Gov. Res. at 18. These five items do not support the government's argument and fall far short of meeting their Founding-era "historical tradition" of firearms regulations "distinctly similar" to section 922(g)(1).

First, the dictionary definition defines felony as an offense that "occasions a total forfeiture of either lands, or goods, or both...and to which capital or other punishment may be superadded, according to the level of guilty," and states that the penalties for felonies were "often swift and harsh." Gov. Res. at 15. Based on this definition, the government says that "today's understanding of 'felony' as a specific and clearly delineated category of crimes makes little sense in the historical context," Gov. Res. at 15, and that it is "hard to imagine that felon dispossession would have been viewed as an impermissible punishment for a crime, given the regularity with which much harsher sentences were doled out," citing "death or total forfeiture." Gov. Res. at 16.

This argument ignores that, while some people were executed then (as now), others were not. *See, e.g.,* "An Act for the Punishment of Certain Crimes Against the

21

United States, "Pub. L. No. 1-9, § 14, 1 Stat. 112, 115 (1790), available at https://tinyurl.com/3wa94hh8 (punishing some crimes, such as treason, murder, and robbery, with death and forfeiture of an estate, but punishing other serious crimes, for example, manslaughter, perjury, and obstruction, by up to three years imprisonment and a fine). And, those who had to forfeit their property when convicted, were permitted to have guns after serving their sentences. *Range*, 69 F.4th at 105 (explaining that people who were not executed were permitted to "'repurchase arms'" after successfully completing his sentence and reintegrating into society."); *Id.* at 128 (Krause, J., dissenting) (noting the same). As *Range* explained, the "greater does not necessarily include the lesser: founding-era governments' execution of some individuals convicted of certain offenses does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed." *Range*, 69 F.4th at 105.

Second, the English law with a religion-based right to bear arms fares no better. The government points to the English Bill of Rights from 1689, which provided that "Protestants may have arms for their defence suitable to their conditions and as allowed by law," and notes that the year before the enactment of the English Bill of Rights, England enacted a law prohibiting Catholics from having weapons. Gov. Res. at 17. The government leans into the English religious-based disarmament, saying that 922 (g)(1) has "similar reasoning" because it disarms "persons who have demonstrate

22

disrespect for legal norms of society." Gov. Res. at 17-18, citing *Jackson*, 69 F.4th at 504.

The government does not attempt to explain why this Court should rely on an English religious-based exclusion that would obviously be unconstitutional in the United States. It should not. The government's argument also ignores that this pre-United States law was <u>not</u> incorporated into the United States Constitution. Unlike the English laws of 1688 and 1689, the Second Amendment, of course, has no textual limit on the types of "people" it protects. As *Bruen* noted, the Supreme Court has "long cautioned that the English common law 'is not to be taken in all respects to be that of America.'" 142 S. Ct. at 2139; *see also id.* at 2142 (noting that the English Bill of Rights was "initially limited" to Protestants, but that the right to bear arms subsequently "matured").

Third, the "minority report" from the Pennsylvania delegation stated that the right to bear arms could be infringed for "crimes committed." Gov. Res. at 18. *Heller* called this report "highly influential" in that it proposed an "individual right" to bear arms, 554 U.S. at 604, which, of course, was incorporated into the Second Amendment. In contrast, the proposed limitation to the right for people who committed crimes was <u>not</u> incorporated. If anything, that this recommendation from the Pennsylvania delegation was rejected and not included in the U.S. Constitution only supports Ms. Sternquist's argument. Tellingly, in making this argument, the government cites *Binderup*, Gov. Res. at 19, a Third Circuit case that relies on an

outdated, pre-*Bruen* "seriousness inquiry" that "no longer applies." *Range*, 69 F.4th at

101 (citing *Binderup v. Att'y Gen.*, 836 F.3d 336, 351–52 (3d Cir. 2016) (en banc)

(plurality)).

Fourth, the government cites a law review article discussing revolutionary-era

recommendations to disarm people who were not "loyal" to the United States. Gov.

Mot. at 18, citing Joseph G.S. Greenlee, The Historical Justification for Prohibiting

Dangerous Persons from Possessing Arms, 20 WYO. L. REV. 249, 263 (2020) (noting

that "[s]edition was treated like treason and prosecuted frequently"). This

"recommend[ation]," like the English Bill of Rights, and "minority report," was also

not incorporated into the Second Amendment. Ms. Sternquist, of course, has also not

been accused of anything similar to sedition, treason, or disloyalty to the United

States.

Fifth, the North Carolina law cited by the government, also pre-dating the

Second Amendment, required forfeiture of a person's gun if he illegally hunted. "Acts

of the North Carolina General Assembly," 1745, Ch. III, Sec. V, available at

https://docsouth.unc.edu/csr/index.php/document/csr23-0015 (noting that person

"shall forfeit his Gun" and pay a fine). Contrary to the government's implication,

however, there is no indication that the person was forever prevented from getting a

gun afterward. As explained above, forfeiture of an item used to commit a crime was

and is common. It is not the same as permanently taking away a person's right to have

a similar item. This is easy to understand: today, people who have illegal content on a

computer routinely forfeit the computer as part of their criminal conviction. This forfeiture does not stop the person from getting a new computer.[10]

The paucity of the government's references to the historical record only underscores what the defense motion explained: there were no felon-disarmament laws until the twentieth century and, thus, no Founding-era historical tradition of regulations "distinctly similar" to section 922(g)(1).

## Conclusion

For the reasons above and those explained in the main brief, this Court should hold that section 922(g)(1) is unconstitutional both on its face, and as applied to Ms. Sternquist, who is not dangerous and has no violent felony convictions. Accordingly, the charge under section 922(g)(1) should be dismissed.


Dated:      July 3, 2023                    Respectfully submitted,
            Brooklyn, New York
                                            By: /s/ Allegra Glashausser
                                            Allegra Glashausser

                                            Attorney for Ms. Kara Sternquist
                                            Federal Defenders of New York, Inc.
                                            1 Pierrepont Plaza, 16th Floor
                                            Brooklyn, N.Y. 11201
                                            (212) 417-8739

---

[10] Although, the government asserts that *Jackson* "discussed other examples" of minor infractions requiring forfeiture of a gun, Gov. Res. at 18, *Jackson* only cited North Carolina for this proposition.

# Exhibit A

# Exhibit B

## Excerpts from Discovery, Cellebrite Report, Folder IS0001514657

Text about ensuring "my own safety"



Text about assault:



Text where another person describes InRange as a YouTube channel discussing marginalized peoples' history with gun ownership:



Discovery, Cellebrite Report, Folder IS0001514657 (excerpt)

» Web Bookmark                                    Go to ▾

| | |
|---|---|
| Title: | Johns Hopkins Professor Endangers the Lives of Transgender Youth \| HuffPost |
| Timestamp: | 8/14/2017 5:47:20 AM(UTC+0) |
| Path: | /Bookmarks bar/Women's Stuff/Trans Issues |
| URL: | http://www.huffingtonpost.com/brynn-tannehill/johns-hopkins-professor-e_b_9510808.html |
| Last Visited: | |
| Visits: | |
| Source: | Chrome |
| Extraction: | File System (1) |
| Source file: | EXTRACTION_FFS.zip/data/data/com.android.chrome/app_chrome/Default/Bookmarks : 0x122A2D (Size: 5291883 bytes) |

» Web Bookmark                                    Go to ▾

| | |
|---|---|
| Title: | Christian Leader Says Trans People are the Oldest, Most Dangerous Kind of Heretic |
| Timestamp: | 9/19/2017 11:35:52 PM(UTC+0) |
| Path: | /Bookmarks bar/Women's Stuff/Trans Issues |
| URL: | http://www.thedailybeast.com/christian-leader-says-trans-people-are-the-oldest-most-dangerous-kind-of-heretic |
| Last Visited: | |
| Visits: | |
| Source: | Chrome |
| Extraction: | File System (1) |
| Source file: | EXTRACTION_FFS.zip/data/data/com.android.chrome/app_chrome/Default/Bookmarks : 0x1231F1 (Size: 5291883 bytes) |

» Web Bookmark                                    Go to ▾

| | |
|---|---|
| Title: | The Failed Logic Of "Trans Panic" Criminal Defenses |
| Timestamp: | 5/5/2017 4:37:37 AM(UTC+0) |
| Path: | /Bookmarks bar/Women's Stuff/Trans Issues/Legal |
| URL: | https://www.buzzfeed.com/meredithtalusan/trans-panic-criminal-defense?utm_term=.ydRabM91X#.ejElzaBGv |
| Last Visited: | |
| Visits: | |
| Source: | Chrome |
| Extraction: | File System (1) |
| Source file: | EXTRACTION_FFS.zip/data/data/com.android.chrome/app_chrome/Default/Bookmarks : 0x12107E (Size: 5291883 bytes) |

» Web Bookmark                                    Go to ▾

| | |
|---|---|
| Title: | All Info - H.R.2796 - 115th Congress (2017-2018): Civil Rights Uniformity Act of 2017 \| Congress.gov \| Library of Congress |
| Timestamp: | 7/13/2017 8:49:22 AM(UTC+0) |
| Path: | /Bookmarks bar/Women's Stuff/Trans Issues/Legal/Anti-Transgender Legislation |
| URL: | https://www.congress.gov/bill/115th-congress/house-bill/2796/all-info |
| Last Visited: | |
| Visits: | |
| Source: | Chrome |
| Extraction: | File System (1) |
| Source file: | EXTRACTION_FFS.zip/data/data/com.android.chrome/app_chrome/Default/Bookmarks : 0x11F6AC (Size: 5291883 bytes) |

» Web Bookmark                                    Go to ▾

| | |
|---|---|
| Title: | Transgender "Bathroom Bills:" Inside the Debate |
| Timestamp: | 3/22/2016 10:52:52 PM(UTC+0) |
| Path: | /Bookmarks bar/Women's Stuff/Trans Issues/Legal/Anti-Transgender Legislation |
| URL: | http://time.com/3974186/transgender-bathroom-debate/ |
| Last Visited: | |
| Visits: | |
| Source: | Chrome |
| Extraction: | File System (1) |
| Source file: | EXTRACTION_FFS.zip/data/data/com.android.chrome/app_chrome/Default/Bookmarks : 0x11F89B (Size: 5291883 bytes) |

» Web Bookmark                                    Go to ▾

| | |
|---|---|
| Title: | Trans Murder Monitoring Project - TGEU |
| Timestamp: | 1/29/2016 7:14:44 PM(UTC+0) |
| Path: | /Bookmarks bar/Women's Stuff/Trans Issues/Social |
| URL: | http://tgeu.org/tmm/ |
| Last Visited: | |
| Visits: | |
| Source: | Chrome |
| Extraction: | File System (1) |
| Source file: | EXTRACTION_FFS.zip/data/data/com.android.chrome/app_chrome/Default/Bookmarks : 0x11D261 (Size: 5291883 bytes) |

## » Web Bookmark

Go to ▾

| | |
|---|---|
| **Title:** | YouGov \| 21% of Americans believe that being transgender is a mental illness |
| **Timestamp:** | 5/21/2017 8:13:50 PM(UTC+0) |
| **Path:** | /Bookmarks bar/Women's Stuff/Trans Issues/Social |
| **URL:** | https://today.yougov.com/news/2017/05/17/21-americans-believe-identifying-transgender-menta/ |
| **Last Visited:** | |
| **Visits:** | |
| **Source:** | Chrome |
| **Extraction:** | File System (1) |
| **Source file:** | EXTRACTION_FFS.zip/data/data/com.android.chrome/app_chrome/Default/Bookmarks : 0x11E5EA (Size: 5291883 bytes) |

# Exhibit C

23 August 2016

## Scissor Cut (single-handed cut #3)

1) Start by holding the deck toward in between the 1st and 4th fingers (along the top & bottom) and the 2nd, 3rd, 4 thumbs (along the sides). The deck should be held firmly in the tips of the fingers, so that the bottom face of the deck is approximately flush with the line of the first joint. {Figure #1}

2) Move the thumb to the mid, moving it behind the lower corner of the same side as the air fingers. Using a steady, but slight bit of pressure (towards the 1st finger from the thumb) separate the lower part of the deck. The upper part of the deck remains stationary in the fingertips.

3) Swing the thumb around from the right side to the left, carrying with it the lower packet of cards.

At 90° (Fig #2b) both packets are parallel and at a right angle. As the lower packet continues to swing to about 180° (Fig 2a) the packets will be at about 45° to each other, moving apart from the side (T g #3c). The entire time, the 1st finger remains stationary 3cm off center on its side boundary, the arm corner. The bottom packet pivots on the 1st finger.

4) Once the bottom packet (held between the thumb and 1st finger) and the top packet (held between the 1st & 4th fingers) are in position (Figure #3), the top packet is allowed to drop slightly on the side of the 1st finger. (Fig#3c)

5) The thumb now moves back over to the right carrying with it the bottom packet. (Fig #3d) which at this point swings over the top packet, which homogenizes there. This is the bottom packet becomes the top, and the top packet becomes the bottom. The move ends with the deck being in the position of being held in between the 1st finger and, 2nd/3rd/4 thumb (Figure #1)

Figure #1

Figure #2

Figure #3



Fig#1a   Fig#3d   Fig#3c

Fig#2a   Fig#3a

Fig#3b

Fig#2b

* In these illustrations, the "bottom packet (originally)" is shaded

21 AUGUST 2010

# Single-handed Fan #3

This fanning method was originally shown to me by R.J. Williams though the method I now use I left to discover myself. This fan is most performed using 1/2 of a full deck in each hand. Examples are for the left hand, however the movements are the same for both hands.

*Note* when done index-up in the right hand, the deck will appear "blank" as in an "all blank fan"

1) Begin by holding a packet of about 26 cards in the mechanics grip.

2) Lift the and remove the 1st finger, placing its tip on the back of the packet so that the tip is in line with the thumb's 1st joint, and the 1st finger's 1st joint is in line with the thumb's cuticle. The pressure created on the packet between the 1st finger and thumb should be minimal, as this will help the cards to fan out.

3) Remove the 2nd, 3rd, and 4th fingers from the side of the packet to behind the packet, curled lightly so that the tips of each press into the meats of the hand, as in a light fist.

4) Slowly unwind and straighten the fingers one at a time, beginning with the 1st, while continuing pressure. As the 1st finger unwinds it draws about 6 or more cards with it. Once the 1st finger is about 1/2 way unwound, the 2nd finger follows suit bringing about 6 cards with it. The cards at the top of the packet remain stationary...

5) Once the fan is complete, the 1st, 2nd, 3rd, and 4th fingers should be straightened out fully leaving the fan gripped equally between the fingers at the thumb.

Figure #1

Figure #2

Figure #3

Figure #4


Figure #1


Figure #2


Figure #3 (view from top)


Figure #4 (view from bottom)

* Checkpoints *

o continuous even spread

o cards create the cresting effect along center →

* N.B. *

▪ Index up done in right hand will result in an "all blank" fan if done evenly

o Index up done in left hand can be combined with index up classic (#1) overhead fan to produce a sort of "double fan" of enormous spread - the indexes of the entire deck in once.

o As the fan is spread as to in one "half circle" (brings it one under the 1st circle) it can be used to "frame" the face etc. for cool effects.



Salmon Diagonal Shift Palm (#85) (Palming a selected card from the middle of the deck)

1) Begin by holding the deck in the left hand, between the tips of the left thumb (on the left side) and the 2nd, 3rd, 4th fingers (on the right side) with the left 1st finger doubled beneath the deck, with its nail resting on the face of the deck's bottom card. This position resembles the thumb-record position, only modified so that the deck is held horizontally and the top of the left thumb, 2nd, 3rd, 4th fingers will be held. The line of the left fingers is about flush with the deck's bottom. (Figure #1)

2) A selected card is inserted into the outer end of the deck, and pushed into the deck until only 1/4 (a-1/2 inch) remains protruding.

3) Bring the right hand over the deck. The right 1st finger rests at the outer left corner of the protruding card, the right 2nd & 3rd fingers along the center of its outer edge, and the right 4th finger at the other right corner. Meanwhile, the right thumb rests at the inner left corner of the deck itself. (Figure #2)
while vigorously pushing the protruding card fully into the deck.

4) Using the right 1st & 4th fingers, push the outer edge of the protruding card inwards and to the left, so the card's outer left corner protrudes from the deck's left side (between the right 1st finger and the left thumb). The card's outer right corner is at the outer end of the deck pressed flush into the deck's outer edge (between the right 3rd & 4th fingers) the card's inner left corner protrudes the inner end of the deck (to the right of the right thumb) while the card's inner right edge protrudes from the inner right side of the deck (crowding the left 3rd & 4th fingers so none of the deck's side with it so they maintain contact with the card's edge). (Figure #3) (Figure #4)

5) The left 4th finger pushes the card to the left, allowing it to swing inwards using the right thumb as a pivot point. As this happens, the left 1st, 2nd & 3rd fingers straighten out, catching the card's other end as it turns. (Figure #4, #5)

6) As the card is palmed, slide the deck back outwards with the right hand while the left hand turns inward cancelling the palmed card. (Figure #6)



Kramer Bottom Palm Method (----)

1) Grasp the deck from above with the right hand, so that the deck is held between the right thumb (on the inner right corner) and the right 2nd & 3rd fingers (3rd on the outer right corner) and the right 1st, 2nd, 4th fingers held naturally, (1st & 3rd fingers together) exposing as much of the deck as possible. (Figure #1)

2) The left hand grasp the deck, encircling the inner left end, (with the left thumb's contact at the inner left end) the left thumb lying across the inner end of the deck, (the tip at the inner right corner). The ___ several fingers lying together on the right side of the deck, at the inner right corner. The ___ 1st finger & the ___ of the left 2nd finger inside the left 1st, 3rd & 4th fingers are close together at the bottom of the deck, slightly cupped in a natural position. (Figure #2)

To Palm:

3) Establish a break with the left 2nd finger, separating the cards to be palmed from the bottom of the deck (Figure #3)

4) The 2nd finger pokes the cards up by its right edge about the left, causing the #3 inner right corner to clear the tip of the right thumb. Meanwhile the cards pivots slightly along its inner left corner (in the left thumb crotch) as it swings the outer right corner begins to protrude slightly from the right side of the deck, toward its outer end (Figure #4)

5) The right 4th finger presses inwards on the outer right corner of the cards to be palmed (cup the edge), causing the cards to move to the palm of the left hand as it continues to swing down and leftwards (Figure #5) (Figure #6)
As the ___ cards swing inwards, the left fingers straighten catching the cards in the palm

* Note steps 1, 3, 2 can be ordered in reverse so long as the position of what which ___ needs in progress to step 3, 5.
* Note move move is not covered by the ___ hand in the above step but the palm.

# The Classic Pass



Figure #1

Figure #2

Figure #3

Figure #4

1) Begin by holding the deck in the left-hand mechanic's grip (Figure #1)

2) Establish a pinky break, isolating the 4th finger on one of the selected card. Obviously this is done after the deck has been cut, allowing the spectator to replace a card in the middle of the deck. The two halves are then isolated.

3) With the pinky break established, the deck is held in a modified mechanic's grip, with the thumb and 2nd finger working across the centre of the deck to hold it slightly at their tips. One point to check for is that the two halves of the deck are not visibly split along the outer end. This is done by maintaining the 1st finger's position and exerts a slight pressure between this finger & the rest of its rest.

4) The right hand approaches the deck (from right to left) with its back facing pad towards the audience. The lower packet is grasped at its outer side inner left corner by the right hand's 2nd & 3rd fingers as thumb respectively.

5) Hold this, the lower packet is tilted up (on its upper left edge) over the upper packet's left edge. This action is assisted by pressing the upper packet being dragged down underneath by the pressure between the 3rd & 4th fingers.

6) As the lower and upper packets transpose, the palm of the right hand should drop towards the top of the deck, covering it while the lower level is drawn across the inner end at the edges (from left to right) as they slip past each other. Thus the ends

※ NOTE: Steps 4 & 5 should be performed at a slight brisk or bit left, or other spectator movements. Steps should be as direct as possible...

The Hinge Change   (apply to all/adapted from such manipulations #1/2, #3) by Jose Wejebe   Color Change #1



1) Begin by holding the deck in the left hand, in the mechanic's grip position, with the face of the deck's bottom card displayed.

2) Bring the right hand over to the deck, gripping it between the right thumb at the lower inner corner, and the R 2nd, 3rd, 4th fingers at the deck's lower outer corner.

3) Using the corner of the Left 2nd finger (top join), push back the lower edge of the deck's top card from the rear, causing the card to be by-appld between the tips of the Left 2nd finger (at its face) and the left 1st finger (at its back) just outside of the corner of the card.

4) Pull the card down, (or apprx by its edge) moving the wrist of the Left hand backward, slightly until it rests at clear the edge of the deck. The card should then be perpendicular to the deck.

5) Push the other corner of the card into to drop between the tip joints of the Right 2nd & 3rd fingers, taking care not to let it protrude from under side of hand. Additionally, the Right 4th finger should be allowed to curl inwards or display a f's.

6) Withdraw your Left hand, displaying it as empty while you hold the deck and the concealed card in the Right hand, seen so see.

7) Extend your Right hand fingers, completely flat to Return the deck to the left hand in the Thumb-crotch position (step) Retaining the concealed card in the right hand for palming.

8) Extend your Right 1st fingers down flat to the face of the deck. This is a good moment for patter.

9) Bring the card so to bring on the tip of the Left 2nd, 3rd, 4th finger tips. horizontal to the deck while continuing to slant finger tips as before. The edge may be allowed to rest under the same edge of the deck to help secure its position.

10) Place the R 2nd middle finger along the outer edge of the card/straight, spread apart from the remaining fingers so the right hand, allowing the audience to see the face could of the deck through your fingers.

11) Simply close the fingers of the left hand, bringing the card up with them. If though at first is down, the Fsecond is the deck. He does so the concealed card and the door is open minimum he hopes which we left hands 2nd, 3rd, 4th fingers. The right hand fingers care do so right half "closes the door" a time with the left fingers making, producing for a slightly change.

# Exhibit D

# Exhibit E



**3m**     **Like**     **Reply**



## Jimmy Wade
**Cara** so what cunt? You wanna act tough.
Bring it on little girl.



 **Jimmy Wade**



2h     Like     Reply

 **Jimmy Wade**

