

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

FTB/AP
F. #2022R00795

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 26, 2024

By E-mail

Officer Brian Woo
United States Probation Department
Eastern District of New York
147 Pierrepont Street
Brooklyn, NY 11201

      Re:    United States v. Kara Sternquist
               Criminal Docket No. 22-473 (DLI)

Dear Officer Woo:

      The government is in receipt of the objections to the Presentence Investigation Report (the "PSR") lodged by the defendant in the above-referenced case on April 12, 2024 (the "Defendant's Objections"). The government offers the following responses to the Defendant's Objections for your consideration.

    I.    The Guidelines Calculation

      The defendant raises two principal objections to the calculation of the advisory range of imprisonment under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") in the PSR. First, the defendant claims that the calculation of the offense level is incorrect because the items identified by experts at the U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") as silencers (and therefore "firearms") are in fact solvent traps – a conclusion that works to lower the offense level at multiple steps in the Guidelines analysis. Second, the defendant claims that the Criminal History score set forth in the PSR is too high. For the reasons set forth in greater detail below, the government submits that neither of these objections requires any material revisions to the PSR.

    A.    The Relevant Firearms are "Silencers"

      Section 2K2.1(a)(4)(B) of the Guidelines, which applies to the defendant's felon-in-possession conviction, provides for a base offense level of 20 if the offense involved "a firearm that is described in 26 U.S.C. § 5845(a)" and the defendant was "a prohibited person" at the time the offense was committed, which this defendant indisputably was. See PSR ¶ 28; Application Note 3 to U.S.S.G. § 2K21. According to 26 U.S.C. § 5845(a) the term "firearm" includes any "silencer" as that term is defined in 18 U.S.C. § 921. Section 921(a)(25) defines a

"'firearm silencer'" as "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a [silencer], and any part intended only for use in such assembly or fabrication."

Technical examiners for the ATF analyzed certain of the items recovered from the defendant's apartment and concluded that 15 of them qualified as "silencers" under the definition in section 921(a)(25). This conclusion followed from the observation that these items generally consisted of cylindrical metal tubes that had front and rear end-caps and baffles for use inside the tubes – all standard design features commonly used in devices intended to function as silencers. See, e.g., Exhibit B to Def. PSR Obj. at 3. Specifically, as explained in the reports of technical examination prepared by the ATF examiners, the rear end-caps, when attached to the metal tubes (which are in turn attached to firearms), are designed to create "expansion chambers" within which the hot propellant gases emitting from the barrel of a gun after a bullet is fired expand and cool before slowly being released into the atmosphere, thereby reducing the sound created by a gunshot. Id. Baffles are generally used "to slow, create turbulence in, or redirect the flow of hot propellant gases" and can be used "to segregate a large expansion chamber to create multiple, smaller expansion chambers of various sizes by stacking several baffles together . . . ." Id. The reports of technical examination reference and attach the U.S. patent 8,910,745 B2, which was filed to document the invention of baffles and describes their design purpose and characteristics. The analysis and observations documented in the reports of technical examination are sufficient to establish that the items are "silencers" by a preponderance of the evidence. See, e.g., United States v. Archer, 671 F.3d 149, 161 (2d Cir. 2011) ("As to the facts that support the application of a Guideline, the burden of proving such facts is on the government, the standard for proving such facts is a preponderance of the evidence, and we review the district court's factual conclusions for clear error.").

The defendant objects to the classification on the ground that some of the items had not been "drilled" meaning that they would not – without modification – permit a bullet to pass through the cylinder. This point is rebutted in the reports of technical examination. As explained in the report that discussed ATF exhibit number 1, for example, the fact that "[n]one of the baffles or the front end-cap feature a centrally located hole to facilitate the passage of the projectile" is not dispositive as to their purpose since "they each possess a small dimpling in the center." See Exhibit A to Def. PSR Obj. at 3. This "dimpling" is designed to "create a reference point which designates the correct location to drill the center hole" that would permit a projectile to pass through the front end-cap and the baffles without obstruction. Id. The report goes on to note that "unfinished center holes are advantageous . . . as [they allow] the center hole sizes to be customized by the end-user to maximize efficiency." Id. The report also observed that the front end-cap could be drilled in approximately five minutes. Id. Accordingly, the absence of drilled holes in some or all of the relevant pieces does not remove them from the statutory definition of "firearm silencer[s]."

The defendant also argues that certain of the devices classified as silencers, when tested by the ATF examiners, only reduced the decibel level of the sound created by a gunshot by approximately 7 to 14 decibels across those devices that were tested. As an initial matter, the results of this analysis demonstrate that the relevant devices did in fact "silenc[e], muffl[e], or diminish[] the report of a portable firearm" – which is the definition of a "silencer" set forth in

2

section 921(a)(25). In addition, courts have upheld convictions for the illegal possession of silencers for devices that have produced approximately the same or less decibel reduction. See, e.g., United States v. Kavoukian, 354 F.3d 117, 119 (2d Cir. 2003) (affirming conviction for possession of an illegal silencer for device that "was capable of reducing the volume of a shot fired from a 22-caliber firearm by about 3.2 decibels"). The law is also clear that the defendant need not have actually tested the device as a silencer for it to qualify as such. See id. at 120 ("[W]e hold that a defendant can be convicted of making or possessing a firearm silencer without proof that he knew from experience that the silencer functions."). Finally, notwithstanding the relatively small percentage of decibel reduction documented in the reports of technical examination, it is well known that comparatively small reductions in the total decibels produced by a particular sound can result in comparatively large reductions in the amount of perceived noise generated by that sound. See generally, Dater, P., "Firearm Sound Levels and Hearing Damage," Small Arms Review, V6, #3, Dec 2002; Dater, P., "Sound Measurement Techniques," Small Arms Review, V3 #11, Aug 2000; Brüel & Kjaer, "Basic Frequency Analysis of Sound." For these reasons, the measures of decibel reduction documented in the reports of technical examination do not undermine the conclusion that the relevant devices are silencers.

The defendant also argues that, even if the identified items could function as silencers, there is no evidence that the defendant intended them to be used as such. The defendant postulates that the devices could have been intended to be used as solvent traps. The evidence of the necessary intent to classify the devices as silencers is amply supplied by the characteristics of the devices themselves, as detailed in the reports of technical examination and illustrated by the commentary from the ATF letters cited by the defendant. For example, the relevant items feature baffles – components that serve no function whatsoever for solvent traps, but that enhance the muffling capability of silencers. See Exhibit C to Def. PSR Obj. at 5 ("These devices often come with a set of 'spacers' which resemble firearm silencer baffles. These 'spacers' serve no legitimate purpose in a 'solvent trap.'"). In addition, as noted above, the items were also manufactured with indentations indicating where to drill holes to permit projectiles to pass through them unobstructed. See Exhibit B to Def. PSR Obj. at 4 (noting that neither the front end-cap nor the baffles had holes drilled through them, but observing that each possessed a "small dimpling" in the center indicating where the hole should be drilled). These indentations again serve no function for solvent traps, but facilitate the operation of the devices as silencers. See ATF's *Open Letter to All Federal Firearm Licensees*, November 20, 2023, at 1-2, available at https://www.atf.gov/file/186521/download ("[H]oles (or marks indicating where holes should be drilled) that allow the passage of a projectile are clear indicators that the device or component parts may be properly classified as 'firearm silencer,' because this allows the propellant gasses to expand and cool. By contrast, a hole serves no purpose in collecting solvent or debris and is actually contrary to the purported use of a 'solvent trap.'").

A person engaged in the (successful) manufacture of multiple privately assembled firearms – like the defendant – is fairly charged with knowledge of, and appreciation for, these technical design features. It is also implausible that someone with the defendant's base of knowledge and prior military service would possess 15 separate solvent traps – nearly twice the number of recovered firearms in the defendant's apartment - when one would almost certainly suffice to accomplish the purported purpose of such a device, which is to collect dirty solvent as it runs out of the muzzle of a particular firearm during the cleaning process. See Exhibit D to Def. PSR Obj. at 2 ("Legitimate solvent traps are attached to the muzzle of a firearm barrel

3

designed to catch or 'trap' dirty cleaning solvent pushed through the barrel from the chamber end and out through the barrel. Solvent traps are intended to prevent solvent from dripping, spraying, or spattering when pushed out the muzzle end of a firearm barrel."). The purported "solvent traps" in the defendant's apartment possessed no design features to accomplish this purpose. Instead, they shared virtually all design features with known firearm silencers.

Since solvent traps are capable of being emptied of dirty solvent and reused, the sheer number of devices possessed by the defendant is evidence of an intent to use them not as solvent traps, but as silencers. The PSR therefore is correct to endorse the conclusions of the ATF examiners that the relevant devices qualify as silencers and therefore "firearms" for purposes of calculating the defendant's offense level.

> B. Even if the Items Classified as "Silencers" Are Not Counted as "Firearms" the Offense Level in the PSR is Still Correct

As the PSR notes, section 2K2.1(b)(1)(B) adds four points to the defendant's offense level because the crime involved somewhere between 8 to 24 total firearms. PSR ¶ 29. The government's objections to the PSR dated April 11, 2024 point out that the PSR did not include four firearms recovered from the defendant's apartment (ATF exhibit numbers 2, 11, 16, and 17). When these firearms are added to the firearms described in paragraph 22 of the PSR (ATF exhibit numbers 20, 21, 22, and 23), they bring the total number of non-silencer firearms to 8. Accordingly, even if all of the items classified by the ATF as "silencers" are discarded for purposes of counting the total number of firearms, the resulting count is still 8, in which case the 4-point enhancement specified by section 2K21.(b)(1)(B) still applies.

The 20-point base offense level in the PSR is also correct. See PSR ¶ 28. As discussed above, that base offense level applies because the defendant was a "prohibited person" (by virtue of her prior felony convictions) and the offense involved a firearm described in 26 U.S.C. § 5845(a). See U.S.S.G. §2K2.1(a)(4)(B). The PSR adopts that base offense level because the offense involved possession of a "silencer," which is one of the "firearms" described in section 5845(a). Section 5845(a) also lists a "machine gun" as a "firearm." In this case, the ATF examiners determined that one of the firearms possessed by the defendant was a "machine gun" (specifically, ATF exhibit number 22). See Exhibit H to Def. PSR Obj. at 5-6. Therefore, even if none of the items identified by the ATF examiners are considered silencers, the base offense level would still be 20 because the defendant possessed a machine gun.

The defendant objects to the classification of this item (ATF exhibit number 22) as a "machine gun," but the PSR is correct to classify it as such. See PSR ¶ 22. Section 5845(b) defines "machine gun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." As described in the ATF's report of technical examination, ATF exhibit number 22 had a "three position safety selector" that allowed the gun to be placed in "safe"; "semi-automatic"; or "automatic" mode. See Exhibit H to Def. PSR Obj. at 5. When the selector was placed in the "automatic" setting, the gun twice test fired two bullets with a single pull of the trigger. See id. at 5-6. On two other occasions, the gun test fired the first bullet of a multi-round load, but failed to fire the second; on each of these occasions, the remaining bullet exhibited a "light primer strike" indicating that the gun had attempted to discharge the bullet, but

4

lacked sufficient force to do so due to its "hammer follow" design. See id. Under these circumstances, the ATF examiner was right to find that the firearm was a "machine gun" since (without repair or modification) it twice fired more than one bullet with a single trigger pull, as it was designed to do.

This conclusion is not undermined by the report from the Forensic Laboratory of the U.S. Postal Inspection Service ("USPIS"). See Exhibit H to Def. PSR Obj. at 1-2. That report reflects that the same gun (Postal exhibit number 3) was successfully test fired by a forensic examiner for USPIS prior to being examined by the ATF technical examiners. See id. at 1. The USPIS report concludes that the firearm was "semi-automatic," but not "fully automatic." The report does not purport to classify the firearm using the terminology of section 5845(b) and does not say in as many words whether the firearm fired multiple bullets with "a single function of the trigger," which is the definition of a "machine gun" adopted by the statute. The ATF's report of technical examination does analyze the firearm using section 5845(b)'s definition and concludes that the gun qualifies as a "machine gun." Accordingly, the base offense level adopted in the PSR remains correct, even if none of the recovered items are classified as "silencers."

  C.   The Probation Department Properly Calculated the Defendant's Criminal History

The Probation Department ("Probation") properly calculated the defendant's criminal history to be a criminal history category of IV.[1] The PSR correctly assigned 1 point to the defendant's 2012 petit larceny conviction. See PSR ¶ 48. Application Note Eight to U.S.S.G. 4A1.2(e) instructs that, "[a]s used in § 4A1.2(d)(2) and (e), the term 'commencement of the instant offense' includes any relevant conduct," (emphasis in original) and cites to U.S.S.G. § 1B1.3 (relevant conduct).

Turning to what the Guidelines consider to be relevant conduct, Section 1B1.3(a)(1) includes, in relevant part, "all acts and omissions committed . . . by defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempted to avoid detection or responsibility for that offense."

In this case, the commencement of the instant offense was not September 15, 2022 (the date of the defendant's arrest). Instead, evidence of the defendant's conduct began as early as December 1, 2021 with the purchase of two "ambidextrous safety selectors[2]" mailed to the defendant's apartment in Manhattan. See PSR ¶ 13; see also Exhibit F to Def. PSR Obj. Indeed, two of the firearms recovered from the defendant's home, analyzed by the ATF as

---

[1]   Probation accurately calculated the defendant's criminal history score to be seven. However, Paragraph 50 of the PSR appears to contain a minor typographical error in that it states that "a criminal history score of six establishes a criminal history category of IV." The government respectfully submits that the PSR should indicate that a criminal history score of seven establishes a criminal history category of IV.

[2]   An ambidextrous safety selector allows for the proper use of the safety while using either the left or right hand.

Exhibits 22 and 23, contained "three-position safety selector[s], allowing [the firearm] to be placed in the unmarked '*automatic*' *(3 o'clock)* position." See PSR ¶ 2; see also Ex. H, pgs. 5, 7-8, Def. Objections to PSR. Because this evidence suggests that the safety selectors purchased by the defendant were later used to enhance the firearms she possessed in her home, this earlier conduct should be considered as preparation for the offense of conviction.

To that end, the commencement of the instant offense should be calculated as ten years prior to December 1, 2021, or on December 2, 2011. See generally, United States v. Susewitt, 125 Fed. Appx. 681, 684 (6th Cir. 2005) (including as relevant conduct the sawing off of a shotgun that occurred approximately nine years prior to the defendant's arrest for being a felon in possession of a firearm); United Stats v. Kennedy, 32 F.3d 876, 890 (4th Cir. 1994) (finding that "sentencing courts may consider preindictment activity to establish the starting of the offense, and then use that date to calculate the time period for which prior sentences are counted."). As such, the sentence on the defendant's petit larceny conviction occurred within ten years of the commencement of the instant offense (i.e., the sentence was imposed after December 2, 2011).

Similarly, Probation also correctly assigned 3 points to the defendant's conviction for Identity Theft in the Southern District of Ohio. See PSR ¶ 40. The sentence on that conviction was imposed on July 9, 2007. Id. Because commencement of the instant offense began as early as December 1, 2021, this sentence was imposed within 15 years of that date. See U.S.S.G. § 4A1.2(e). Also, because the defendant was originally sentenced to 12 months' imprisonment and then 4 months' imprisonment after violating the terms of her supervised release, the resulting total of 16 months' imprisonment justifies the assignment of 3 points for this conviction (i.e., a sentence of imprisonment exceeding one year and one month). See U.S.S.G. §§ 4A1.1(a); 4A1.2(k)(1).

II. The Defendant's Other Objections

A. The Defendant's Objections to the PSR Paragraphs Documenting the Defendant's Possession of Numerous Fraudulent Law Enforcement Credentials

The defendant requests that the PSR remove from paragraphs 17 and 18 the descriptions of the fraudulent law enforcement credentials and other documents and materials (e.g., the identifications and credit cards of third parties[3]) as irrelevant to the defendant's offense of conviction. The government submits that the PSR should include the references to these materials. The presence of these items, including among others, multiple fraudulent personal identity verification ("PIV") cards in the defendant's name (an in some cases, in her image) from several different federal agencies, is relevant to the defendant's intent in possessing the various firearms and firearm-related components that were recovered from her apartment. To be sure, the defendant can offer counter inferences or explanations for her possession of these items for the Court's consideration, but they are certainly relevant to the Court's evaluation of the

---

[3] As noted in the government's April 11, 2024 objections to the PSR, several of the identifications and credit cards in the defendant's possession correspond to police reports of lost or stolen personal items.

defendant's personal "history and characteristics," even if the Court were to find them not to qualify technically as "relevant conduct" under the Guidelines. See 18 U.S.C. § 3553(a).

That 18 U.S.C. § 716 – a statute with which the defendant was not charged – provides for an affirmative defense to the possession of "counterfeit official insignia" does not alter this conclusion. Again, the defendant is free to present these same observations and explanations to the Court concerning the other items recovered from the apartment. Given the defendant's criminal history, which includes prior felony convictions involving the illegal possession of fraudulent identifications, it is not unfair for the PSR to include descriptions of these materials, and there is no cause to revise the PSR in this regard.

      B.      The Defendant's Objections to PSR Paragraphs 13-15

The defendant claims that her purchase of ambidextrous "safety selectors" is innocuous and unrelated to the charged offense. To the contrary, as discussed above, ATF exhibit number 22 – the firearm that was the subject of the defendant's guilty plea – featured a safety selector that could toggle between the "safe," "semi-automatic," and "automatic" positions. Given that the defendant was engaged in the manufacture of firearms despite prior felony convictions, the purchase of component parts for assembling firearms is plainly relevant to the defendant's offense conduct and should be included in the PSR.

      C.      The Defendant's Remaining Objections

With the exception of the responses described above to the defendant's arguments concerning the calculation of her criminal history score, the government defers to Probation with respect to the defendant's remaining objections concerning her prior criminal history. In addition, the government generally takes no position with respect to the defendant's objections concerning her "characteristics." The government does agree with Probation that a search condition (both physical and electronic) should be imposed in connection with any term of supervised release that is imposed. Given the nature of the defendant's criminal history, her record of hiding pieces of contraband while in custody (as detailed in the government's

objections to the PSR), and the manner in which the current crime was committed, the government submits that the search condition is amply justified here.

*   *   *

Thank you for your consideration of these responses.

Very truly yours,

BREON PEACE
United States Attorney

By:    /s/ F. Turner Buford
       F. Turner Buford
       Andy Palacio
       Assistant U.S. Attorneys
       (718) 254-7000

Enclosure

cc:    Allegra Glashausser, Esq. (by ECF and E-mail)
       Clerk of the Court (DLI) (by ECF and Hand)