**Federal Defenders**
OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza -16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1204 Fax: (718) 855-0760

Tamara Giwa
*Executive Director and
Attorney-in-Chief*

*Eastern District of New York*
Michelle A. Gelernt
*Interim Attorney-in-Charge*

May 3, 2024

Brian H. Woo
United States Probation Officer
Brooklyn, New York 11201

Re: *United States v. Kara Sternquist*, 22-cr-473

Dear Officer Woo:

I am respectfully submitting the below reply to the government's letter dated April 26, 2024 related to Ms. Sternquist's presentence report.

Ms. Sternquist did not have any silencers

In Ms. Sternquist's objections to the PSR, she explained that the items she possessed and referenced in the PSR were not silencers, as they did not have holes drilled through them, as necessary for use as a silencer, and because Ms. Sternquist had neither knowledge of them being silencers nor intent to use them as silencers. Dkt. 101. In support, Ms. Sternquist explained why ATF's current view that no hole was necessary to make an item a silencer was not supported by any case law or formal rule making, and cited case law explaining that knowledge and intent is required. Dkt. 101 at 2-7.

In response, the government quotes from the ATF reports in this case, which asserted that holes were not necessary for the ATF to classify an item as a silencer, and states that Ms. Sternquist intended the items to be used as silencers because she had "15" of them and had "knowledge" about guns. Dkt 102 at 3. It also points to an ATF letter about silencers issued <u>after</u> Ms. Sternquist's arrest, which stated that some items "commonly marketed as solvent traps" were silencers. *See* Sternquist letter April 12, at 6, n. 4. The government largely does not respond to the caselaw cited in Ms. Sternquist's objections. It does not rebut that the items possessed by Ms. Sternquist were regularly sold and marketed on the open internet as solvent traps, and that ATF recognized this, before changing its opinion after Ms. Sternquist's arrest. Dkt. 101, *compare* Ex. C with ATF "Open Letter" dated Nov. 20, 2023. It points to no facts indicating that Ms. Sternquist intended these items to be used as silencers. Because the

1

government's argument is unsupported by citations to caselaw or the factual record, it should be rejected.

First, the government states that it is irrelevant that no hole was drilled through any of the items possessed by Ms. Sternquist because there was a "small dimpling in the center." Dkt. 102 at 2. It cites to no caselaw supporting that a "small dimpling" is sufficient to turn a legal item into an illegal item and it points to no formal administrative rulemaking by the ATF that would support ATF's own definition of a silencer as not needing a hole in it.[1] The defense objections noted that counsel could find no case law supporting ATF's definition that a mark or dimpling turns a legal tube into an illegal silencer. Dkt. 101 at 7 & n.5. The government does not rebut this or offer any case citations supporting its position.

Crucially, the government also does not dispute that Ms. Sternquist did not drill any holes in these items. Instead, the government quotes ATF as stating that dimpling is "advantageous" because it allows "maximum efficiency" to the "end-user." Dkt. 102 at 2. The government does not explain this jargon, which doesn't appear to make sense on its face: if someone wanted to use an item as a silencer it would be more "efficien[t]" if the item had a hole drilled through it, so that it could be used immediately as a silencer. In any event, ATF's view about "efficiency" does not have the force of law.

---

[1] Indeed, it doesn't point to any informal rulemaking either, nor has the government made any particular assertion as to any agency process related to the definition of a silencer prior to Ms. Sternquist's arrest.

The type of deference afforded to agencies is currently before the Supreme Court, which appears to be reconsidering the doctrine of *Chevron* deference in *Relentless v. United States. See* Amy Howe, "Supreme Court likely to discard *Chevron*," Jan. 17, 2024, SCOTUSblog, available at https://www.scotusblog.com/2024/01/supreme-court-likely-to-discard-chevron/; Christina Pazzanese, *"*Chevron deference' faces existential test," Jan. 16, 2024, The Harvard Gazette, available at https://news.harvard.edu/gazette/story/2024/01/chevron-deference-faces-existential-test/. In any event, the measure of deference to an agency's interpretation can vary vastly depending on the circumstances.

> The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position. The approach has produced a spectrum of judicial responses, from great respect at one end to near indifference at the other.

*United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) (cleaned up). The government has made no showing under any standard that there is an ATF interpretation of the definition of silencer that is required any degree of deference.

Second, the government asserts that because Ms. Sternquist "successful[ly]" "manufacture[d]" guns, she is "fairly charged with knowledge of, and appreciation for, these technical design features." Dkt. 102 at 3. Again, the government points to no case law supporting this; it does not cite any cases suggesting that the mere fact someone may have put together a gun is relevant to knowledge and intent related to whether undrilled tubes are silencers. Nor does it distinguish the cases cited by the defense, which each rely on facts absent here to find intent, including the defendant's testimony that he understood the item was a silencer, *United States v. Coffell*, 720 F. App'x 521, 528 (11th Cir. 2017) ("Coffell's own testimony reflects that he obtained the silencer with the understanding that it was intended to be used to silence a firearm"), testimony that the defendant told others he was making a silencer, *United States v. Carter*, 465 F.3d 658, 666 (6th Cir. 2006), and the fact that holes had been drilled in the items. *United States v. Moore*, 253 F.3d 607, 611 (11th Cir. 2001) (pointing to fact that "there were holes drilled in the central cylinder" as evidence supporting item was a silencer).

The government also does not point to any other facts present here suggesting that Ms. Sternquist's had the intent that these items be used as silencers. Instead, it says it is "implausible" that she would have 15 solvent traps, "nearly twice the number of guns she had." Dkt. 102 at 3. In addition to this being a miscount of the number of guns she had, the government's argument that you don't need 15 solvent traps for less than 15 guns also applies equally to silencers: one would not need 15 silencers for less than 15 guns either. Ms. Sternquist had multiples of everything she owned. She is a collector bordering on a hoarder. That she had multiple undrilled tubes does not speak to her intent to use them as silencers.

Third, in the defense letter, we noted that, even after the agent modified the items possessed by Ms. Sternquist, the sound reduction was slight. This supports Ms. Sternquist's argument that the items were not intended to be silencers because, even after they were modified, they did not significantly reduce the sound. In response, the government cites a case in which there was testimony that a defendant, who "frequently spoke to his friends of his intent to make a silencer," was found guilty of making and possessing a silencer. *United States v. Kavoukian*, 354 F.3d 117, 119 (2d Cir. 2003). The Circuit upheld the conviction, finding that the jury was properly told that "in order to convict, it must find beyond a reasonable doubt that the device possessed the characteristics that make it a silencer, and that Kavoukian knew that the device had those characteristics." *Id.* 120. The court found that the government did not have to show that the defendant had already tried the device he made as a silencer or knew if he had made it successfully. *Id. Kavoukian* does not support the government's argument. Instead, *Kavoukian* is yet another example of a case where there is evidence

3

of intent lacking here: unlike in *Kavoukian*, here there is not evidence that Ms. Sternquist "spoke to [her] friends of [her] intent to make a silencer."

The government also says that "it is well known that comparatively small reductions in the total decibels produced by a particular sound can result in comparatively large reductions in the amount of perceived noise generated by that sound." Dkt. 102 at 3. In support, it cites two articles from "Small Arms Review" from 2000 and 2002, and an undated slide presentation.[2] These articles do not appear to undermine anything stated by the defense, or support the government's comment that "perceived noise" is more important than the fact that noises above 140dB cause hearing damage. Consistent with the citations in the defense submission, one of the articles cited by the government states that sounds above 140 dB damage hearing and that for gun "suppressors," "the important thing is that they…reduce[ ] the sound below …140dB." [3] None of the items the government calls silencers here reduced the sound appreciably below 140dB. Dkt. 101 at 3 (one item was at 139.93; the others were all above 140).

Fourth, the government argues that even if the items are not counted as silencers, the offense level in the PSR is still correct, based on its argument that partial frames and receivers should also be counted as guns, Dkt. 100, and that she possessed a "machine gun." Dkt. 1032 at 4. Ms. Sternquist rebutted the first argument in her response papers. Dkt. 103. Additionally, with respect to the item the government calls a machine gun, there was insufficient evidence that Ms. Sternquist knew this gun could ever fire more than one shot with one trigger pull. As noted in Dkt. 101, when the first government agency tested this gun to see if it was automatic, it could not get

---

[2] At my request, the government sent me a copy of the undated slide presentation, which is apparently from a sound and vibration business, named "Bruel & Kjaer." *See* Bruel & Kjaer company website, https://www.bksv.com/en. It consists of graphs with little explanatory text.

[3] This quote appears on page 6 of the PDF the government sent me of this article, titled "Firearm Sound Levels and Hearing Damage." The PDF states it was published in the Small Arms Review, Volume 6, but the article does not appear on the Small Arms Review's website for that volume, https://smallarmsreview.com/category/articles/articles-by-issue-articles/v6/. This article, which provides no citations or source information, includes comments such as "The European community is well known for lax safety standards" and "European restaurants are not enjoyable for a non-smoker." In any event, this article generally does not appear to support the government's argument.

The other Small Review Article by the same author discusses complicated measurements that should be used when assessing suppression of a gunshot, including an assessment of humidity, reflection, atmospheric pressure, and wind. Philip H. Dater, "Sound Measurement Techniques," Small Arms Review, Aug. 1, 2000, available at https://smallarmsreview.com/sound-measurement-techniques/. It does not appear that the ATF used that analysis and this article does not appear relevant.

4

it to fire more than one bullet with a single trigger pull. Dkt. 101, Ex G. The government says this is irrelevant because that agency used the words "fully automatic" instead of "machine gun." Dkt. 102 at 5. That is a distinction without a difference. The Supreme Court has used the terms "automatic" and "fully automatic" to "refer to a weapon that fires repeatedly with a single pull of the trigger." *Staples v. United States,* 511 U.S. 600, 603, 114 S. Ct. 1793, 1795, (1994). *See also United States v. Sternquist*, No. 22-MJ-1005(EK), 2022 WL 6162532, at *1 (E.D.N.Y. Oct. 8, 2022) (defining "fully automatic" as "capable of shooting multiple rounds with a single trigger-pull"). The second agency to test the gun could only get the item to fire more than one round twice in five attempts. Based on these numerous attempts in which the gun did not fire automatically or as a machine gun, this gun should not be classified as one intended to fire as a machine gun.

<u>The safety selector purchased in December 2021 was not part of "preparation for the offense."</u>

The government asserts Ms. Sternquist's possession of a gun began in December 2021 with a purchase of a safety selector, saying that the purchase was part of the "preparation for the offense of conviction." Dkt. 102 at 6. The safety selector purchased in December 2021, however, is not the "three-position safety selector" on the charged gun. The government does not assert it is and there is no reason to believe that it is, given that a "three-position safety selector" is not the same as an ambidextrous safety selector. *See e.g.*, "Types of Safeties," Hunter-Ed https://www.hunter-ed.com/newsouthwales-firearms/studyGuide/Types-of-safeties/202601_144086/ (explaining that some safeties have three positions, a back, middle, and forward position, while others have two positions, on or off); Len Backus' Long Rand Hunting Forum, https://www.longrangehunting.com/threads/2-position-or-3-position-safety.197349/ (web forum discussing users' preferences for type of safety selector).

Thus, Ms. Sternquist did not acquire the unregulated, legally-purchased safety selector in December 2021 as "preparation for the offense of conviction." Dkt. 102 at 6. In support the government cites two out-of-circuit decisions that are not like this case. In *United States v. Kennedy*, 32 F.3d 876, 890 (4th Cir. 1994), the court said that the starting date of the offense was the starting date of the conspiracy. There is no conspiracy alleged here. And in *United States v. Susewitt*, 125 F. App'x 681, 682 (6th Cir. 2005), the defendant "admitted" that "nine or ten years earlier, he and a friend used [a] saw to cut the barrel of the shotgun involved in this case to an illegal length." Unlike the time when the person sawed off the shotgun in *Susewitt*, the purchase of the safety selector was not illegal and was not used in the illegal gun possession.

As explained in her original objections, her criminal history category should be II. Dkt. 101 at 8-10.

<u>The government provides no factual basis connecting her possession of government identifications to her crime of conviction.</u>

The government states, without explanation, that the possession of government identifications are "relevant to [her] intent in possessing the various firearms and firearm-related components that were recovered from her apartment." Dkt. 102 at 6. They are not. The government searched all Ms. Sternquist's electronic devices. Despite that, it does not now and never has pointed to any facts supporting that the government identifications were at all related to her "intent in possessing" the gun. There is a complete lack of evidence connecting those identifications to the guns.

Respectfully submitted,

/s/
Allegra Glashausser
Assistant Federal Defender
Federal Defenders of New York
(212) 417-8739