

U.S. Department of Justice

United States Attorney
Eastern District of New York

FTB/AP
F. #2022R00795

271 Cadman Plaza East
Brooklyn, New York 11201

May 28, 2024

By Hand and ECF

The Honorable Dora L. Irizarry
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re: United States v. Kara Sternquist
       Criminal Docket No. 22-473 (DLI)

Dear Judge Irizarry:

  The government respectfully submits this letter in advance of the sentencing hearing for the defendant in the above-referenced case, which is scheduled for June 20, 2024. On December 20, 2023, the defendant pleaded guilty to Count Three of the indictment, which charged her with possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). The Presentence Investigation Report prepared by the U.S. Probation Department ("Probation") dated March 29, 2024 (the "PSR") and the addendum thereto dated May 17, 2024 (the "PSR Addendum") calculated a total offense level under the U.S. Sentencing Guidelines ("U.S.S.G." or the "Guidelines") of 21, and the government submits that the calculation is correct. Because the defendant falls within Criminal History Category IV, this offense level corresponds to an advisory range of imprisonment of 57 to 71 months. For the reasons set forth below, the government respectfully submits that a sentence within this Guidelines range is warranted.

  I. Relevant Facts

  As set forth in the PSR, the defendant, despite having two prior federal felony convictions, was found to be in the process of assembling from component parts multiple, functional firearms (including weapons designed to fire automatically). Specifically, the search of the defendant's apartment in Manhattan that was conducted by federal agents on September 15, 2022 revealed that she was in possession of 8 guns in various stages of construction, each of which was determined by technical examiners with the U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") to qualify as a "firearm" under the

definition in 18 U.S.C. § 921(a)(3). (PSR ¶ 22; PSR Addendum at 1-2). Photographs of some of these guns are set forth below:

- ATF Exhibit No. 11:



- ATF Exhibit No. 20:



- ATF Exhibit No. 21:



- ATF Exhibit No. 22:



- ATF Exhibit No. 23:



The ATF's technical examiners determined that four of these guns were operable (meaning that they were successfully test-fired) either as recovered by the federal agents or with only minor, technical modifications. (PSR Addendum at 2). One of the guns (ATF Exhibit no. 22) was determined by the ATF's technical examiner to be a "machine gun," as defined in 18 U.S.C. § 921(a)(24) and 26 U.S.C. § 5845(b), because it fired more than one bullet with a single trigger pull (as it was designed to do). See PSR Addendum at 2; Gov't Response to Def. PSR Obj., ECF No. 102, at 4-5; Def. Obj. to PSR, ECF No. 101, Exhibit H, at 5-6.

The evidence developed during the investigation showed that the defendant had purchased numerous parts for use in the construction of firearms either in her own name or using an alias. See PSR ¶¶ 13-16. Records from the sellers of these parts showed that they were shipped to the defendant's apartment. See id. In addition, the government also determined that the defendant had also purchased firearm component parts (including high-

capacity magazines) that were shipped to the address of a third party, who had agreed to then ship the parts to the defendant's residence in Manhattan. See ECF No. 55, at 5-6.

In addition to these firearms and component parts for firearms, the defendant was in possession of 15 silencers, which also qualify as "firearms" under 18 U.S.C. §§ 921(a)(3), (a)(25). (PSR ¶¶ 20-21).[1] Specifically, the silencers were "device[s] for silencing, muffling, or diminishing the report of a portable firearm . . . ." 18 U.S.C. § 921(a)(25). Below is a picture of one of the silencers and its component parts that was recovered from the defendant's apartment (ATF Exhibit No. 3):



In addition to firearms, silencers, and related parts, the defendant was also found to be in possession of dozens of phony law enforcement credentials for multiple different agencies, including personal identity verification ("PIV") cards bearing the defendant's picture. (PSR ¶ 18). The evidence obtained in the investigation indicated that the defendant had been steadily acquiring fraudulent pieces of identification for federal agencies, including from overseas, and having those pieces of identification shipped to her residence. (Id. at ¶¶ 7-10, 12). The defendant was found to be in possession of hundreds of pieces of identification and credit and debit cards in the names of third parties. (Id. at ¶ 18). At least four of the pieces of identification (New York State driver's licenses) corresponded to complaints of lost or stolen items that had been filed with the New York City Police Department. (PSR Addendum at ¶ 1). In addition, the defendant possessed multiple

---

[1] One of the items reviewed by the ATF Examiners (ATF Exhibit No. 8) was a bag containing an "outer tube" and multiple baffles (7 "modular cone baffles" and 2 "cone baffles"). Def. Obj. to PSR, ECF No. 101, Ex. B at 10. The ATF Examiner concluded that each of these items could independently be classified as a "firearm" for a total of 10 "firearms." See id. at 21-22. Probation and the government in its Pimentel letter elected to count the contents of ATF Exhibit No. 8 as one "firearm" for purposes of determining the total number of firearms that the defendant possessed under the Guidelines – an assessment that is consistent with the treatment of the other items classified as "silencers" by the ATF, which included multiple component parts, but were each counted as one "firearm." See id. at 20-23; PSR ¶¶ 21, 29.

4

passports in the names of third parties that purported to have been issued by other countries. (PSR ¶ 18).

II. Guidelines Calculation

A. The Offense Level

The PSR set forth the following calculation of the defendant's offense level under the Guidelines:

| | |
|---|---:|
| Base Offense Level (§ 2K2.1(a)(4)(B)(i)) | 20 |
| Plus: Between 8 and 24 firearms (§ 2K2.1(b)(1)(B)) | +4 |
| Minus: Acceptance of responsibility (§§ 3E1.1(a),(b)) | -3 |
| Total: | <u>21</u> |

(PSR ¶¶ 28-37). The government respectfully submits that this calculation is correct.

The defendant raises two principal challenges to the computation of the offense level. First, the defendant claims that the base offense level is too high because the defendant possessed neither a "machine gun" nor a "silencer" – either of which triggers a base offense level of 20 under section 2K2.1(a)(4)(B)(i).[2] For the reasons set forth in the government's April 26, 2024 response to the defendant's PSR objections, the defendant in fact possessed both a "machine gun" and (at least) one silencer. See Gov't Response to Def. Obj. to PSR, ECF No. 102, at 4-5; PSR Addendum at 4. With respect to the machine gun, the ATF examiners determined that one of the firearms (ATF Exhibit No. 22) recovered from the defendant's residence was designed to, and in fact did, fire more than one bullet with a single trigger pull – the statutory definition of a "machine gun." See Gov't Response to Def. PSR Obj., ECF No. 102, at 4-5. For the reasons set forth in the government's response to the defendant's PSR objections, the government respectfully submits that Probation's conclusion was therefore correct. See id.

In addition, the defendant also possessed numerous items that qualified as "silencers." As explained by the ATF technical examiners, notwithstanding the defendant's claim that the items were solvent traps, they each possess design characteristics that have utility for the muffling of gunshots, but not for the catching of solvent fluid. See Gov't Response to Def. PSR Obj., ECF No. 102, at 2-4. Specifically, the items each contained

---

[2] That Guideline specifies that the base offense level of 20 results if the defendant is a "prohibited person," which this defendant was; and the offense involved a firearm described in 26 U.S.C. § 5845(a). Section 5845(a) in turn includes in its definition of "firearm" both "machine gun[s]" and "silencer[s]."

5

baffles, which enhance a silencer's ability to reduce the noise created when a gun discharges a bullet, but have no function for a solvent trap. See id. In addition, the end caps of the items (as well as the baffles) were generally made with indentations (or "dimpling") indicating the position where holes should be drilled to permit the passing of a projectile trough the fully assembled silencer (i.e., both end caps and the cylindrical tube filled with baffles). See id. These design features indicate that the items were intended to be used as silencers, and, when tested by the ATF examiners, multiple items did in fact reduce the noise produced by gunshots. See id.

As noted above, the defendant contends that the items are solvent traps and relies principally on United States v. Crooker, 608 F.3d 94, 99 (1st Cir. 1999), to argue that the government must prove an intent on the part of the possessor to use the relevant device as a silencer before it can fall within the statutory definition. The reasoning of Crooker does not apply here because the device at issue there was a silencer designed to muffle the noise of an air gun and that could not – without the use of an adapter – be used to muffle the noise of a conventional, "powder bearing" firearm. Crooker, 608 F.3d at 95-96. The Crooker court distinguished devices that were plainly designed to be compatible with firearms, saying "[i]n the ordinary criminal case, the device charged as a silencer is one manufactured for use with a firearm and is easily connected (e.g., by threading one onto another); and the possessor knows perfectly well the intended function of the device." Id. at 96-97 (citing United States v. Hall, 171 F.3d 1133, 1152 (8th Cir. 1999).

Here, the ATF reports of technical examination show that multiple items classified as silencers were affixed to firearms for test firing using the component parts included with the items without the need for additional equipment. See, e.g., Def Obj. to PSR, ECF No. 101, Exhibit B, at 5-10. This, when coupled with the product design features described above and the defendant's obvious knowledge and familiarity with firearms, is more than sufficient to conclude (on a preponderance standard) that the PSR was correct to agree with the conclusions of the ATF technical examiners that the relevant items were "silencers" as defined in 18 U.S.C. § 921(a)(25).

The second principal challenge the defendant makes to the Guidelines range is to application of the 4-point enhancement for possessing 8 to 24 total firearms under section 2K1.1(b)(1)(B). The defendant's contention rests primarily on the same argument discussed above – that the items classified as "silencers" are not really silencers and therefore should not be counted as "firearms" for purposes of applying the enhancement. For the reasons stated above, the silencers were properly identified as such and therefore should be included in the total firearms count – this alone results in the defendant's possession of more than 8 (but less than 24) firearms. In addition, even if none of the silencers are counted, the remaining items classified as firearms by the ATF technical examiners would still number 8, resulting in the application of the enhancement. See Gov't Response to Def. PSR Obj., ECF No. 102, at 4; Gov't Reply in Support of PSR Obj., ECF No. 104, at 1. Accordingly,

6

Probation was correct to apply the enhancement to increase the defendant's offense level by four points.

B.      Criminal History Category

Probation concluded that the defendant fell within Criminal History Category IV and maintained that conclusion over the defendant's objection. See PSR ¶ 50; PSR Addendum at 5-6. This is one level higher than the estimate of the defendant's Criminal History Category in the government's Pimentel letter dated December 4, 2023. See ECF No. 90 at 3. Nonetheless, the government agrees that Probation's calculation of the defendant's Criminal History Score is correct.

Specifically, the government respectfully submits that Probation was right to assign criminal history points to the defendant's 2012 petit larceny conviction, which resulted in a sentence of 10 days' imprisonment, given that the sentence was imposed within 10 years of the commencement of the instant offense, which includes relevant conduct such as the defendant's purchase of component parts to be used in assembling firearms in December 2021. See Gov't Response to Def. PSR Obj., ECF No. 102 at 5; PSR ¶ 48. In addition, Probation was also correct to conclude that the defendant's sentence of 12 months' incarceration in connection with her conviction in U.S. District Court for the Southern District of Ohio for identity theft, plus another four months' imprisonment following her violation of the conditions of her supervised release, should result in the assignment of 3 Criminal History points. See PSR Addendum at 5-6. This is so because the total sentence for the crime of conviction coupled with the supervised-release violation exceeds one year and one day and therefore qualifies for the 15-year lookback specified in section 4A1.2(e)(1). See id.; U.S.S.G. §§ 4A1.1(a), 4A1.2(k)(1)-(2). As such, the defendant has seven Criminal History points, which places her in Criminal History Category IV.

C.      The Advisory Range of Imprisonment

Because the defendant's offense level is 21, and her Criminal History Category is IV, the Guidelines provide for an advisory range of imprisonment of 57-71 months. See PSR ¶ 93.

III.      The Appropriate Sentence

A.      Legal Standard

The Sentencing Guidelines are advisory, not mandatory. United States v. Booker, 543 U.S. 220, 258-60 (2005). However, the Supreme Court held in Booker that sentencing courts must consider the Guidelines in formulating an appropriate sentence. Id. In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of Booker:

> [A] district court should begin all sentencing proceedings by
> correctly calculating the applicable Guidelines range. As a
> matter of administration and to secure nationwide consistency,
> the Guidelines should be the starting point and the initial
> benchmark.

Gall, 552 U.S. at 49 (citation omitted). Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [a district court] may not presume that the Guidelines range is reasonable. [A district court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

    B. Discussion

The defendant's crime is a very serious one. She was engaged in the production of multiple firearms, including assault rifles, some of which were clearly intended to fire automatically. These firearms were handmade by the defendant from component parts acquired primarily over the internet – they were "ghost" guns. The dangerousness of the weapons assembled by the defendant is significantly exacerbated by her possession of silencers, which have no real defensive function – they are designed and intended to enhance the offensive capability of firearms, by reducing the chance that a shot will be heard, thereby increasing the chances that a gun can be used without detection.

The fact that the defendant also possessed fraudulent law enforcement credentials bearing her name and image is alarming. Such credentials could very well enable the defendant to gain access to sensitive locations while in possession of homemade firearms. That the defendant was not found to be in possession of ammunition is cold comfort at best, given the ease with which she was able to acquire the various parts she used to assemble her weapons.

The defendant's conduct must be considered within the overall trajectory of her criminal history. The defendant has two prior convictions, which produced sentences of 12 months and 27 months, respectively. (PSR ¶¶ 40, 47). In both cases, the defendant would also violate the conditions of her supervised release, resulting in additional custodial sentences. (Id.). The defendant was committing the instant offense while on pretrial release in New York State for a felony charge of criminal mischief arising from an allegation that she broke the windows of a store in Manhattan. (Id. at ¶ 57). Notwithstanding those (and other) prior arrests, the defendant set about methodically committing the crime here, evidently undeterred by her prior periods of incarceration.

Under these circumstances, the government respectfully submits that a sentence within the advisory Guidelines range is warranted. The government acknowledges the difficult circumstances of the defendant's upbringing and her uniquely challenging period of pretrial detention; it is certainly fair for the Court to consider these factors in fashioning an appropriate sentence. Nevertheless, the severity of the defendant's crime and the calculated

way in which it was committed demand a significant period of incarceration. Threats to public safety must be assessed based on capability, and the defendant knowingly, intentionally, and illegally acquired the capability to inflict great harm. For these reasons, the government respectfully submits that a sentence in the advisory Guidelines range is sufficient, but not greater than necessary, to serve the ends of justice.

IV. <u>Forfeiture</u>

Consistent with the preliminary order of forfeiture issued by the Court on March 13, 2024, the government respectfully requests that the Court – as part of the sentence it imposes – order the final forfeiture of the defendant's interest in the firearm that was the subject of Count Three of the indictment, to which the defendant pleaded guilty.

V. <u>Conclusion</u>

For the reasons stated above, the government respectfully requests that the Court impose a sentence of imprisonment within the advisory Guidelines range of 57 to 71 months.

Respectfully submitted,

BREON PEACE
United States Attorney

By:    /s/
F. Turner Buford
Andy Palacio
Assistant U.S. Attorneys
(718) 254-7000

cc: Allegra Glashausser, Esq. (by ECF and E-mail)