Tamara L. Giwa
*Executive Director and
Attorney-in-Chief*

Michelle A. Gelernt
*Attorney-in-Charge*

June 4, 2024

Honorable Dora L. Irizarry
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *United States v. Kara Sternquist*, 22-cr-473

Dear Judge Irizarry:

Kara Sternquist is a transgender woman, who is partially paralyzed. For the past 19 months, she has been shackled to a bed, under 24-hour watch by two armed guards. Before that, she was in the hospital for 1 ½ months, also in in-custody, shackled to the bed. As the government notes, her pretrial detention has been "uniquely challenging." Dkt. 108 at 8. The serious challenges of the past 21 months are the latest for Ms. Sternquist in a life that, from the start, has been marked by abandonment, failed attempts at being accepted, and threats of violence. Her mother was incarcerated at Kara's birth, disappeared when she was a toddler, and is presumed dead. Kara was left with her grandparents, who were alcoholics, and sent Kara to an all-boys military boarding school. At school, she was paddled and beaten, and had to hide the girl's underwear she wore. Her grandparents then sent her even further away, to Mexico, where she was more seriously abused. At 18, she joined the Navy under the Don't Ask Don't Tell policy; she was attacked because she was queer.

In the past decade before her arrest, however, she had started to find her place in the world. She fully came out as a woman, she found a stable job, she was active in pride events, she volunteered. Using her creative whimsy, she formed communities where she fit in, as a Ghostbuster, Doctor Who character, and the teacher from the Magic School Bus. She developed a trans-friendly swim program. She volunteered for the Make a Wish Foundation. As an old friend put it, despite its difficulties, her life

was also full of "magic, passion, and performance." Ex. B (Towers Letter). [1] She is a "woman of strong character and resilience." Ex. B (Simpson letter).

Unfortunately, despite rebuilding her life in these positive ways, she did not escape being targeted because of her gender expression. Leading up to her arrest, she had received on-line death threats, was assaulted by two men near her home, and was scared she was vulnerable in a world hostile to her basic identity. It was in this context that she ordered gun parts, and built the gun that led to her conviction here.

I am now writing in advance of Ms. Sternquist's sentencing, scheduled for June 20, 2024, for possessing a gun after having been convicted of a felony. As noted in the PSR objections, I respectfully urge the Court to find that her guidelines should be calculated as 15 to 21 months. Whatever the guideline calculation the Court adopts, however, I respectfully request that the Court sentence Ms. Sternquist to time served or a period of home confinement.

## I.    A childhood "marked with isolation and neglect," and "fear[ ] that she would not be accepted for her identity."

Ms. Sternquist was born in custody. PSR 21. When her birth mother, who was addicted to drugs, was released, she collected baby Kara and tried to raise her. PSR 22; NJ PSR 23. A couple years later, her grandmother found young Kara "dirty and emaciated." PSR 22. Her birth mother had been washing her in gas station restrooms,

---

[1] Attached to this letter are the following exhibits:

    Ex. A: Notes of conversation with Kara Sternquist May 29, 2024
    Ex. B: Letters of support from,
        Hannah Simpson, Kara's friend;
        Brian Rea, Kara's friend;
        Gia Pace, Kara's former wife and friend;
        David Anderson, Kara's friend;
        Chris Towers, Kara's childhood friend;
        Mike Taylor, Kara's former co-worker;
        Dana Loughry, friend of the family;
        Daniel Sutton, Kara's friend.
    Ex. C: Excerpted medical records
    Ex. D: Photos from the inside of Ms. Sternquist's apartment
    Ex. E:  A sample of on-line threats received by Ms. Sternquist
    Ex. F:  Picture of Kara's legs in shackles (taken May 29, 2024).

or other public facilities. PSR 22. After that, her birth mother disappeared. She has never been able to find her. Kara does not know who her father is.

Her grandmother and step-grandfather adopted her. PSR 22. They are the only parents she has ever known and she calls them her mother and father. (I will do the same, below). As Kara's former wife, Gia Pace explains, Kara's mother was "tough" and "unaffectionate." Ex. B (Pace Letter). She was also an alcoholic, as was her father. PSR 22 & 28. Her father would "str[i]k[e] her with a belt." PSR 28. Her childhood was "marked with isolation and neglect." PSR 23.

When Kara was only 10 years old, her parents shipped her off to an all-boys military academy boarding school. PSR 22-24. She was paddled, held down while other boys "bludgeon[ed] her with socks filled with soap bars," PSR 24, and sexually harassed in communal showers. She also had to participate in weekly military parades and presentations, which involved standing perfectly still while holding a rifle for 30 minutes to an hour and a half. These parades took place in all weather. If you moved – even involuntarily to cough, sneeze, or pass out from the sun – you would be in trouble. When she was a young teen, she told the school's psychiatrist that she was transgendered. PSR 24. She left the school.

Her parents shipped her off again, this time to Casa by the Sea, a place in Mexico that purported to be a school. PSR 22-24. There she was also abused: she was forced to remain in stress positions, for example, putting her chin on the floor, arms behind her back, and legs crossed. PSR 24. If she moved from the position, she would be hit. PSR 24. She was locked in a kennel, ordered to march, or made to sit underneath a desk for hours. PSR 24. During this abuse, she would be watched by security guards, who she understood to be former military members. PSR 24. Later, Mexican child protective services closed the facility. NJ PSR p. 21. As her mother described it to probation, "the damage we and that school has caused [ ] has been great[.]" PSR 23.

At 18, she enlisted in the United States Navy. PSR 25. There, six Navy men severely beat her, due to her gender identity. PSR 25. She believes this attack led to her later spinal injury. PSR 25 & 71. She reported the attack to her commanding officer, but was ignored. PSR 25. They suggested she leave the service, which she did. PSR 25.

## II. Kara's transition: My parents wanted to me to "be a man" and "I wasn't capable of doing that."

- Ms. Sternquist conversation with counsel February 6, 2024.

Ms. Sternquist realized that she was a girl when she was a student at the all-boys military academy, but tried to keep it hidden at first. Once, her mother caught her trying to wear her mother's underwear; her mother beat her. At school, she would hide girl's clothing, and worry about underwear inspections (something that wasn't uncommon at military boarding school). Her family and her teachers tried to push her into their "idea of normal" and would ask her "what's wrong with you?" Ms. Sternquist tried to suppress her feelings. She felt "alone," "abandoned," and "feared that she would not be accepted for her identity." PSR 28. As her childhood friend explained it: "For as long as I have known Kara, she has had a difficult time trying to fit into a world where she did not feel that she belonged." Ex. B (Towers letter).

Eventually she came out to her parents, but she had to do it more than once. Her mother did not want to "talk further on the topic of [Ms. Sternquist's] gender." PSR 26. She started hormone therapy before her 2010 arrest, but that therapy was "abrupt[ly]" discontinued by the BOP. PSR 25. She restarted hormone therapy in 2015, and again came out to her parents. PSR 26. This caused arguments. Ex. B (Loughry letter). It wasn't only her parents who disapproved. As her friend David remembers it, "through her transition from male to female, I saw how people would look at her with suspicion and sometimes disgust for just walking around the City." Ex. B (Anderson Letter). But her mother's condemnation was the most hurtful. Her mother's difficulty with Ms. Sternquist's identity strained their relationship. PSR 26. Ms. Sternquist had longed to mend their bond. *See* Dkt. 75.

Despite how hard it was to come out, coming out allowed Ms. Sternquist to build a stable life for the first time. As probation notes, Ms. Sternquist had "lived a productive and community-driven life" while living in New York City for the past decade. PSR 30. Ms. Sternquist worked at the Jewish Community Center in New York for 6 years, up until the day of her arrest. One of her former colleagues wrote to the Court explaining that Kara's work "involve[d] understanding and discretion;" she had the "necessary professionalism" and would be "called in for sensitive rentals." Ex. B (Taylor letter). She "could be trusted with a national conference or a multi-floor Bar-or Bat-Mitzvah." Part of their work involved a theater renovation, where "trust is absolutely necessary." Ms. Sternquist "completed these projects quickly and well." Ex. B (Taylor letter). As he explained:

"I have no doubt that she will find a job when she comes home, that she will quickly set to work on any opportunity that is offered, and that she will be both appreciative and earnest in following through." Ex. B (Taylor letter).

She also volunteered for the National Yiddish Theatre Folksbiene, PSR 29, and was a member of the New York City Ghostbusters, a "nonprofit and charitable organization," "focused on providing an interactive children's educational program." PSR 30. As her friend describes her, her personality is "creative," "intelligent, interesting, whimsical, and supportive." Ex. B (Anderson Letter). Her former wife, explains that she is a "sensitive" person and a "talented performer who made [her] laugh by pulling a quarter from behind [her] ear or made [her] smile with all the cosplay costumes." Ex. B (Pace Letter).

## III. Committing this offense out of fear that her safety was at risk because of her identity.

Ms. Sternquist has taken full responsibility for possessing guns. She fully understands the severity of her actions and the fear her actions elicited. She does not in any way wish to minimize her conduct. But she does want to explain why she had these guns: she had guns because of her perceived need to protect herself as the rights of transgendered people were under attack. *See* Dkt. 83 at 10-15. Ms. Sternquist was the target of death threats on Facebook. Dkt. 83 at 12; Ex. E. In these threats, she was told that she would "get a bullet" and be "slaughter[ed]." *Id.* At this time, people running for office were talking about shooting "people like" her for using the bathroom. Dkt. 83 at 11. And, in October 2021, she was attacked by two men in New York City near her home, who called her "a transgender," broke a bottle, and threatened to hit her with it. PSR 28. When the NYPD didn't arrest both of the people who attacked her, she became concerned that the police wouldn't protect her because she was trans. She started gathering canned goods and water, preparing to live without leaving her apartment for a lengthy period of time if necessary. *See* Ex. D. She started living in the basement of her apartment, thinking it was safer. She also ordered gun parts and started to put together guns. As she explains it, she was "scared and wanted to defend" herself because it "seemed no one else in the world would." Ex. A.

Again, this is not to minimize her conduct, but to explain it. She possessed guns and gun parts, but she had no intention to hurt anyone; just an intention to

protect herself. That she had no ammunition underscores this. The government has also reviewed all of her electronic information. Ms. Sternquist was extremely active on line; nothing in this electronic trove of information suggested she had any intent to do anything unlawful with any gun, except to have it, just in case. Instead, her electronic information only underscored her legitimate fears for her safety.

The government is aware of all of these facts. Nonetheless, its sentencing submission ignores them. It again tries to connect the guns to the badges and identifications, calling this "alarming," and speculating that she could "very well" "gain access to sensitive locations." Dkt. 108 at 8. But the government has never pointed to any evidence supporting that Ms. Sternquist had any such intention. That is because there is none. There is nothing in Ms. Sternquist's background or her electronic data suggesting that she had any intention to use the guns with the identifications. Ms. Sternquist had no intention of doing anything of the kind.[2]

The government also exaggerates Ms. Sternquist's conduct. There is no suggestion that Ms. Sternquist had more than one gun that was "designed to fire automatically." Dkt. 108 at 1 & 8. It continues to call the flaws in the guns, which made them inoperable without manipulation by ATF agents, "minor technical modifications." Dkt. 108 at 3. And the government says Ms. Sternquist possessed the guns "methodically" or in a "calculated way." Dkt. 108 at 8-9. It does not support this assertion, which is not borne out by the evidence. Ms. Sternquist's apartment was a true mess when the search warrant was executed. She was far from methodical in her actions; there was stuff everywhere. *See* Ex. D. The guns were not even put together in any sort of methodically way. On the contrary, they jammed and did not fire until the skilled ATF agents fixed them. This underscores her lack of precision.

## IV.    Nineteen months shackled to a bed in a nursing home.

Shortly before her arrest, in March 2022,



---

[2] As explained in the PSR objections, Ms. Sternquist also had no intent to use any identifications or badges unlawfully. On the contrary, they were part of a collection. Ms. Sternquist is a collector by nature; she is just someone who has multiples of things and has a tendency towards hoarding. Her overflowing apartment reflects that. *See* Ex. D. It was full of collections, not just of identifications, but of keychains, coins, costumes, crafting items, old electronics and many other odds and ends.



When she was discharged from the hospital, she went to a nursing home. There, her feet are shackled to each other at all times, and then shackled to her bed or her wheelchair. Her feet are shackled even during her 20-30 minutes of physical therapy in her room. She is watched at all times by two armed guards.

Nineteen months later, her medical situation remains severe. She has made only small progress in rehabilitation, progressing from not being able to stand, to being able to stand for 1 to 2 minutes. Ex. C at 12. She currently takes about 13 medications regularly, including daily ████████████████ for pain. PSR 27-28; Ex C. She still has urinary incontinence. PSR 28. She also has been diagnosed with ██████████ ██████████████████████. PSR 28.

Her medical care also remains problematic:

- <u>Missed medications</u>: As the Court knows, on numerous occasions, Ms. Sternquist's pain medications have run out, and Windsor Park has been unable to refill them for some period of time, including for days in November and December 2023, and March 2024. I know this happens more frequently than my notes document; Ms. Sternquist has tried not to bother me with a problem she understands is reoccurring. She tends to only let me know when the problem persists and when the pain has increased so much that she really needs me to step in. This same problem of missed medications happens with her ██████████ medications.

- <u>Lack of blood testing:</u> After 14 months, Windsor Park did blood work for the first time and realized that her hormone levels were not what they should be. Some levels had spiked. Suddenly, the facility

radically changed her hormone medications. These changes caused Ms. Sternquist to feel terrible; her mood plummeted. *See* Ex. C at 1-2.

- <u>A suspected ████████ untreated for months:</u> She has had an ongoing problem with ████████. But, starting sometime last winter or early Spring, the amount of blood increased. The incarcerated person who is her neighbor and shares her bathroom complains regularly about the bathroom being bloody. Windsor Park told her she had a ████████ and needed to see a specialist; they said they had put in the request to MDC and were waiting for MDC's approval of the specialist. After waiting patiently for some number of weeks, Ms. Sternquist told me about this problem. I started emailing MDC about this on March 26. I have now written them four additional times (April 16, April 23, May 7, and May 29). On May 30, a member of the MDC legal department stated that it was her "understanding" that an appointment was scheduled, but she could not tell me the date of the appointment. As of this writing, she has not been seen by a specialist.

Despite all of these medical horrors, Ms. Sternquist has consistently engaged in all of the rehabilitative treatment she is offered. She has been as proactive as she can be under the circumstances to rehabilitate herself physically and psychologically. She does physical and occupational therapy, and mental health services, when available.

Her pretrial incarceration at the nursing home has been extremely challenging psychologically as well as physically. The nursing home itself is a cacophony of noises. The older residents have a daily activity that involves playing booming music (recent selections included the Macarena and "The Tooty-Ta Song") and hitting a beach ball around. At all times, large TVs blast in the common area. The door to Ms. Sternquist's room is always kept open. Beeping from other rooms is near constant. Other residents gasp and yell. Guards, nurses, and other staff congregate in the hallways. Ms. Sternquist's room itself also has two TVs, one that she can watch, and one that the guards' watch. I find concentrating during my legal visits extremely challenging, even though I know that I will get to leave when the visits end.

Ms. Sternquist is also not permitted to have even the personal items allowed to women incarcerated at MDC. She cannot have makeup, although she feels naked without it. A request to obtain a religious necklace was never denied, but the necklace

never arrived. A nightguard to stop her from grinding her teeth was not allowed. She has no privacy from guards when she changes her clothes; the door to the bathroom must remain ajar while she uses it. Laundry is hit or miss. In May 2023, for example, she was without clean clothes for 3 to 4 weeks. This gets pretty gross especially because she is incontinent. For example, on May 29, 2024, when I arrived to visit her, she was sitting in urine. She had been that way for about 1 ½ hours, waiting for someone to assist her with new clothes. This same day, she was out of clean socks. The shackles were cutting into her legs, making visible welts. *See* Ex. F. Correctional staff at Windsor Park also continue to misgender her. Many months into her incarceration, they still called her Michael. Even today, they rarely use her proper pronouns. PSR 28. At best, when I am visiting, they just call her "Sternquist."

Her time at the nursing home is, as she describes it, "dehumanizing." Ex. A.

Her social visitors have also endured indignities to see her. The rules of visitation have never been consistent. One day strip searches started being required: Gia Pace, Ms. Sternquist's former-wife and friend, was required to lift her dress over her face, pull her bra out from her body and shimmy. Her friend Hannah Simpson had to do the same (made only slightly less demeaning because she was wearing a shirt and pants, so only had to lift her shirt). Visitors were also, seemingly randomly, turned away despite me adding them to her visiting list and being told they had been approved. As David Anderson writes, "I tried over four or five times to visit Kara during her detention…but there always seemed to be some miscommunication or mix up with my paperwork;" "five times, I had to stay out in the lobby as her wife went into visit…" Ex. B (Anderson Letter). Kara is so grateful that her friends keep showing up. As she says, "without them, I would be lost." Ex A.

Through the support of her friends, she has remained full of empathy for others despite her pain and psychological strain. As friend Brian explains:

> "Since the first days of her incarceration, Kara and I have spoken three times a week…She never ceases to display compassion and interest in everything I'm doing. Despite her incredibly difficult circumstances, she always asks me how I am, shows consideration and empathy, and checks in on how…I'm doing." Ex. B (Rea Letter).

She has also been able to reconnect with her elderly father, who was recently placed in a nursing home himself due to dementia. She is uniquely able to commiserate with him over the indignities of nursing home life. She very much hopes that she is a released at a time when he is not only still alive, but still able to remember her. Ex. A & B (Simpson Letter). It is her dream to be able to spend time with him now, before the end of his life.

## V.      Time served – over 21 months – is the appropriate sentence.

Ms. Sternquist's legal arguments related to the guidelines are in her letters objecting to the PSR. Dkts. 101, 103, & 105. As noted in those letters, I respectfully request that the Court find that Ms. Sternquist's guideline range should be 15 to 21 months. If, however, the Court adopts probation's guideline calculation, I respectfully urge the Court to sentence Ms. Sternquist well-below that guideline range. Probation notes that Ms. Sternquist's physical, mental, and emotional conditions and the need for continued treatment "may be a factor that warrants a departure" from the guidelines range. PSR 33. The Court should find that is true. Ms. Sternquist has endured such hardships in her life. Whenever she is released, she will still face threats of gender-based harassment and violence and a long road to any physical recovery. The goals of sentencing will be well-served without a further incarceratory sentence.

Ms. Sternquist's need for medical treatment counsels against any further incarceratory sentence.

This Court is well acquainted with the severe problems with medical care at the MDC. Unfortunately, these problems are not limited to Brooklyn. Just like at the MDC, BOP medical departments across the country are extremely short staffed: a 2023 DOJ report noted that only 69% of BOP medical officer positions were filled, while 89% of BOP facilities had one or more clinical positions vacant, with some facilities having no medical officers. Pandemic Response Accountability Committee, "Review of Personnel Shortages in Federal Health Care Programs During the Covid-19 Pandemic," Sept. 2023, available at https://www.pandemicoversight.gov/media/file/healthcare-staffing-shortages-report. A 2022 DOJ inspector general report noted that the "BOP did not have a reliable, consistent process in place to evaluate timeliness or quality of inmate healthcare." DOJ, Office of the Inspector General, "Audit of the Federal Bureau of Prisons Comprehensive Medical Services Contracts awarded to the University of Massachusetts Medical School," March 2022, available at

https://oig.justice.gov/sites/default/files/reports/22-052.pdf. The "BOP did not have systems to measure or track" "how long" a person had to wait to receive care after a cancelled appointments and why there was a "frequent need" to cancel appointments. *Id.* Thus "it is difficult for the BOP to determine whether [people] are receiving care within the required community standard." *Id.* at 13.

This year, the Office of the Inspector General issued a report about the BOP's chronic failures to prevent deaths of incarcerated people. U.S. DOJ, Office of the Inspector General, "Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions," February 2024, available at https://oig.justice.gov/sites/default/files/reports/24-041.pdf. The OIG made 12 recommendations to "address persistent operational deficiencies," *id.* at 73-74, and issued a press release explaining the "long-standing operational challenges…[that] further impair the BOP's ability to reduce the risk of [ ] deaths," that the BOP's "response to medical emergencies was often insufficient due to lack of clear communication, urgency or proper equipment," and that there was a "lack of available information about inmate deaths," which "limits the BOP's ability to potentially prevent future deaths." Press Release, "DOJ OIG Releases Report on Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions," Feb. 15, 2024, U.S. DOJ, Office of the Inspector General, available at https://oig.justice.gov/news/doj-oig-releases-report-issues-surrounding-inmate-deaths-federal-bureau-prisons-institutions. *See also* Hannah Rabinowitz, CNN, "DOJ watchdog report finds chronic failures by Bureau of Prisons contributed to the deaths of hundreds of inmates," Feb. 15, 2024, https://www.cnn.com/2024/02/15/politics/bureau-of-prisons-inspector-general-report/index.html.

In addition to her current pretrial incarceration, Ms. Sternquist has already experienced medical difficulties in other BOP facilities first hand. During her last incarceration, she was involuntarily taken off her hormone medications by the BOP. As her friend Hannah writes, "I am terrified that if Kara gets a longer sentence, she will be transferred to a federal facility, where she will face increased risk as a trans inmate of additional harassment and denial of appropriate care. The ramifications on her body could last the rest of her life." Ex. B (Simpson letter).

The community is where Ms. Sternquist can receive medical care in the "most effective manner." *See* 18 U.S.C. § 3553(a)(2)(D).

<u>A sentence without further incarceration would serve the other goals of sentencing.</u>

Ms. Sternquist recognizes that her offense is serious and requires punishment. The past 21 months has been a severe punishment. Even the government recognizes that her time on pretrial detention has been "uniquely challenging." Dkt. 108 at 8. When pretrial incarceration is more difficult than it usually is, a shorter period of incarceration is appropriate. *See Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (calling for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant); *United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) (reducing sentence where defendant's pretrial conditions were "qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case"); *United States v. Francis*, 129 F. Supp. 2d 612, 619-20 (S.D.N.Y. 2001) (reducing sentence in acknowledgment of "the qualitatively different, substandard conditions to which the Defendant was subjected" in pretrial detention). For example, courts regularly acknowledged that COVID caused an unusual harshness of incarceration and imposed terms of imprisonment substantially less than the bottom of the defendants' advisory ranges. *E.g.*, *United States v. Piper*, 18-cr-008 (AMD) (E.D.N.Y. June 25, 2020) (imposing time-served sentence on resentencing where bottom of guidelines range was 63 months). *See also, e.g., United States v. Camacho*, 19-cr-389 (CM) (S.D.N.Y. Nov 19, 2020) (imposing time-served sentence where bottom of guidelines range was 57 months); *United States v. Paulino*, 19-cr-607 (AJN) (S.D.N.Y. Oct. 21, 2020) (imposing time-served sentence where bottom of guidelines ranges was 27 months). Because Ms. Sternquist's pretrial incarceration has been exceptionally challenging, it has been a greater punishment and deterrent than it would have been otherwise.

A sentence without further incarceration would also avoid unwarranted sentencing disparities. Below-guideline sentences are common in this district for people convicted of gun possession. *United States v. Kyle Balkissoon*, 21-cr-186 (EK) (5 years of probation; guideline range of 70 to 87 months); *United States v. Rondelle Esters*, 21-cr-398 (EK) (guideline range of 30-37 months, sentenced to time served of approximately four months); *United States v. Maurice Mizrahi*, 22-cr-504 (DLI) (sentenced to 18 months; guideline range of 37 to 46 months); *United States v. Liggins*, 20-cr-133 (RPK) (sentence of time served of approximately three months and two years of supervised release on a guideline of 10 to 16 months); *United States v. Darnell Braxton*, 20-cr-237 (LDH) (sentence of 5 years of probation; guideline range of 30 to 37 months); *United States v. Belton Brabham*, 18-cr-186 (FB) (non-jail sentence with guidelines of 92 to 115 months); *United States v. Benjamin Council*, 18-cr-417 (MKB)

(time served of about 8 days; guideline range of 33 to 41 months); *United States v. Christopher Manuel*, 18-cr-0627 (JS) (sentenced to time served on 1 day in custody and two years of supervised release; guideline range of 15 to 21 months); ); *United States v. Rodriguez*, 18-cr-0581 (LDH) (guideline of 21-27 months; sentenced to 5 months); *United States v. Michael Willis*, 15-cr-472 (ARR) (5 years of probation with first 15 months on curfew; guideline range of 84 to 105 months); *United States v. Christopher Quinn*, 15-cr-210 (ENV) (5 years of probation with 6 months home confinement; guidelines range was 24 to 30 months); *United States v. United States v. Coello*, 19-cr-111 (JBW) (time-served sentence where defendant faced 70-87 month guidelines range); *United States v. Leylon Dey*, 15-cr-420 (RJD) (range of 30 to 37 months; sentenced to 3 years of probation).

That is true even in cases with much more aggravated fact patterns than presented here. *E.g.*, *United States v. Dwayne Patterson*, 21-cr-524 (PKC) (person fired gun several times; guidelines of 51-63 months imprisonment; sentenced to time served of about 5 months); *United States v. David Wright*, 20-cr-351 (ENV) (30 months of imprisonment; person shot another person in the leg); *United States v. Matthew Ottey*, 19-cr-334 (MKB) (three years of probation, when person shot gun in the air; guideline range of 57 to 71 months); *United States v. Raheem Boomer*, 17-cr-453 (ENV) (multiple shots fired; sentence of 6 months of home detention, with work permitted, and two years of supervised release). Ms. Sternquist's offense also lacks these aggravating elements: she did not shoot a gun; she never even had ammunition. Ms. Sternquist never had a gun on the streets; she only ever had a gun inside her home. The public does not need further protection from Ms. Sternquist.

> "While there are many competing considerations in every sentencing decision, a sentencing judge must have some understanding of the diverse frailties of humankind…a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (citations omitted).

Ms. Sternquist knows about being in trouble and in pain and she is desperately hoping that the Court will find a generosity of spirit in her sentencing.

\*        \*        \*

Ms. Sternquist is fully ready to rejoin the community, to focus on her rehabilitation, to lean on her friends for support, and to comply with her conditions of supervision. As an old family friend explains, "She has very deep remorse that she has not been a good citizen and has done wrong things. The positive thing to come out of her incarceration is her strong will to build a decent life for herself and society." Ex. B (Loughry letter). Others echo those sentiments: As Hannah writes, "I know Kara can rebuild her life." Ex. B (Simpson letter). Brian explains, "What makes the current moment unique is that now…she will have something she has lacked…a true support system surrounding her, filled with responsible and caring people who love her and … whose guidance she wants to respect." Ex. B (Rea letter). And they all emphasize that her friends will be there to help: "Her friends, who have been with her and supported her even when the times got rough, are all here for her when she needs help or even just a shoulder to hang on to." Ex. B (Towers letter).

As Kara herself explains, "I want to do good things for the trans and LGBTQ communities. I want to be useful to my community. I want to do good things in the world." Ex. A. I respectfully urge the Court to help her get back on this productive path now by finding that a further incarceratory sentence would be longer than necessary.

Respectfully submitted,

/s/
Allegra Glashausser
Assistant Federal Defender
Federal Defenders of New York
(212) 417-8739

# Exhibit A

I was scared and wanting to defend myself. It seemed no one else in the world would. That's the whole reason I was building those guns. I was watching the world fall apart. January 6th. Me getting attacked and the police not doing anything about it, not even referring to it as a hate crime. I was really afraid that if something happened in the world; if there was a successful coup. I already had been getting hate and death threats. I was afraid of what would happen to someone like me if they were successful. I wanted to be able to protect myself if something bad happens. I was so afraid of what was going on in the world. But I never had any intention of hurting anyone. I had no plans on going anywhere I shouldn't go with a gun. I would never put a bullet into a gun in an offensive capacity.

I felt very alone and vulnerable. Now, I am surrounded by people who I know will protect me and have my best interests in mind. I'm not worried about that anymore. I know they will protect me no matter what. I didn't realize how much people were going to be there for me.

Being in the nursing home has been incredibly hard. I lost my ability to walk. To go to the bathroom, it takes two staff members to unchain me, get me into the wheelchair and get to the bathroom. By then, I've often wet myself. I am wetting myself at least once a day. It's hard for me to get into the shower: it involves four staff members for me to just clean myself. I am constantly watched by two armed guards, 24 hours a day. It is dehumanizing. I am so grateful for my friends, who take time out of their schedules to make sure they talk to me. Without them, I would be lost. It is so difficult for them to visit me here. I get no mail. It's hard for me to even get books to read.

My hopes for the future are that I can see my dad while he's still around and take care of him. I hope to restart a career. I hope to get re-involved in the community to do good; I would love to connect to another community center. I want to do good things for the trans and LGBTQ communities. I want to be useful to my community. I want to do good things in the world.

# Exhibit B

June 3rd, 2024

The Honorable Judge Dora L. Irrizary
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Dear Judge Irrizary,

My name is Hannah. You might have seen me quietly observing from the gallery during Ms. Kara Sternquist's in-person proceedings, including during her bond hearings, furlough request, and guilty plea. I have been Kara's friend for the better part of the last decade. I hope to paint a picture of my dear friend and what I hope justice looks like for her.

Kara is a woman of strong character and resilience who is now focused on her extensive physical recovery. I would stake my financial livelihood, my reputation within our shared social communities, and my honor on a simple fact: *Ms. Kara Sternquist, my friend, is neither a violent nor a dangerous human being.*

Kara and I both live in Manhattan and occupy close, overlapping social circles in Pride, Renaissance Faire, and fandom communities. We are both transgender women engaged with activism in social, community service, and local politics out of necessity for our very existence and recognition of our rights. Kara is also a prominent *NYC Ghostbuster*. They are a troop of nerdy cosplayers who dress up in elaborate and authentic-looking costumes to go lead service events like teaching science experiments to kids at festivals, such as the one at the USS Intrepid Museum celebrating Fleet Week each year. As a Ghostbuster, Kara participated in many public events. I was a member of the *NYC Away Team* concurrently, an equivalent social and service group of Star Trek fans gathering at the same venues. This brought Kara and I together.

Kara is exceptionally handy and savvy when it comes to her craftsmanship skills. She can carve, weld, sew, and knit anything that enters her imagination. Creating, tinkering, and cosplay are central to Kara's mindset and ethos. A recent goal from before her arrest was to build out a school bus as a mobile science experiment platform in the style of Ms. Frizzle from the *Magic School Bus* book series.

Kara and I also connected through the Manhattan Jewish Community Center on the Upper West Side. I happen to be Jewish, and this JCC was notably and proudly welcoming for the LGBTQ+ community by hosting mixer events throughout the year. There is routinely a Chanukah party each winter, a Purim Party in spring, the Pride Bash for summer, and a Sukkot Party each fall, plus more. Kara was employed as an AV tech and event production lead. She was broadly responsible for preparing media, lighting, and audio equipment that needed to be set up and struck that belonged to the JCC. Sometimes she'd just put out the tables and chairs too. Or she'd run the sign-in desk, check IDs for age-restricted events, or do whatever else was needed. If things were going smoothly, she'd sit down and hang out with us and take in some of the events for herself, especially the invited guest speakers or educational programs.

Judaism has a unique tradition of intentionally hiring non-Jews in community centers and synagogues, in part because they are not bound by the same restrictions on Sabbath "work" as some Jews hold themselves to. It is common to delegate to non-Jews. Kara may not have been raised Jewish, but if she figured out that she was Jewish one day it wouldn't surprise me one bit. She has a very Jewish—caring, empathetic, fiercely motivated toward excellence—soul. She's the kind of person who thrives by finding ways to help others. Kara was the embodiment of someone who worked her hardest so that others could feel safe expressing themselves, particularly relating to faith and worship. It was critical for her, as a trans person, to feel accepted and represented in this role. This JCC—like many Jewish spaces—was a facility younger LGBTQ+ Jewish individuals felt safe to frequent, yet they equally served elder residents of the city who had comparatively less exposure to LGBTQ+ and particularly trans individuals. Kara felt that if she could pave a successful path, another trans person could come around next to achieve even greater things.

One of Kara's broader goals at her work was to build up a swim program with hours designated specifically for trans and non-binary people, whose bodies and their own perceptions of their bodies make it difficult to feel comfortable in traditionally gendered spaces like the locker rooms or swimming in a pool itself. Sharing space with other trans people, she felt, would assuage these concerns. Kara developed a monthly swim session to be open to the public at an affordable rate, lower than normal pool access, and had received positive feedback. She designed sample artwork modernizing a classic New York City "learn to swim" poster with elements of the contemporary trans pride color palate to make it instantly recognizable.

*Kara was a role model. Kara is a role model.*

Kara is a United States Navy veteran whose career was cut short by misguided policies pathologizing and ostracizing queer and trans identities. Kara is consequently disabled and has medical challenges on top of requiring assistance with some activities of daily living (ADLs). When she was arrested, she had been largely using a wheelchair. Due to spinal surgery, she lost not only strength in her legs, but also a degree of bladder control as those nerves release from between the same discs that were inflamed or damaged. This incontinence led her to using home catheters to assist with urination. No woman wants to think about catheterizing herself, yet Kara wasn't even 40 at the time. Kara's recovery remains stunted, as she has spent over a year and a half confined to one room and chained to a bed. You can't regain your ability or stamina to walk in shackles. Kara has also routinely been denied her gender-affirming hormones or prescribed incorrect medications that are inconsistent with recognized standards of gender-affirming care, by physicians who lacked expertise in such care. I am terrified that if Kara gets a longer sentence, she will be transferred to a federal facility where she will face increased risk as a trans inmate for additional harassment and denial of appropriate care. The ramifications on her body could span the rest of her life.

Kara is a wonderful, loving cat mommy. With Gia, her wife at the time, she shared in responsibilities for their cat named Houdini. Not long before Kara's arrest, I was a reference for the feline adoption agency. I talked about how Kara relished the responsibility of pet ownership and benefited from companionship as Gia and Kara were amicably separating. Kara adopted a kitten named Molly, who is thankfully safe and currently being cared for by Gia. Reuniting Kara with her kitty cat is going to be a calming and stabilizing element of Kara's reentry to society.

When Kara is released, she will have a robust support system. She will be staying at first with me at my apartment in Harlem. I have worked professionally as a hospital Patient Care Technician and volunteered as an Emergency Medical Technician. I will provide initial assistance as needed. If her needs exceed my capacity, I will help get her into a rehabilitation facility where she can rebuild her physical strength more intensely and receive additional assistance with her ADLs. In either case, I expect that she will begin venturing out slowly, as her strength permits, to rebuild her social circles in Ghostbusters, Doctor Who, and Star Trek fandoms. This will be a gradual process and she may just spend a lot of time knitting, reconnecting with her cat, and catching up on movies with me. I know the first goal will be getting herself to and from Starbucks independently to secure her favorite salted caramel coffee concoctions.

Kara will likely have to take the time to concentrate on her physical recovery and endurance before she focuses on securing employment. She has a multitude of skillsets that offer many potential paths, and I cannot wait to be her reference should she wish return to support roles serving the Jewish community of this city or its college campuses. In the short term, I have already discussed with her that my own Etsy and eBay online shops can use her talent. I plan to hire her to assist in the capacities of order fulfillment, photographing/detailing items to post up, and other related duties. Sometimes I work with local non-profits to collect old cell phones or other tech from community members that I wipe and sell to fundraise from. I am prepared to pay Kara $20/hour for approximately 8-12 hours weekly for these assorted tasks.

Another important priority in Kara's life is reconnecting with her father, who has been suffering from dementia and likely Alzheimer's. He is now in a nursing home, a development that took place since she has been in custody. His own decline followed Kara's mother's passing last year as well. Kara has worked hard to re-establish regular contact and she hopes to be involved with caring for her him upon release, once she is able. She does not want to miss out on any additional time she still may have with him.

This is all to say: Kara has a lot to look forward to, a lot of responsibility, and a lot of purpose to her post-incarceration plans that will keep her occupied and doing good in the world. I know that Kara can rebuild her life. It begins today with making sure we jumpstart her physical rehabilitation and give her the chance to step up for her loved ones. Kara is an exceptionally mindful, emotionally aware, resourceful, resilient, and intelligent individual. I hope she will merit your leniency in sentencing.

Thank you for reading my letter and do feel free to reach out. There is so much more that I can share with you about my friend Kara.

Yours faithfully,

Hannah E. Simpson

May 30th, 2024

To The Honorable Judge Dora L. Irizarry,

I write to you today in the hopes of conveying the magnitude of my respect and admiration for Kara Sternquist. Both the person she is and – even more so – the person she is becoming every day. I have personally known Kara for over four years, including this most recent year consisting of her incarceration. I am well acquainted with her capacity both for intellectual vigor as well as her contributions to the well-being of others in the form of community service, particularly through her work with the LGBTQ+ community, her volunteer work for the Jewish community, and her use of her boundless energy to bring joy to others through cosplay. The fact that Kara has led a life of such hardship and been the target of so much hatred and violence and yet she still turns her focus to the betterment of others inspires me.

I met Kara through my work as an access control physical security consultant. This work consists of evaluating access controls such as locks, RFID card systems, alarms, and SCIFs, to help organizations improve their security protocols. I am a GSA Certified safe and vault technician and am routinely hired by the Departments of Defense and Homeland Security. I also publish educational videos and articles. My career in this field spans over a 15 years and I am now the owner-partner of two physical security companies. It is through my work that I first encountered Kara, who reached out to me about working in this field. Our correspondence became regular as I came to understand her remarkable curiosity about many of the technologies and credentialing systems that we rely upon every day and her desire to use her knowledge of these systems to help others.

Kara's mind – due in no small part to the unconventional life she has been subject to for much of her upbringing and years finding her path – can see elements within a technology system that your "typical" engineer or designer will overlook. She has actively participated with me in discussions about improving security in hardware and software that will result in "ah-ha!" moments due to her insights.

1

I have shed so many tears, Your Honor, over the fact that – to put it plainly – Kara is so much like me. Kara is who I could have easily been without the incredible privilege and guidance I was fortunate enough to have in my youth.  Were it not for the love and supervision of my involved and focused parents, along with several engaged and dedicated teachers along the way, I could have just as easily made some of the poor decisions that Kara has made. If Kara had the benefit of not being a lone, curious individual, but instead if she were working under the auspices and guidance of a professional, credentialed firm, there is no doubt in my mind that her skills would have been keenly applied without allowing her curiosity to drive her beyond the border lines of good judgement. I have played over and over in my head the possibility of what Kara's present situation in life might have been like had we met sooner than we did.  I deeply believe that had Kara been afforded the same guidance and instruction in her life that I have had in mine, that she would undoubtedly be as notable a presence in our industry, or even a more prominent a figure, than I am today.

Even now though, I would still hire Kara to work at my side.  I trust her implicitly and believe strongly both in her goodwill as well as her technical insight.

Since the first days of her incarceration, Kara and I have spoken three times a week. We have a standing call Monday, Wednesday, and Friday. She never ceases to display compassion and interest in everything I'm doing. Despite her incredibly difficult circumstances, she always asks me how I am, shows consideration and empathy, and checks in on how I'm handling my projects.

Since her arrest, Kara and I have of course spoken many times about her plans for the future. She is forward-focused and committed to making a better life for herself and those around her. I have remained in touch with Kara so regularly during the past twenty months not simply because of our friendship and my deep love and appreciation for her, but because I am deeply invested in her future potential.  Once this current chapter of her life winds its course, it is my intention to continue my same deep connection to Kara and help her establish new routines and explore new horizons upon her release.  Our communication will remain just as regular and it is my intention to see that her talents and insights shall be applied productively and

finally, for the first time in her life, under the guidance and oversight of established and professional institutions.

I am aware that this is not the first time that Kara has interacted with our courts and our justice system. What makes the current moment unique is that now, when the next chapter of her life dawns, she will have something she has lacked during all previous years: a true support system surrounding her, filled with responsible and caring people who love her and whom she deeply wants to please and whose guidance she wants to respect.

I do not say this lightly, Your Honor, but I can assure you that when Kara Sternquist re-enters society upon the conclusion of this matter, I firmly believe that she will not darken the doorstep of your courtroom or of any other hall of justice in our nation ever again.

I am available to answer any questions your Honor may have regarding my work, and the type of job I could provide to Kara upon her release. Please feel free to ask Ms. Glashausser's office to relay any such communications to me and I will give them prompt attention.

Sincerely,

Brian Rea

Your Honor,

I am very sad to see Kara in the situation she is in now.

When I met this person, I saw so many endearing personal qualities - a great sense of humor, sensitive and social. A talented performer who made me laugh by pulling a quarter from behind my ear or made me smile with all the cosplay costumes.

As time passed, it became clear that he identified as she and ultimately chose the name Kara. Out of love, I accepted this transition and tried to understand it as it unfolded slowly.

I also came to understand that Kara endured significant hardship as a child, abandoned by her mother, raised by a tough and unaffectionate grandmother who loved her, but didn't know how to show it. I witnessed firsthand the struggle she felt and saw that she was trying to sort it out for herself.

As she made the final decision to transition to a female gender identity, she faced many perceived and real challenges. Not the least, she felt externally threatened and saw other transgender persons being threatened, in our society.

I have done everything I know possible to help Kara feel comfortable with her adult identity. Knowing Kara, I do believe that she means well for all the people around her.

Thank you,

Giacinta Pace

May 22, 2024

Dear Judge Dora L. Irzarry,

I met Kara completely by chance 10 years ago in a park in New York City. My Irish band had decided that for St. Patrick's day that year we would book several short gigs and play at several bars around West 4th Street and do a little mini tour. Between sets, we found ourselves near the park, so we decided to play and entertain revelers enjoying each others company there. Kara was at the same park performing contact juggling, simply entertaining people pretty much with the pure intention we were.

She allowed us to perform beside her and we kind of merged our performances, providing music for her juggling. We all got along so well, she came with us for the rest of our tour and quickly became a friend of the band.

For the next 10 years, Kara and I developed a friendship and artistic association that was based on intellectual conversations and artistic collaborations. Her girlfriend and then wife was a close friend of mine so I'd often see her when visiting and we would help each other with photographic and performance endeavors.

Over the years, I have found Kara intelligent, interesting, whimsical, and supportive. She would often come to our gigs, showing her support for our music, and engaging in deep conversations that introduced me to her own challenges after her transition and the worries of others she knew who were struggling to find acceptance. Knowing Kara through her transition from male to female, I saw how people would look at her with suspicion and sometimes disgust for just walking around in the City. And although I wasn't a confidant, I always got the impression that there was some struggle with her relationship with her family due to her transition. Kara was very empathetic toward other people going through these types of difficulties due to transitioning. She tried to reach out to these types of people with a blog that formed a loose community of people going through similar challenges she was. Kara was the first trans person I really knew well, and just by hanging out with her and listening to her experiences I really got an appreciation for the perspective of someone going through this type of physical and social change.

Kara has a creative and committed whimsy to her. When I first met her, she was someone who was living as a gender she didn't feel genuine to, and over the years, she has worked hard to learn who she is through creative expression. She enjoyed dressing up as various characters from TV shows with an amazing attention to detail and performing at comic book conventions and Renaissance Faires. She truly inhabited these characters and, as a semi-professional photographer, I always delighted in our collaborative photo shoots where she modeled her new costume ideas. We always came out with incredible photos that I was always proud of. She was easy to work with, with great ideas and an intuitive sense of presentation and we had so much fun. Our shoots were truly educational times for me who had never known someone who was transitioning. They are still some of my favorite shoots and she always supported my education of understanding people going through what she was, and never made me feel bad for my ignorance about her experience.

Kara also stayed supportive of my band for years and years. One time, when she had decided that she was going to try her hand at leather work, she custom made a penny whistle holder for three of my whistles. It has three snap holders for three whistles, is dyed with my band colors and she even hand

embossed it with my band logo, which is Celtic knot in the shape of a shamrock. She made this for me in secret and presented it to me at the Faire as a gift. It is still one of my prized possessions and I still use it for certain performances.

I tried over four or five times to visit Kara during her detention in Brooklyn, but there always seemed to be some miscommunication or mix up with my paperwork even though I have led an exceptionally clean life. Despite submitting the forms to try and visit and being approved, I was turned away three times, for reasons that I never fully understood. So, five times, I had to stay out in the lobby as her wife went into visit. It saddens me that I would travel from Manhattan into Brooklyn without a car of my own, finding myself only a hallway away from seeing her, being assured that everything was in order, and not being able to go in and visit her again and again.

I hope that after her incarceration I can see her again and help reconnect her to the artistic community and join in her continued artistic journey.


Sincerely,

David Anderson

Judge Dora L. Irizarry,

My name is Christopher Towers. I am currently Active Duty Navy stationed in Helena, Montana and have been here since 2021. I have served in the Navy for almost 20 years. I am a childhood friend and school mate of Kara Sternquist and have been around her in some form or fashion since 1994.

I have known Kara for almost 30 years of our lives. In that time, we attended school in Mexico, Missouri at Missouri Military Academy, watched her join the United States Navy in the early 2000's, talked and discussed life and the world in general, and seen her care and compassion increase and blossom with the support of friends and family over the years. Her love and passion for Doctor Who and performing for both adults and children has been magical to watch over the last 15 years.

For as long as I have known Kara, she has had a difficult time trying to fit into a world where she did not feel that she belonged. From attending an all-male school, to joining the United States Navy under the Don't Ask Don't Tell policy, to ultimately coming about and feeling like she finally belonged under the Doctor Who banner, performing for those around her, making costumes and gear for those who she knew had the same passion as she did to just belong and feel accepted in the current world we live in made the difference in her day-to-day life.

I know that Kara's life has not been the easiest, most grand, or exactly what anyone could call normal. The feelings of disassociation and unacceptance from family and friends has weighed heavily on her during many a phone call we have had. The last conversations I had with Kara she was putting together her travel bus, wanting to come out to Montana and visit the family, getting her life on track after her and her partner separated, and building a better life by returning to school for certifications in wielding and metal work so that she could be self-sufficient. In my eyes this is amazing for her and was showing that she was on a path to recovery even though she was working through severe depression and anxiety.

I would really like to see my lifelong friend's dreams come true of bringing magic, passion, and performance to those around her and to those she knows best. Her friends, who have been with her and supported her even when the times got rough, are all here for her when she needs help or even just a shoulder to hang on to. I look forward to the day when I can see Kara again and know that she is alright and doing much better in life.

//S//

Christopher Towers

April 30 2024

To whom it may concern:

My name is Mike Taylor. I am a former coworker of Kara Sternquist, whom I trusted and enjoyed working with for 5 years. I worked with Kara at the Marlene Meyerson JCC, a community center on the upper west side of Manhattan. We worked in the AV Department and the Theatre.

Kara did AV set-ups and troubleshooting for classroom media and for rentals, both of which involve understanding and discretion. Kara had the necessary professionalism to assist rental clients and was called in for sensitive rentals: She could be trusted with a national conference or a multi-floor Bar- or Bat-Mitzvah.

The Theatre had been undergoing renovation and we often worked together in the air tracing cable, cleaning and hanging lights. When working with a partner from a scaffold or ladder, trust is absolutely necessary. We also split up and took on individual projects, most of which were supposed to result in the items in question–lights, sets, cables, rigging gear– working as they did when they were new, and Kara completed these projects quickly and well.

Kara had a passion project that she kept the crew up to date on, sometimes sketching out the latest addition, sometimes asking advice on hardware or electronics: She was renovating a bus to repurpose as a mobile stage and a traveling home. She was planning puppet shows and cosplay of classic scenes. All of her spare time was devoted to mechanical upgrades, play scenes and costume designs, and the bus had to turn into different sets for all the types of performances she had in mind. Things didn't always go as planned and there were sometimes setbacks when parts had to be customized and re-formed, or a lucky scavenging find turned out to be the wrong voltage, but Kara persevered with good humor and renewed intent.

Kara is an intelligent, focused and practical individual. I have no doubt that she will find a job when she comes home, that she will quickly set to work on any opportunity that is offered, and that she will be both appreciative and earnest in following through.

Thank you for your time,
Sincerely,

Mike Taylor

May 16, 2024



Judge Dora L. Irizarry:

I am a friend of Kara Sternquist. She was born a male. At 3 days old, her Grandmother flew to California to get her because his Mother was an addict and did not want her. Jo Ann had not heard from her daughter, Kara's mother, in years. Soon after Jo Ann took custody of Kara, contact was lost again. There has never been contact with Kara's biological mother since. The grandparents, Jo Ann and Larry, adopted her. In his teens, she began wondering about being a transsexual.

I have known her since 1991 when she was a lad. That was the same year I met Jo Ann and Larry, her adoptive Mother and Father, in South Padre Island, Texas. During the next 7 years, Jo Ann and I became best friends. I didn't see much of Kara when she was young, as she was with Jo Ann or in military school most of the time during the school years. In 1997 Jo Ann and Larry moved to Florida. From that year until Jo Ann's death last May, we visited each other up to 3 times a year for weeks at a time. I would also see Kara when she was home.

I wonder how different things would be had she spent more at home with her parents going to public schools. She struggled in school, which was one of the reasons she was sent to private school, the Marine Military Academy in Harlingen, Texas. After high school she entered the Navy. It was during this time, she decided she was transsexual. While serving, she was severely beaten by fellow Navy men after they found out she was gay. That incident started her back problems, which now causes her to use a wheelchair.

After the Navy, she settled in New York City and married a lovely girl named Gia Pace. She has a cat that she misses terribly, who now is staying with Gia. Gia was with Kara during most of her transition to female. I know that Kara is grateful for the relationship with Gia. Although they are divorced, they still have a good relationship. I believe this shows the quality of person that Kara is and that Kara harbors no bad feelings.

Kara is a very talented person. For a while she was a mime performing on the streets of New York, earning enough money for a living. She thoroughly enjoys acting and has worked in quite a few festivals. Her favorite character to play is Missy in Dr. Who.

There have also been times in her life that were extremely difficult. Although she did not like to; at times she had to ask her parents for financial help. Kara had very strong feelings and thoughts that the world, people and government, are against LGBTQs. It became increasingly hard for Jo Ann and Larry to have conversations without getting into arguments about her political views and the way she was treated.

Because of these disagreements, their relationship became strained. Visits became more were infrequent and short because conversations ended up becoming awkward. Telephone conversations became that way too. Kara's father is currently in a care center for individuals with Alzheimer, and she has been trying hard to be in contact with him. She has had a hard time. Sometimes he doesn't answer his phone because he's hesitant to answer unknown numbers. I try to help them get in touch.

She is a caring, compassionate person. I know this because she worked at the Jewish center teaching art, and really enjoyed that. She wants to do the right thing and does not want to offend anyone as she is a non-violent person. I truly believe that she did not want to fight back during the assault in the Navy which caused more damage to her body.

Kara has had a very long time to realize all the mistakes she has made. We have talked many times together since her adoptive mother, Jo Ann, passed away last May. She has very deep remorse that she has not been a good citizen and has done wrong things. The positive thing to come out of her incarceration is her strong will to build a decent life for herself and society. She has every intention to become a law abiding, decent citizen, earning her own living. When she is first released, she plans to stay with a very good friend, Hannah Simpson, as she does require assistance with the wheelchair. Kara is planning to work. She's communicating with the Navy for a Navy pension which will enable her to pursue a better life for herself.

Although I live in Texas, I believe I am able to be a good influence on her, to offer good advice, be a good listener, give hope, and point her in a good positive direction.


Thank you,

Dana Loughry

Daniel Sutton



Tuesday, June 4, 2024

The Honorable Judge Dora L. Irrizary
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: United States of America vs. Kara Sternquist

Dear Judge Irrizary,

My name is Daniel Sutton and I am a friend of Kara Sternquist. I am a
member of the LGBT community of which Kara is also a member. I met
Kara through Hannah Simpson, a mutual and close friend.

Hannah, Kara, and myself served as extras during a film shoot on the
Upper West Side of Manhattan, during which time I was able to meet
Kara and socialize with her. Kara is a kind person; someone I feel
comfortable with. She does not come across as dangerous of threatening
in any way. Once released back into the community, she will have a
support system in me, Hannah, and her other friends, and we can help
guide her in making healthy and positive life choices together.

I encourage you to take these observations into consideration during
Kara's sentencing.

Thank you for your consideration,

Daniel Sutton

# Ex. C

# Excerpt Medical Records

p. 1-3:      progress notes

p. 4-10:     medication list

p. 11-15:    physical therapy plan

p. 16-19:    records from MDC 2022

p. 20-29:    records from hospitalization 2022

# Exhibit D





Canned goods inside Ms. Sternquist's apartment. Photos taken 12/1/2022





Bagged water and dry goods inside Ms. Sternquist's apartment. Photos taken 12/1/2022



More canned goods inside Ms. Sternquist's apartment.
Photos taken 12/1/2022





Bags full of long lasting food stuffs, inside Ms. Sternquist's apartment. Photo taken 12/1/2022



Clutter in Ms. Sternquist's kitchen and living area. Photo taken 12/1/2022



Photo taken by law enforcement during execution of the search warrant in Ms. Sternquist's living area (next to the kitchen).



Photo taken by law enforcement during execution of the search warrant in Ms. Sternquist's apartment.

# Exhibit E



3m    Like    Reply



**Jimmy Wade**
**Cara** so what cunt? You wanna act tough.
Bring it on little girl.





**Jimmy Wade**



2h   Like   Reply



**Jimmy Wade**



# Exhibit F