1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2
      - - - - - - - - - - - - - - - - X
 3
      UNITED STATES OF AMERICA,        : 22-CR-00473(DLI)
 4                                     :
                                       :
 5                                     :
           -against-                   : United States Courthouse
 6                                     : Brooklyn, New York
                                       :
 7                                     :
                                       : Friday, August 2, 2024
 8    KARA STERNQUIST,                 : 2:15 p.m.
                                       :
 9            Defendant.               :
                                       :
10    - - - - - - - - - - - - - - - - X
```

```
11            TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
              BEFORE THE HONORABLE DORA L. IRIZARRY
12                UNITED STATES SENIOR DISTRICT JUDGE
```

13                   A P P E A R A N C E S :

14    For the Government: BREON PEACE, ESQ.
                          United States Attorney
15                        Eastern District of New York
                          271 Cadman Plaza East
16                        Brooklyn, New York 11201
                     BY:  F. TURNER BUFORD, ESQ.
17                        ANDRES PALACIO, ESQ.
                          Assistant United States Attorneys
18

19    For the Defendant:   FEDERAL DEFENDERS OF NEW YORK, INC.
                           One Pierrepont Plaza
20                         16th Floor
                           Brooklyn, New York 11201
21                     BY:  ALLEGRA W. GLASHAUSSER, ESQ.

22

23    Court Reporter:  Stacy A. Mace, RMR, CRR, RPR
                       Official Court Reporter
24                     E-mail:  SMaceRPR@gmail.com

25    Proceedings recorded by computerized stenography.  Transcript
      produced by Computer-aided Transcription.
```

SAM      OCR      RMR      CRR      RPR

Proceedings                                    2

1                         (In open court.)

2              THE COURTROOM DEPUTY:  All rise.

3              (Judge DORA L. IRIZARRY entered the courtroom.)

4              THE COURT:  Good afternoon.  Please have a seat.

5              (Defendant entered the courtroom.)

6              THE COURTROOM DEPUTY:  Criminal cause for a

7    sentencing, Docket Number 22-CR-473, United States versus Kara

8    Sternquist.

9              Please state your appearances.

10             MR. BUFORD:  Good afternoon, Your Honor.

11             It's Turner Buford for the United States.

12             THE COURT:  Good afternoon.

13             MR. BUFORD:  And I'm joined at counsel table by

14   Officer Brian Woo from Probation.

15             USPO WOO:  Good afternoon.

16             THE COURT:  Good afternoon.

17             Please a seat.

18             MS. GLASHAUSSER:  Good afternoon, Your Honor.

19             Allegra Glashausser representing Ms. Sternquist, who

20   is seated next to me.

21             THE COURT:  Good afternoon to both of you.

22             I am going to ask everyone, please, to remain seated

23   for this proceeding.

24             Good afternoon to all of our observers in the

25   audience.

Proceedings                                                    3

1          We are here today for sentencing on Ms. Sternquist's

2     plea of guilty to Count Three of the Indictment.  And it is my

3     practice that before we get into the sentencing hearing

4     proper, that I will explain how we are going to proceed during

5     the hearing.

6          I am sure, Ms. Sternquist, that your attorney has

7     explained to you what's going to happen today, but I just want

8     to make sure that you understand the process, and that it is

9     clear also for our observers in the audience.

10          So, the first thing that I will do is that I am

11     going to place on the record everything that I have received

12     and considered with respect to sentencing for two reasons that

13     are interrelated.

14          That is so that all of you are assured that I, in

15     fact, have received everything that I should have received in

16     consideration for sentencing; and related to that, so that all

17     of you are assured that all of you have received what I have

18     received, so we are all working with the same information.

19          Next, to the extent that there are any outstanding

20     objections to the pre-sentence report that don't require the

21     holding of a hearing, and I don't see anything here that does

22     require a hearing, I will resolve those outstanding objections

23     to the pre-sentence report.

24          Next, as I am required to do under the current state

25     of federal sentencing law, I will determine what the

1   sentencing guideline range is that applies in this case.

2          Now, the sentencing guidelines have to be considered

3   under the current state of federal sentencing law, but they

4   are not binding.  They are not mandatory.  They are just the

5   starting point.

6          The Court has to consider policy considerations

7   within the guidelines, as well as any departures that there

8   might be within the guidelines, but the Court also has to

9   consider what are called 3553(a) factors, which I'm sure will

10  be discussed more during the hearing.

11         And because I have all these other things to

12  consider, I will then turn the floor over to the attorneys, so

13  that they can put on the record what their sentence

14  recommendation is and the reasons for it.

15         The law also gives you a right, Ms. Sternquist, to

16  make a statement prior to the imposition of sentence.  And if

17  you wish to make a statement, I will be happy to give you that

18  opportunity.

19         So, it is not until all of that has happened that I

20  will impose sentence.

21         Do you understand that process, Ms. Sternquist?

22         THE DEFENDANT:  Yes, Your Honor.

23         THE COURT:  Thank you.

24         All right.  So, this is what I have received and

25  there is quite a bit.

Proceedings                                          5

1          There is the pre-sentence report, along with the
2    sentence recommendation from Probation that was disclosed
3    March 29th of 2024.
4          The Government's objections to the pre-sentence
5    report, dated April 11th of 2024.
6          Defendant's objections to the pre-sentence report,
7    dated April 12th of 2024, and there were a number of exhibits
8    that were attached to that document.
9          There is the Government's response to defendant's
10   objections to the pre-sentence report, dated April 26th of
11   2024.
12         Defendant's response to the Government's objections
13   to the pre-sentence report, dated April 26th of 2024.
14         The Government's reply to the defendant's letter of
15   April 26th of 2024.
16         And defendant's reply to the Government's
17   opposition, and that letter was dated May 3rd of 2024.
18         There is the addendum to the pre-sentence report
19   from Probation addressing the various objections that were
20   made to the pre-sentence report.
21         There is the Government's sentencing memorandum of
22   May 28th, 2024.
23         The defendant's sentencing memorandum, the -- a
24   request was made, and that was dated June 4th of 2024.
25   Request was made by the defense to file under seal, and that

Proceedings                                    6

1    was request was granted.

2            There were a number of exhibits that were attached

3    to defendant's sentencing memorandum, including conversations,

4    notes of conversations with Ms. Sternquist, various letters

5    from supporters or character references for Ms. Sternquist.

6            Some portions of medical records.  I know

7    Ms. Sternquist's records are quite voluminous, but there were

8    portions that were attached, as well as some photographs and

9    snapshots of Facebook posts and photographs of

10   Ms. Sternquist's condition.

11           In addition, on June 4th, there were additional

12   objections.  This was to the addendum to the pre-sentence

13   report that was filed by defense counsel.

14           And on June 10th, there was a cover letter with

15   additional medical records that had just been obtained by

16   defense counsel.

17           And I believe those have been provided to Probation,

18   correct, Ms. Glashausser, the --

19           MS. GLASHAUSSER:  I have --

20           THE COURT:  -- those from June?

21           MS. GLASHAUSSER:  I have provided Probation medical

22   records.  He's nodding his head.

23           THE COURT:  Okay.

24           MS. GLASHAUSSER:  I just don't remember what date.

25           Thank you, Your Honor.

Proceedings                                        7

1          THE COURT:  All right.  Okay.  I just wanted to make

2    sure.

3          There was also a supplemental letter that was

4    provided by the defense.  This was June 14th, one supplemental

5    letter from a character reference for Ms. Sternquist from

6    Hannah Simpson, along with some photographs; and as well as

7    additional argument by the defense in opposition to the

8    finding that defendant possessed a machine gun, under the

9    sentencing guidelines, based on a decision rendered by the

10   United States Supreme Court in Garland versus Cargill on that

11   date, June 14th of 2024.

12         In light of that letter, the Court had set a

13   briefing schedule for -- on that issue, and in response the

14   Government filed an opposition letter dated July 8th of 2024.

15   Defendant replied on July 15th of 2024.  And there was a

16   second addendum to the pre-sentence report addressing the

17   Cargill issue and the other more recent objections that were

18   raised by the defense, and incorporating the supplemental

19   medical records that were provided.

20         Also to be attached to the Judgment and Commitment

21   Order is the Preliminary Forfeiture Order that was endorsed by

22   the Court on March 13th of 2024.  There had been a briefing on

23   the issue of forfeiture, but that really does not affect us

24   here today.

25         That is everything that I have received in

Proceedings                                    8

1    connection with sentencing.

2            Is that everything I should have from the

3    Government, Mr. Buford?

4            MR. BUFORD:  Yes, Your Honor.

5            THE COURT:  From Probation?

6            USPO WOO:  Yes, Your Honor.

7            THE COURT:  And, Ms. Glashausser, from the defense?

8            MS. GLASHAUSSER:  Yes, Your Honor.

9            THE COURT:  Thank you.

10           Ms. Sternquist, I know it's a lot of paper, did you

11   have an opportunity to review all of these with your attorney?

12           THE DEFENDANT:  Yes, Your Honor.

13           THE COURT:  Are you familiar with the objections

14   that were made on your behalf to the pre-sentence report?

15           THE DEFENDANT:  I think as much as I can, Your

16   Honor.

17           THE COURT:  Okay.  But you did discuss them with

18   your attorney?

19           THE DEFENDANT:  Yes.

20           THE COURT:  Okay.  So, those objections aside,

21   taking into consideration the rest of what's in the

22   pre-sentence report, is there anything in there that you think

23   needs to be corrected?

24           THE DEFENDANT:  No, Your Honor.

25           THE COURT:  Okay.  Thank you.

Proceedings                                                9

1          The objections that were made to the pre-sentence

2     report, both on behalf -- taking together the objections made

3     by both the Government and the defense, were quite extensive

4     and I have to commend our Probation officer.  I thought he did

5     a very thorough job of outlining everyone's position and

6     outlining the Government's response and reasons there for.

7          I have carefully reviewed the addendum to the

8     pre-sentence report and concur with the conclusions that were

9     made by Probation, and so -- for all of the reasons that were

10    stated therein.  And I do note that that also did include not

11    only incorporating objections that were made by the

12    Government, but also certain objections that were made by the

13    defense.

14         So, the pre-sentence report is either not changed or

15    amended in accord with that addendum to the pre-sentence

16    report.

17         Now, with respect to the Cargill objections that

18    were raised, I did review all of the arguments that were made

19    by both sides, and I have also reviewed the addendum that was

20    prepared by Probation.  Again, I do commend Probation for its

21    thorough addressing of the issue, and the additional -- and

22    incorporating all of the additional objections that were made.

23         And I do note that with respect to paragraphs 52,

24    57, 66, and 83, all of the corrections that were sought by the

25    defense will be incorporated in the pre-sentence report.

Proceedings                                    10

1        I do agree with the ultimate conclusion by Probation

2   that is incorporated in the second addendum with respect to

3   the application of Cargill, and the position that's taken by

4   the Government that, in essence, Cargill really has no effect

5   here.

6        And I did just have a brief opinion that I wanted to

7   read into the record with respect to the issue, only because

8   this is a novel issue really.

9        So, for clarification, on June 14th of 2024,

10  Ms. Sternquist filed a letter objecting to the classification

11  of one of the firearms, which was Exhibit 22 here, as a

12  machine gun in light of the Supreme Court decision rendered

13  that date on -- in Garland versus Cargill, reported at

14  602 U.S. 406.

15       Defendant's document will be referred to as the

16  letter that's docket entry number 114.

17       The Government responded in opposition on July 8th,

18  and the defendant replied on July 15th.

19       Defendant's objection is overruled for the following

20  reasons:

21       As stated, at issue here is firearm, Exhibit 22,

22  which was examined by a firearms enforcement officer or FEO,

23  from the Bureau of Alcohol, Tobacco, Firearms and Explosives

24  or ATF.

25       The FEO observed that Exhibit 22 contains a

1    three-position safety selector allowing it to be placed in the

2    unmarked, automatic or 3 o'clock position, and in which

3    position Exhibit 22 function tests as a machine gun.

4           Exhibit 22 was assembled with an M-16 type bolt

5    carrier, with the components to fire in three-round bursts.

6           The FEO conducted four test fires of Exhibit 22 in

7    the automatic position.  The first test successfully fired two

8    rounds automatically, with a single pull of the trigger.  The

9    second and thirds tests only fired one round with a single

10   pull of the trigger, but the FEO observed a light primer

11   strike on the back of the unfired rounds.  The fourth test

12   resulted in only two rounds being fired automatically with a

13   single pull of the trigger, with the third unfired round also

14   having a light primer strike.

15          The FEO attributed the unfired rounds and the light

16   primer strikes to the hammer-follow design of the firearm,

17   which can prevent the hammer from striking with sufficient

18   force to detonate the primer of the cartridge.

19          Hammer-follow AR type firearms that shoot

20   automatically are classified as machine guns.

21          Taking all of this into consideration, the FEO

22   concluded that Exhibit 22 is a machine gun.

23          Defendant contends that Exhibit 22 should not be

24   characterized as a machine gun following the Supreme Court's

25   decision in <u>Cargill</u>.  The Government opposes, arguing that

1   Cargill has no bearing on the classification of Exhibit 22 as

2   a machine gun.  Probation in its second addendum concurs with

3   the Government's conclusion, as does this Court.

4          A machine gun is defined as "any weapon which

5   shoots, is designed to shoot or can be readily restored to

6   shoot automatically more than one shot without manual

7   reloading by a single function of a trigger."  26 United

8   States Code Section 5845(b.)

9          In Cargill the Supreme Court rejected the ATF's rule

10  that interpreted Section 5845(b) to include bump stocks as

11  machine guns because firearms with bump stocks "cannot fire

12  more than one shot by a single function of the trigger."

13  602 U.S. at 415.

14         "Between every shot the shooter must release

15  pressure from the trigger and allow it to reset before

16  re-engaging the trigger for another shot.  A bump stock merely

17  reduces the amount of time that elapses between separate

18  functions of the trigger."  That's Cargill at 421.

19         "The Supreme Court was clear that only the trigger

20  assembly is relevant when analyzing Section 5845's requirement

21  that multiple rounds be fired with the single function of a

22  trigger.  The statutory definition hinges on how many shots

23  discharge when the shooter engages the trigger."  That's

24  Cargill at 422.

25         A plain reading of Cargill and the statute reveals

Proceedings                                    13

1    that Cargill does not alter the characterization of Exhibit 22

2    as a machine gun.  Exhibit 22 had a selector that could be

3    placed in a distinct automatic firing position and it

4    contained the components to fire in three-round bursts.  More

5    importantly, it fired more than one round automatically with a

6    single pull of the trigger in two test fires.  The misfires

7    were attributable to the hammer-follow design.

8          The light primer strike in each of the unfired

9    cartridges indicates that a single function of the trigger

10   caused the firearm to operate in an automatic fashion.  If the

11   firearm was not capable of automatic fire, the hammer would

12   not have been re-engaged and there would not have been light

13   primer strikes.

14         Defendant's claim that Exhibit 22 never fired

15   automatically is unavailing.  There is no support for the

16   claim that the two instances in which Exhibit 22 fired

17   multiple rounds with a single function of the trigger were

18   misfires.

19         Instead, it is more likely that after numerous

20   attempts, the ATF -- it counters the argument by defendant

21   that instead it is more likely that after numerous attempts

22   the ATF, essentially, got the gun to misfire.

23         Instead, it appears more likely that the instances

24   where it fired one round in the automatic position were the

25   true misfires, considering the hammer-follow and light primer

Proceedings                                              14

1    strikes.  Contrary to defendant's assertion, Exhibit 22 did

2    fire automatically, unlike bump stocks, which require more

3    than a single function of the trigger.

4            "For bump stocks, a shooter must do more than pull

5    the trigger.  The shooter must actively maintain just the

6    right amount of forward pressure."  602 U.S. at 424.

7            Exhibit 22 did not need anything more than the

8    single function of the trigger to fire more than one round.

9    And see that ATF report at 6.

10           Defendant's contentions that the ATF report is

11   silent about why Exhibit 22 fired only one round at times or

12   whether the agent used a different amount of pressure on the

13   gun to get the gun to shoot two bullets are red herrings.

14           As an initial matter, the ATF report was not silent

15   as to why it sometimes only fired one round.  The

16   hammer-follow design is not always effective at detonating the

17   cartridge.  See the ATF report at 5.

18           In any event, Section 5845 does not require such

19   analysis.  All that matters is that the firearm discharged

20   more than one shot automatically by a single function of the

21   trigger and that the firearm was designed to do so.

22           Finally, Exhibit 22's lack of an auto sear does not

23   mean that it is not a machine gun.  The Supreme Court's

24   discussion of auto sears, that's S-E-A-R-S, was restricted to

25   a single footnote; and even there the auto sear clearly was

Proceedings                                              15

1  described as a sufficient, but not necessary, characteristic

2  for a machine gun.  See Footnote 4 in Cargill at 602 U.S. 420.

3          As the Government notes, Exhibit 22 is capable of

4  automatic fire without an auto sear because of the

5  hammer-follow design.  Cargill confirms the characterization

6  of Exhibit 22 as a machine gun because it fired more than one

7  round automatically with a single function of the trigger.

8  Accordingly, defendant's objection is overruled.

9          With these rulings, the sentence guideline range as

10 calculated by Probation is correct.  There is a total offense

11 level of 21, a Criminal History Category of IV, and that

12 provides a sentence guideline range of 57 to 71.

13         I just do want to note one thing.

14         I know that there was a tremendous amount of

15 discussion about whether or not the 15 cylindrical objects

16 were actually silencers or not silencers.  At the end of the

17 day, I agree with the Government, Probation agrees with the

18 Government, that, in fact, those did qualify as silencers and,

19 therefore, firearms under the guidelines and under the

20 statute.

21         Nonetheless, even if those silencers did not qualify

22 as firearms because there were already eight firearms that

23 were recovered here, the four-point enhancement would still

24 apply and there would be no change to the total offense level.

25         Aside from the objections that have already been

1    made and addressed, are there any additional objections by the

2    Government?

3              MR. BUFORD:  Not from the Government, Your Honor.

4              THE COURT:  Ms. Glashausser.

5              MS. GLASHAUSSER:  Your Honor, if I may.  I'd just

6    like to make a brief record with respect to the rulings that

7    you've made.  And I understand --

8              THE COURT:  No, your papers have been very thorough

9    and very repetitive.

10             MS. GLASHAUSSER:  But, Your Honor, with respect --

11   you just said that it -- the silencer decision wouldn't impact

12   the guidelines.

13             But, respectfully, that's -- I just want to make

14   sure that Your Honor also saw my argument with respect to the

15   partial frames and receivers --

16             THE COURT:  I did, and it's overruled.

17             MS. GLASHAUSSER:  And I just want to make sure in

18   the record because this case came out after Your Honor told

19   me not -- I couldn't put in additional cases, that the Supreme

20   Court subsequent to that decided in Loper Bright v Raimondo

21   that Chevron deference was no longer valid.

22             And with respect to reviewing the ATF's regulation,

23   which was interpreting the statute, which the Government

24   relies on with respect to that partial frame and receiver,

25   that the new Supreme Court case, which I had kind of mentioned

Proceedings                                                17

1   in my argument as something that was pending, has been

2   decided.  And that --

3              THE COURT:  I considered it and rejected it.

4              MS. GLASHAUSSER:  Thank you, Your Honor.

5              And just with respect to the machine gun argument, I

6   just want to make sure that the record is clear that I wasn't

7   solely objecting on Cargill.  I had made an argument regarding

8   Ms. Sternquist's lack of intent with respect to the machine

9   gun from my initial PSR objection.

10             So, it wasn't simply -- Cargill was merely something

11  else that supported that argument, but that objection was

12  not --

13             THE COURT:  I considered every argument that you

14  raised in connection with the application of any of those

15  enhancements and definitions.

16             MS. GLASHAUSSER:  Thank you, Your Honor.

17             With respect to additional guideline objections --

18             THE COURT:  Yes.

19             MS. GLASHAUSSER:  -- we did object, as well, to the

20  Criminal History Category calculated in the pre-sentence

21  report.

22             THE COURT:  Which I also rejected.

23             MS. GLASHAUSSER:  Respectfully, Your Honor, just so

24  I am clear, is there --

25             THE COURT:  It was fully explained in Probation's

Proceedings                                        18

1    addendum, the initial addendum to the pre-sentence report,

2    very thoroughly addressed.  And I concur with that analysis.

3              MS. GLASHAUSSER:  I just want to be sure because one

4    of our objections relates to Ms. Sternquist's petty larceny

5    conviction.

6              THE COURT:  I understand, and that point gets

7    assessed, as explained in the addendum.

8              MS. GLASHAUSSER:  But the --

9              THE COURT:  There is no need for us to spend two

10   hours here rehashing what's already been submitted by

11   Probation --

12             MS. GLASHAUSSER:  I understand.

13             THE COURT:  -- that I have adopted, which carefully

14   considered both the arguments that the Government made and

15   that defense counsel made.

16             MS. GLASHAUSSER:  Understood, Your Honor.

17             THE COURT:  The point gets counted.

18             Anything else?

19             MS. GLASHAUSSER:  Nothing that's not in my papers,

20   Your Honor.

21             THE COURT:  Okay.  Thank you.

22             As amended by way of addendum, the Court adopts the

23   pre-sentence report.

24             So, we are at the point where I will turn the floor

25   over, if you will, to the lawyers, so that they can discuss

Proceedings                                                    19

1    their sentence recommendations and reasons for it.

2              We'll start with Mr. Buford for the Government.

3              And then, Ms. Glashausser, we'll hear from you.

4              And then, Ms. Sternquist, if you wish to make a

5    statement, I'll be happy to hear from you.

6              Mr. Buford, whenever you're ready.

7              MR. BUFORD:  Thank you, Your Honor.

8              We don't have much more to say than what's in our

9    papers.  Notwithstanding the defendant's two prior felony

10   convictions, she set about acquiring the parts necessary to

11   make multiple firearms, including assault-style rifles.  Not

12   just one gun, but multiple guns, and one of which, in fact,

13   did fire automatically.

14             This is alarming conduct that was, obviously,

15   undertaken deliberately.  And when considered in conjunction

16   with the fact that the defendant was also in possession of law

17   enforcement credentials with her name and identity -- again,

18   multiple such credentials — it's hard to think of a benign

19   explanation for what was happening.

20             The defense has suggested that this was for

21   self-defense, but a couple of things, in our view, cut against

22   that.  One is just the number of the guns.  The other is the

23   presence of the silencers, which, as we point out in our

24   papers, are not defensive weapons.  These are weapons that are

25   offensive in nature, designed to muffle the sound of gunshots

Proceedings                                             20

1   so that they go undetected.

2            When one looks, as we say in our papers, at the

3   overall trajectory of the defendant's criminal history, the

4   offenses appear to be increasing in severity.  And -- and for

5   that reason, we believe a guidelines sentence is appropriate.

6            We acknowledge the defendant's health situation and

7   history here is a mitigating factor that is fair for the Court

8   to consider, but on balance, our assessment of the seriousness

9   of this conduct ultimately weighs in favor of a guidelines

10  sentence.

11           THE COURT:  Thank you.

12           Ms. Glashausser.

13           MS. GLASHAUSSER:  Thank you, Your Honor.

14           Ms. Sternquist has been shackled to a bed in a

15  nursing home or a hospital for 23 months now.  It has been, I

16  think, indescribably hard for her, both physically and

17  mentally.  She had a life-threatening infection at the

18  beginning of this case because of MDC's lack of care, and then

19  the way they tried to provide care, that is likely to impact

20  her future ability to get gender affirming surgery.

21           She came to this case partially paralyzed, but with

22  the hope of regaining feeling in -- in her lower extremities,

23  but she's only had physical therapy while shackled, and a very

24  limited amount.  She's made almost no progress in these two

25  years.

Proceedings                                    21

1          She's in constant pain.  And for the past,

2    approximately a month, where she's been moved around, she's

3    just missed many, many days of pain medication.  Now she's

4    having a lower dose that kind of comes when it comes, and it

5    is very unclear how to fix that problem.

6              Meanwhile, she has a bowel tear that's untreated.

7    She's left sitting in her own urine and feces for hours on

8    end, and she's completely by herself.  She's in conditions

9    that would be like being in solitary confinement, or I should

10   say she's by herself, except she is under watch twenty-four

11   hours a day by people who are not talking to her.  So there's

12   no social interaction, but are watching her.  So, there's no

13   privacy.

14             Psychologically, this has been extremely scary and

15   debilitating, and I've watched her mental health suffer.

16   Obviously, we've all watched her physical health suffer, but

17   her mental health, too.  It's been so hard.

18             And I've struggled with this case because it's hard

19   to really put it into words.  Even just visiting the

20   facilities -- the facilities that she's been shackled in have

21   been hard for me.  They are not places that anyone would want

22   to be.

23             These things are all extremely alarming to me, that

24   that's how our system was set up to help somebody that really

25   needed physical care while she was incarcerated.  But

Proceedings                                          22

1   importantly, my hope for Your Honor is today is that because

2   of how hard it has been, this 23 months has had a really

3   outside effect on punishment and deterrence.  And I know that

4   the Court has considered those things in the COVID era.  This

5   is different, and in many ways way worse.

6           As Ms. Sternquist was explaining it to me just today

7   in talking about sentencing, she was saying, I cannot do this

8   again.  And she -- she means so much by that, not just that

9   she cannot do something to land herself in this position, but

10  that she just can't physically put herself through this sort

11  of circumstance again.

12          That is something that I think Your Honor should

13  really strongly consider in assessing the goals of sentencing,

14  both the ones about punishment and deterrence, but also the

15  ones for the need for effective treatment.  What

16  Ms. Sternquist really needs is treatment on the outside, in

17  the community, where she is able to do physical therapy where

18  she can actually try to move outside of her room.  I mean,

19  right now she is just at standing up, but with that goal in

20  mind.

21          Briefly to address her -- her -- her conduct and

22  while we're here, the Government just said that it was hard to

23  think of an explanation and contemplate that this was

24  self-defense, but we have put in so much information to show

25  that this was for self-defense.  And it's surprising to me to

Proceedings                                23

1   hear the Government still say the same things 23 months later

2   that they had on day one --

3         THE COURT:  Where in the statute does it provide an

4   affirmative defense of self-defense for a felon to be in

5   possession of a firearm?

6         MS. GLASHAUSSER:  I apologize, Your Honor.  I

7   definitely don't mean that at all.  I'm not -- I'm not -- I'm

8   not providing an affirmative defense and I am not excusing her

9   conduct.

10        THE COURT:  Because I have had gang bangers sitting

11  right there in that seat who are involved in all kinds of

12  terrible crimes, they're going out, they're murdering people,

13  they're assaulting people, they're robbing drug dealers and so

14  on; and then I had to have the gun for self-defense.  There is

15  no defense there either.

16        MS. GLASHAUSSER:  Definitely, Your Honor.  And I'm

17  not in any way suggesting that at all.

18        However, the Government has painted a totally

19  different picture of what happened here than the reality.

20        Ms. Sternquist had guns that she, a hundred percent,

21  should not have and were against the law and she was not

22  allowed to have, putting aside our Second Amendment argument.

23  But she had them out of a place of fear.  She did not plan to

24  do anything like what the Government is suggesting,

25  speculating.  And the Government knows that because they have

Proceedings                                              24

1    gone through all of her electronic devices.  She had a large

2    presence online.  They have all of that information.  And in

3    all of that information, they have never pointed to anything

4    that supports their theory.

5            Instead, we have presented it to Your Honor in

6    various -- at various points in our motions and sentencing

7    that they showed that she was scared and that she had these

8    guns out of that fear.  She never had any ammunition.  She had

9    no intention to do anything like what the Government is

10   suggesting.

11           With respect to the arguments about the number of

12   items she had, that's why I included those pictures of her

13   home.  Ms. Sternquist, and I say this affectionately, is

14   really a quite -- she's a hoarder.  Her home was full of

15   stuff.  A collector is a nice way to say it, and I think

16   she -- she -- that's part of her personality.  When she gets

17   into something, she tends to get many of those items.

18           THE COURT:  But she has a history of collecting law

19   enforcement badges, false law enforcement badges for the CIA,

20   for the DEA, Department of Defense, the Navy, DEA, DEA Task

21   Force, U.S. Marshals, Food and Drug Administration.  And in

22   her prior convictions for the same thing, for the very same

23   thing, two federal convictions for the same thing for having

24   those items, in addition to fake -- the driver's licenses from

25   different states, to having credit cards.  Some of these

Proceedings                                                        25

1    things were stolen.  And she was selling them online.

2            So, it goes beyond hoarding and it goes beyond

3    collecting.

4            And her Comic Con activities, her -- the play acting

5    and all of that that she engages in, those characters,

6    according to the letters and everything that was submitted in

7    the defense papers are for what?  For Ghostbusters, Star Trek,

8    Dr. Who characters.

9            So, where in that mix are identifications for

10   U.S. Marshals Service, another agency for which she had badges

11   and false identification?

12           Hoarding does not explain that.

13           MS. GLASHAUSSER:  So, hoarding and collecting

14   explains the numbers, Your Honor, and that's what I'm trying

15   to convey, that it -- that is not something that is more

16   alarming.

17           And the badges aren't -- are not related to her

18   convictions today.  Those are -- that's a separate --

19           THE COURT:  It's all relevant conduct and I can

20   consider that, the same way that I can consider dismissed

21   conduct.

22           MS. GLASHAUSSER:  So, Your Honor I do not believe

23   it's relevant conduct or conduct, but I accept Your Honor's

24   ruling on that.

25           My underlying point is that Ms. Sternquist was

Proceedings                                                    26

1    somebody who was afraid for her life because of her basic

2    identity.  She had been attacked on the street because she was

3    a transgender woman.  The police did not help her.  She'd been

4    attacked online, threatened with her life because of her

5    identity, and she was scared.

6              And that's not -- that's not to excuse her conduct,

7    but to explain it.  And to also explain why this won't happen

8    again.

9              Today, Ms. Sternquist has, and knows she has, the

10   full support of her friends, two of whom are in the audience

11   today.  Hannah, who she hopes to live with.  And her friend

12   David, who wrote a letter to Your Honor as well.  And she has

13   many other letters, as Your Honor read.  More people planned

14   to be here, but were unable to travel for this -- just for

15   this particular day.

16             But she has that support and she also knows she has

17   it.  She recognizes it and knows to rely on it, rather than

18   getting into this sort of isolation that she found herself in

19   before.

20             That conduct is not some -- is not conduct that

21   merits the sort of sentence that the Government is requesting,

22   that Probation is requesting, especially when considering her

23   conditions of confinement.

24             I apologize, Your Honor, I just want to see what

25   Ms. Sternquist has written to me.

Proceedings                                              27

1          (Pause.)

2          MS. GLASHAUSSER:  Ms. Sternquist's current

3    conditions, as dire as they have been, and her -- her -- her

4    paralysis shortly before her arrest are also just the latest

5    in a lifetime of extreme hardships.

6          Ms. Sternquist was born in jail.  Her mother

7    abandoned her when she was a toddler and she's never been able

8    to find her.

9          She went to an all boys boarding school, which was

10   extremely difficult as -- as young Kara was then, knew that

11   she was a girl, but had to pretend to be a boy in an extremely

12   harsh environment.  When that didn't work out for her, she was

13   sent overseas to a school where she was abused.  And, yes, she

14   had a lot of trouble and had a criminal history in the years

15   following that.

16         Leading up to this case, though, she had gotten on

17   track.  She had a decade of time where she was working, had

18   started to achieve some stability.  And that is something that

19   she can get back to, she has the tools to get back to it and

20   she has the support to do so.

21         THE COURT:  Well, why didn't that stability prevent

22   her from feeling the need to go out and get parts to make

23   ghost guns?

24         MS. GLASHAUSSER:  Because of that fear that she had

25   been feeling at that time, and not relying on her support

1    system in that time of her life.

2            THE COURT:  And she also had an open felony case in

3    local court for criminal mischief as a felony.

4            And I could tell you, having been in the state court

5    system for 23 years, it's unusual to get criminal mischief as

6    a felony.  Over $30,000 in alleged damage to a storefront.

7            So, in that ten years it is not like it was

8    unblemished.  She had an open case when she got arrested here.

9            MS. GLASHAUSSER:  Yes, Your Honor, that --

10           THE COURT:  Which is typical.  She has one case

11   after another.  While she's on bond on one case, she gets

12   arrested for something else.  She violated every term of

13   supervised release in her federal convictions.

14           MS. GLASHAUSSER:  So, the local case was resolved

15   with a disorderly conduct.

16           THE COURT:  When?

17           MS. GLASHAUSSER:  I -- during -- it was a number of

18   months ago, while she was at the nursing home.  I facilitated

19   that with her -- her local lawyer.  I could get Your Honor the

20   date, but I don't have it at my fingertips.  It may be in the

21   PSR objections.

22           But, you're right, that was in the same time

23   period -- this is around the same time period leading up to

24   her arrest in this case, where she had a period of doing

25   extremely well, and was still doing extremely well at her job,

Proceedings                                             29

1   and then had this -- fell into this fear.  And that's why

2   we're here today.

3         But it -- I don't think it's fair to consider her

4   young -- her much younger life, where she was getting in --

5   where her criminal history is coming from, where her

6   convictions are coming from with who she is today.  Because

7   who she is today --

8         THE COURT:  She was no child when she got the

9   federal convictions.

10        MS. GLASHAUSSER:  I'm not suggesting she was a

11  child, Your Honor, but there was a ten-year -- approximately

12  ten-year gap.  Those prior convictions, she had not yet fully

13  come out as a woman.  She was homeless at a number of points.

14  She was bouncing around between states with a complete lack of

15  stability.

16        And for her, fully coming out as a woman, being able

17  to live as herself, was an extremely important life turning

18  point, and one that was extremely hard in her family, that her

19  parents had a lot of trouble accepting, and were still -- her

20  mother was still working on that when she died.

21        It -- Kara is writing notes to me kind of

22  reiterating these same themes of how after her divorce that

23  she was feeling very lonely.  And that she was threatened and

24  attacked.  All of those things were leading up to the

25  conviction here -- to the conduct, the conduct here.

Proceedings                              30

1          Importantly, she is not -- that will not happen

2     again, and I think there are so many reasons why not.  First

3     of all, Ms. Sternquist is now disabled, which happened shortly

4     before her arrest in this case.  Her life had dramatically

5     changed shortly before she was arrested.  She was just getting

6     used to how to handle that, how to address her partial

7     paralysis, how to try to get better, how -- how to live as

8     a -- with a disability.

9          And then -- and then she was arrested and has now

10    spent these 23 months with really nothing to think about,

11    nothing but her own thoughts rattling around in her head.  And

12    occasionally, I was allowed to bring a book.

13         What Ms. Sternquist also said to me shortly before

14    coming up here, Your Honor, is this time spent shackled to the

15    bed for 23 months, it's been so dehumanizing that her real

16    hope for today was for Your Honor to see her as a human.  And

17    not just as a human, but a full human being who is loving, who

18    is giving, who is there for her friends who are like her

19    family.  And for Your Honor to see that really she needs to be

20    sent back to the community, to a new home with her friend

21    Hannah.  And probably to a new rehabilitation facility, in all

22    likelihood, where she can start to heal her body and get back

23    on the track that she was on before.

24         So, I am urging Your Honor to really consider these

25    certainly uniquely hard conditions.  In my practice, I've

Proceedings                                        31

1    never experienced a case like Kara's.

2            And honestly, my whole office knows about it.  It's

3    just -- it's such a sad situation visiting her and seeing her

4    there unable to move, but shackled to the bed, and in such

5    physical dire straights.  And unable to even get basic

6    medication or medical appointments or see the doctors when she

7    needs to.

8            So, I am urging Your Honor to see that that is

9    enough in this circumstance to meet all of the goals of

10   sentencing.  And that sending her to another BOP facility,

11   that would likely be similarly bad or bad in different ways,

12   would serve no goals of sentencing and would just physically

13   injure her more, while not making her better prepared to come

14   back to the community.

15           Despite all of that, Kara has been working with any

16   service that she gets.  You know, at the original facility,

17   sometimes a social worker would come and talk to her from the

18   facility, and she always was open with them.  When physical

19   therapy came, she was always ready to do it.

20           She has been focused on, even in her little room,

21   doing everything she can.  Staying connected to her friends,

22   talking to them as much as she is allowed, to make sure that

23   she is ready to be the person that I know that she can be,

24   that her friends know that she can be, and I hope that Your

25   Honor can see.

Proceedings                                      32

1          THE COURT:  Thank you.

2          Ms. Sternquist, as I said, you have a right to make

3    a statement to the Court.

4          Do you wish to make a statement?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  Okay.  You can take your time.

7          Did you write anything today?

8          THE DEFENDANT:  It's been very difficult in the days

9    and weeks leading up to this, because of my medication

10   situation, for me to focus on anything to write.  So --

11         MS. GLASHAUSSER:  She planned to write something,

12   but with the move -- with the two moves --

13         THE COURT:  Yes.

14         THE DEFENDANT:  It's been difficult to put anything

15   in coherent words.

16         THE COURT:  Okay.  Just take your time.

17         THE DEFENDANT:  But --

18         THE COURT:  Take a deep breath and take your time.

19         THE DEFENDANT:  -- one -- one part of the picture

20   that's been me -- painted of me is -- one side of the picture

21   that's been painted of me is in regards to the badges that I

22   had.  I just wanted to clarify something.  I never had any ill

23   intent.  I want to make clear that I am not excusing any kind

24   of conduct or anything, just that the picture is not what it

25   appears to be.

SAM      OCR      RMR      CRR      RPR

Proceedings                                                33

1          I have only ever wanted to give presentations to the
2  information security world in order to use the -- the
3  information that I had gained when I was younger and stupider
4  and since -- and got in trouble, to do good.  To show people
5  security flaws and things like that.
6          It was a career move that I was hoping to make.  It
7  was not an intention of doing something wrong, but I can
8  under -- I can see how that picture got painted.  And just --
9  that's just a brief side note in everything else.
10         I never -- I never wanted that to get confused with
11 what's real in my life.  And what's real in my life is that my
12 mother just passed.  I need to take care of my father.
13         I have -- I've been through every mistake that I've
14 made, every mistake that I've made leading up to this over and
15 over and over and over and over every day.  And all I want to
16 do is do the right thing from now on.
17         I just -- I just want to take care of my family
18 while they're still there.  I just -- I just want to get out
19 and -- and be with my dad, so that we can grieve my mom.
20 Every time I call him, he talks about how much he misses his
21 wife.  And I'm really the only thing he has of his wife to
22 remember.  I just want to be with him.  I just want to be
23 there for him.
24         And I just don't have it in me to make mistakes like
25 I've made leading up to this case.  Regardless of what picture

SAM      OCR      RMR      CRR      RPR

Proceedings                                                    34

1    is being painted, I can't take the chance to make mistakes

2    like this ever again.  I don't have it in me physically.  I

3    don't have it in me mentally.  I don't have it in me

4    spiritually.

5         I cannot wind up doing more time as a criminal,

6    especially under these kind of circumstances.  It's broken me.

7    It's broken me of any desire to do anything that I shouldn't

8    be doing.

9         All I want to do is be a contributing citizen to the

10   world, like I was trying my best to when I worked at the JCC,

11   when I worked with Make-A-Wish Foundation, when I worked with

12   the New York City Ghostbusters and other -- and other

13   organizations that I was in, that I was constantly trying to

14   give back with.  I've only ever wanted to give back.

15        And I'm sorry.  I'm sorry I let my fear run me.  I'm

16   sorry I made so many mistakes because of that fear.  I -- I

17   can't let myself be run by fear and live in fear like that

18   ever again.  It will kill me and I don't want that.

19        I want a long, happy life with my friends and my

20   family.  I just -- I just want to do what's right in the

21   world.  I don't want to do anything wrong.  I'm sorry that I

22   have had such a screwed-up past.  I don't want to go back into

23   that past.  I want to move on.

24        This time it's been so lonely and so difficult,

25   difficult on me just managing my pain.  I have sat with a

Proceedings                                      35

1    Level 7 to a Level 10 pain most days I've been incarcerated

2    during this time.  And that -- living with that kind of pain

3    and living with the inhumanity of some of the things that I've

4    had to suffer through.  I've had a stroke, I had a pulmonary

5    embolism, a life-threatening infection; and all because of my

6    disability and people's inability to care for me.

7            I -- I -- I cannot, I cannot do this again.  It will

8    kill me and I don't want that.  I want to live a long, happy

9    life doing the right thing all the time.  All I want is to do

10   the right thing.

11           I'm sorry that -- that -- that -- the pictures being

12   painted are really screwed up.  I -- I never intended that.

13   And it won't ever happen again because I won't let it happen

14   again.  If I find myself living in fear because of threats, I

15   will rely on my family and friends to help me and to protect

16   me and keep me from making these kinds of mistakes again.

17           I -- I don't know what else to say, Your Honor.  I

18   just -- I just want to do good in the world.  I just want to

19   give back.  I pay my taxes.  I try to do my best.  I try to

20   give back to every community I can.  And I'm sorry I screwed

21   up in the middle of that.

22           The last ten years have been the best years of my

23   life and I don't want to go down the road that I went through

24   in my earlier years, when I was homeless and destitute and

25   just didn't have anybody.  That was the worst time of my life.

Proceedings                                                    36

1    And I want to think that the best years are ahead of me, not

2    behind me.

3           I'm very sorry, Your Honor, for every mistake I've

4    made.  I'm not always the best at making judgments, but I know

5    that relying on my friends and family to help me make good

6    judgments in the future will keep me off that path.  And

7    that's all I want.

8           That's all I have to say, Your Honor.

9           THE COURT:  Okay.  All right.  Thank you.

10          As I noted in the very beginning of this proceeding,

11   there is a lot that the Court has to take into consideration

12   in determining what is a reasonable sentence in this or in any

13   case.

14          We start with consideration of the advisory

15   sentencing guidelines, even though they are not mandatory, but

16   they are the starting point.  We start with a calculation of

17   the guidelines range.

18          The Court also considers any policy considerations,

19   any departures that might be available, whether they go above

20   the guidelines or below the guidelines.

21          And the Court also has to consider what are called

22   3553(a) factors.  And those factors, very simply, are goals

23   that Congress determined should be accomplished whenever a

24   federal judge imposes sentence.  Those goals are what we call

25   factors, it's the same thing.

Proceedings                                    37

1          And Congress put it in a statute in Title 18 of the

2     United States Code, Section 3553(a).  That statute starts with

3     something called a parsimony clause that says that whatever

4     sentence the Court imposes should not be greater than

5     necessary to achieve those goals of sentencing.

6          Not every goal applies in every case.  For example,

7     restitution is a goal, but restitution is inapplicable here.

8          The Court has considered the nature and

9     circumstances of the offenses here, the history and

10    characteristics of Ms. Sternquist, the defendant before the

11    Court.

12         The sentence should reflect the seriousness of the

13    offense, promote respect for the law, and provide just

14    punishment for the offense.

15         It should afford adequate deterrence to criminal

16    conduct generally in society as a whole, that's called general

17    deterrence.  And to protect the public from any further crimes

18    that the defendant might commit, that's called specific

19    deterrence.

20         The sentence should provide a defendant with any

21    needed educational or vocational training, medical care, and

22    other correctional treatment in the most effective manner.

23         There was some discussion in the defense papers

24    about avoiding unwarranted sentencing disparity among

25    defendants; and in this case, would be among defendants

Proceedings                                    38

1    charged with being felons-in-possession of a firearm.

2            I do have to say that there was a whole laundry list

3    of cases, but I am sure that the factual backgrounds of all of

4    those cases is quite varied.  So, it is always difficult to

5    make a comparison when not doing a deep dive into the specific

6    background facts of each particular case.

7            There is no question that the offense here is

8    serious and this isn't just a run-of-the-mill

9    felon-in-possession of a firearm.  What we have here is a

10   person who bought pieces online and created what are commonly

11   called now ghost guns, which provides -- which creates a

12   specific danger.

13           When those guns get out into the community, they are

14   not traceable.  They do as much damage as a regular gun.  And

15   there wasn't just one gun for self-defense, there were

16   multiple guns.

17           I've already made a finding that there were

18   silencers as well.  Although not in a complete and final form,

19   but they were capable of being adapted for such.

20           And given all the letters that have been written in

21   support and testament to the intelligence and creativity of

22   Ms. Sternquist, and apparent handiness in creating things,

23   knowledge in welding, knowledge in working with metal, working

24   with wood, working with all sorts of things, it is not beyond

25   the imagination to think that — I think the estimate was what,

SAM      OCR      RMR      CRR      RPR

Proceedings                                        39

1    five minutes — under five minutes to create a silencer

2    drilling where there was a dimple at the end.

3            But beyond that, the Court does have to take into

4    consideration the circumstances here and the investigation

5    leading up to the arrest here, and the finding of these law

6    enforcement badges of all the different agencies I mentioned

7    earlier.  There were also passports, multiple passports.

8            There were also New York State drivers' licenses

9    with corresponding credit cards or -- in other words, names of

10   the same individuals.  Those were legitimate New York State

11   drivers' licenses that had been either reported lost or

12   stolen.  The same thing with the credit cards.  And in one

13   case with one of the credit cards, there had been some

14   unauthorized charges or withdrawals.

15           So, it is beyond any understanding about how

16   possession of any of those items had to do with the

17   defendant's fear for her life.  Especially, putting it in

18   context of her prior convictions.

19           And I'm not even going to go into all the earlier

20   convictions because, frankly, a Criminal History Category of

21   IV underestimates the defendant's criminal history here.  And

22   she was treated rather leniently, for the most part.

23           But her two prior felony convictions that were in

24   federal court were for possession of similar items, so she

25   knew that that was illegal.  She had been convicted twice of

Proceedings                                        40

1   that.  Twice.  What's scary about the prior two convictions is

2   that she was selling them online.

3           And, in fact, in the second case, she was -- it

4   turns out, she was selling them to a federal undercover.  And

5   in that second case -- I'll continue when you're ready to pay

6   attention.

7           MS. GLASHAUSSER:  We are paying attention, Your

8   Honor.  I was taking a note of what you were saying.

9           THE COURT:  You were having conversation.

10          MS. GLASHAUSSER:  I'm sorry, Your Honor.  I was

11  just -- I meant no disrespect in any way.  I'm listening very

12  intently and noting things down.

13          THE COURT:  In that second case, the defendant was

14  also selling New York State birth certificates, blank birth

15  certificates, which the undercover managed to buy.

16          And in an age where we have already suffered in this

17  country terrorist attacks, and continued to have to deal with

18  that specter hanging over our heads, I don't understand for

19  the life of me why people forget that we lost more than thirty

20  -- 3,000 American lives on 9/11, right here on our soil.

21          To have identifications like that available on an

22  open internet market is a scary thing.

23          And then you add to that ghost guns that cannot be

24  traced.  And I'm sorry, but eight firearms are not for

25  self-defense.  And as I said before, it is not a defense.

Proceedings                                               41

1    There is no affirmative defense for being a felon-in-

2    possession of a firearm.  And Ms. Sternquist knew she was --

3    had two felony convictions.

4              Of concern, too, one of the letters from one of the

5    supporters, who happens to be an employee of GSA working on

6    secured access for federal buildings, was taking the defendant

7    along on jobs and teaching her about secured access.  And the

8    defendant was coming up with ideas on how to fix systems and

9    so on.  As she, herself, said, fixing weaknesses.

10             Well, the whole idea of having phony law enforcement

11   badges and ghost guns in the hands of somebody who is aware of

12   security weaknesses in federal buildings is a frightening

13   prospect.

14             And some of the websites that she was on were very

15   clearly expressing anti-law enforcement sentiment.  And there

16   is no doubt that given the horrors, because they are --

17   concededly, they are horrors that she went through at the

18   military academy as a kid, in the Navy, it's horrific.  No one

19   should have gone through that for any reason.  But the Navy

20   was another agency that she had phony ID badges for.  And it

21   is not a far stretch to think that she might have a slight axe

22   to grind with the Navy or even with NYPD for their failure to

23   protect in her time of need, which also is unconscionable,

24   that should not have happened.  As the saying goes, two wrongs

25   don't make a right.

Proceedings                                              42

1        And you're asking the Court to take on faith, on

2   blind faith at that, that Ms. Sternquist is going to comply

3   with whatever conditions the Court places on her, when she has

4   clearly demonstrated an utter lack of ability to do that.

5        While on bond she committed new crimes, sometimes

6   several crimes.

7        She failed to comply with the conditions of

8   supervised release in her first federal conviction, resulting

9   in additional jail time, which is part of the reason why she

10  got three points for that conviction.  And then she got 12

11  months for that, plus additional jail time, four months for

12  the violation of supervised release.

13       And I have to say, given my experience, twenty years

14  on this court, it is not often that defendants get sentenced

15  to jail time for a violation of supervised release.  It takes

16  a serious violation of the Court's trust for that to happen.

17       And then she has a second conviction where she's

18  sentenced to 27 months in federal court.  Again, for the same

19  thing.  And she gets violated again, this time for six months'

20  jail time, because she couldn't comply with the conditions.

21       There is absolutely no doubt that the conditions at

22  the MDC are horrible.  We see that documented every day almost

23  these days.  The medical treatment is terrible.  I have been

24  on the verge of holding them in contempt myself on other

25  cases, as counsel well knows.  And I certainly have taken that

Proceedings                                                      43

1    into consideration.

2            And, quite frankly, but for the fact that

3    Ms. Sternquist does have the conditions that she has, I would

4    have considered a significant upward variance from the

5    guideline range as a sentence in this case.  But she has,

6    indeed, as counsel has stated on the record, both orally and

7    in the submissions, suffered more than the average inmate has

8    suffered.

9            That being said, a sentence of time served is not

10   appropriate in this case under all of these circumstances.

11   And a sentence at the lower end of the guideline range is

12   appropriate.

13           And the Court imposes a sentence of 60 months, with

14   three years of supervised release to follow, with the

15   following special conditions:

16           The defendant must submit her person, property,

17   house, residence, vehicle, papers, computers, other electronic

18   communications or data storage devices or media or office to a

19   search conducted by a United States Probation officer.

20   Failure to submit to a search may be grounds for revocation of

21   release.

22           The defendant shall warn any other occupants that

23   the premises may be subject to searches pursuant to this

24   condition.  An officer may conduct a search pursuant to this

25   condition only when reasonable suspicion exists that the

Proceedings                                        44

1    defendant has violated a condition of his supervision and that

2    the areas to be searched contain evidence of this violation.

3    Any search must be conducted at a reasonable time and in a

4    reasonable manner.

5             In addition, the defendant shall participate in a

6    mental health evaluation; and, if necessary, a treatment

7    program as approved by Probation, and contribute to the costs

8    of such services rendered and/or any psychotropic medications

9    prescribed to the degree that she is reasonably able, and

10   cooperate in securing any applicable third-party payment and

11   disclose all financial information and documents to Probation

12   to assess the ability to pay.

13            You may not possess any firearm, ammunition or

14   destructive device.

15            I am advising you, as you should be very well aware

16   at this juncture, given the charge here, that as having now

17   the third felony conviction, that you are a person who is

18   prohibited from possessing a firearm.  If you are found to be

19   in possession of a firearm, you may be subjected to a sentence

20   of up to 15 years.

21            If you do possess a firearm while on supervised

22   release, you may be sentenced to additional jail time.  And

23   that sentence would run consecutive to any jail term imposed

24   for the actual offense of being a felon-in-possession of a

25   firearm.

Proceedings                                              45

1          I do want to say this.  That, again, I have read

2    everything that has been submitted by the parties and all the

3    arguments made by the defense.  And even if the defendant's

4    criminal history and total offense level should be as proposed

5    by the defense, in this Court's view, the sentence of

6    60 months under all of the circumstances is appropriate here.

7          THE DEFENDANT:  You might as well sentence me to

8    death.

9          THE COURT:  Now, Ms. Glashausser, I did have some

10   thoughts about recommendations to the Bureau of Prisons.  I

11   did want to make a recommendation that Ms. Sternquist be

12   assigned to a medical facility; Devens, Butner, and I keep

13   forgetting, there is one out in the midwest that happens to be

14   particularly good, but I'm forgetting now the name of the

15   facility.

16         But I think if, in general, I ask that she be

17   assigned to, specifically to a medical facility, number one;

18   and number two, that the Bureau of Prisons ensure that she is

19   given her gender-affirming treatment and other treatment as

20   medically necessary.

21         MS. GLASHAUSSER:  Yes, Your Honor.

22         However, I would ask Your Honor to order that she,

23   or recommend that she be at a women's medical facility.  The

24   ones you have mentioned are, I understand, only men's

25   facilities and --

Proceedings                                        46

1          THE COURT:  Oh, okay.

2          MS. GLASHAUSSER:  -- there is a women's facility in

3    Texas.

4          THE COURT:  It's --

5          MS. GLASHAUSSER:  Carswell, I believe --

6          THE COURT:  Yes.

7          MS. GLASHAUSSER:  -- it's a medical facility.

8          THE COURT:  Yes.  Yes, Carswell.

9          MS. GLASHAUSSER:  And I believe there's another --

10   there's -- a Lexington medical facility that has a women's

11   section as well.  Those are the only two women's facilities --

12         THE COURT:  Right.  Okay.

13         MS. GLASHAUSSER:  -- I am aware of.

14         THE COURT:  All right.  So, I will make that

15   recommendation as to those two facilities.

16         And, again, the Bureau of Prisons is directed to

17   provide her gender-affirming treatment and other treatment as

18   necessary.

19         Mr. Buford, I am still concerned about the surgery

20   business because it -- this has been going on since February.

21   It's August, and I don't think she's been evaluated yet for

22   the surgery.

23         Correct, Ms. Glashausser?

24         MS. GLASHAUSSER:  That's right.  She has a bowel

25   tear --

Proceedings                                        47

1          THE COURT:  Right.

2          MS. GLASHAUSSER:  -- that she's had for many, many

3    months and she has not gone to see the doctor to have what

4    they believe is the surgery.

5          THE COURT:  I don't understand what the delay has

6    been.

7          So, if I could get a report, like, by Wednesday.

8          MR. BUFORD:  Yes, Your Honor.

9          THE COURT:  And tell that medical director at the

10   MDC that if he doesn't want to be held in contempt, that he

11   needs to get on the stick about this.

12         MR. BUFORD:  Understood, Your Honor.

13         THE COURT:  What's his name, Bialor?

14         MR. BUFORD:  Dr. Bialor, yes.

15         THE COURT:  Bialor, yes.

16         There is no fine, due to inability to pay.

17         Restitution is not applicable.

18         The other counts had already been dismissed

19   previously.  There are no open counts, correct?

20         MR. BUFORD:  That's correct, Your Honor.

21         THE COURT:  And as I said, the forfeiture order will

22   be attached to the Judgment and Commitment Order.

23         You are advised, Ms. Sternquist, that you are

24   entitled to appeal from the sentence and judgment of the

25   Court.  If you do wish to appeal, you must do so within

Proceedings                                    48

1    14 days of the final entry of judgment.

2              You may be entitled to be represented by counsel on

3    appeal.  If you cannot afford counsel, you may ask for counsel

4    to be appointed for you at no cost to you.  And, of course, if

5    you cannot afford the fees and the costs of the appeal, you

6    may ask for leave to proceed by way of poor person relief.

7              Ms. Glashausser, I am going to ask that you stay on

8    for that 14-day period and file a notice on behalf of your

9    client, if that's what she wants to do.

10             MS. GLASHAUSSER:  Yes, Your Honor, I will.

11             And if now is an appropriate time, I'd like to note

12   my objection to the sentence as both procedurally and

13   substantively unreasonable.  It is much greater than

14   necessary.

15             And with respect to the guidelines --

16             THE COURT:  You can save it for your appeal.

17             MS. GLASHAUSSER:  Yes, Your Honor --

18             THE COURT:  Your objection is noted.

19             MS. GLASHAUSSER:  Just with --

20             THE COURT:  That is the sentence of the Court.

21             MS. GLASHAUSSER:  I understand, Your Honor.

22             THE COURT:  You can appeal.

23             MS. GLASHAUSSER:  Yes, Your Honor.

24             The Court of Appeals does look to whether there's an

25   objection below.

Proceedings                                                      49

1        And the decision with respect to the length of her

2   sentence was based on a determination, in part, that various

3   items did count as guns.  So, those are related directly to

4   the guidelines issues.

5        And I also just want to make sure that --

6        THE COURT:  Which have been preserved for appeal,

7   given your objections and given my rulings.

8        MS. GLASHAUSSER:  I also just want to make sure that

9   the Court -- I objected to the search condition in my papers,

10   and object to --

11        THE COURT:  You did object to the search condition,

12   but given the fact that the internet was used to access the

13   pieces that were purchased, and were purchased online to

14   create the firearms, a search condition for electronic devices

15   is most appropriate here, as is a search condition for the

16   apartment.  And it is justified by the facts of this case.

17        Is there anything else, Christy?

18        THE COURTROOM DEPUTY:  I don't believe so, Judge.

19        THE COURT:  All right.

20        Is there anything further from the parties?

21        MR. BUFORD:  Not from the Government, Your Honor.

22        THE DEFENDANT:  Just execute me.

23        MS. GLASHAUSSER:  Your Honor, Ms. Sternquist has not

24   been getting her medications at the facility.  So, if Your

25   Honor could, in addition -- I appreciate the order about her

1  bowel tear, but her -- her pain medication and her hormone

2  medication --

3          THE COURT:  What is going on with that?

4          THE DEFENDANT:  Just execute me.

5          MR. BUFORD:  Your Honor, the update that we got from

6  the clinical director at the facility was that Ms. Sternquist

7  is being provided Oxycodone as needed.  They have started her,

8  as I understand it, on other pain medications to include

9  Gabapentin and Lyrica with the --

10         THE COURT:  But I don't understand why it was

11 necessary for them to change the regimen that she was already

12 on, given that she was at the other facility for so much

13 longer and they had already --

14         THE DEFENDANT:  I was always on Gabapentin.

15         THE COURT:  -- made assessment of her condition?

16         MR. BUFORD:  It -- my understanding, Your Honor, is

17 that some of the new facilities expressed concern at the

18 dosage, given that it's opioids that are being used for the

19 pain medication, and wanted to proceed deliberately.

20         I understand Dr. Bialor was consulting with them,

21 urging them to adopt the previous regimen.  There was some

22 hesitation given the dosages, and that's what I understand

23 that they're working through now.

24         THE COURT:  Can you follow up on that and include

25 that in the update by next Wednesday, please?

Proceedings                                                    51

1           MR. BUFORD:  Yes, Your Honor.

2           THE COURT:  Okay.  All right.  You may take charge.

3      Thank you.

4           THE DEFENDANT:  Just execute me.  It would be a lot

5    cheaper.  Just have them put a bullet in my brain right here.

6           (Defendant exited the courtroom.)

7           THE COURT:  Ms. Glashausser, is she going to have to

8    be put on some suicide watch now?

9           MS. GLASHAUSSER:  She's watched twenty-four hours a

10    day, Your Honor.

11           THE COURT:  Okay.

12           (Matter adjourned.)

13

14

15

16

17                    *     *     *     *     *

18

19    I certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled matter.

20

21      /s/ Stacy A. Mace                    August 2, 2024
      _____      _____

22        STACY A. MACE                      DATE

23

24

25

                SAM     OCR     RMR     CRR     RPR